**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**APPALACHIAN VOICES**
164 South Depot St.
Boone, NC 28607

**2°C MISSISSIPPI**
212-B Draperton Ct.
Ridgeland, MS 39157

**AIR ALLIANCE HOUSTON**
2520 Caroline St.
Houston, TX 77004

**ALLEGHENY COUNTY,**
**PENNSYLVANIA**
436 Grant St.
Pittsburgh, PA 15219

**BESSEMER HISTORICAL SOCIETY**
**(D/B/A STEELWORKS CENTER OF**
**THE WEST)**
215 Canal St.
Pueblo, CO 81004

**CITY AND COUNTY OF SAN**
**FRANCISCO, CALIFORNIA**
1 Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102

**CITY OF SACRAMENTO,**
**CALIFORNIA**
915 I St.
Sacramento, CA 95814

**CITY OF SPRINGFIELD,**
**MASSACHUSETTS**
36 Court St.
Springfield, MA 01103

**DEEP SOUTH CENTER FOR**
**ENVIRONMENTAL JUSTICE**
9801 Lake Forest Blvd.
New Orleans, LA 70127

**DOWNWINDERS AT RISK**
1808 S. Good Latimer Expy. #202
Dallas, TX 75226

**HEALTH RESOURCES IN ACTION**
2 Boylston St.
Boston, MA 02116

**INSTITUTE FOR SUSTAINABLE**
**COMMUNITIES**
535 Stone Cutters Way
Montpelier, VT 05602

**INTER-TRIBAL COUNCIL**
**OF MICHIGAN**
2956 Ashmun St.
Sault Ste. Marie, MI 49783

**KALAMAZOO COUNTY, MICHIGAN**
201 W. Kalamazoo Ave.
Kalamazoo, MI 49007

**LOWCOUNTRY ALLIANCE FOR**
**MODEL COMMUNITIES**
2125 Dorchester Rd.
North Charleston, SC 29405

**MARTIN LUTHER KING JR.**
**COUNTY, WASHINGTON**
401 Fifth Ave.
Seattle, WA 98104

**NATIVE VILLAGE OF KIPNUK**
P.O. Box 57
Kipnuk, AK 99614

**PARKS ALLIANCE OF LOUISVILLE, INC.**
1711 Gresham Rd.
Louisville, KY 40205

**PITTSBURGH CONSERVATION CORPS**
**(D/B/A/ LANDFORCE)**
201 North Braddock Ave.
Pittsburgh, PA 15208

**PUSH BUFFALO**
429 Plymouth Ave.
Buffalo, NY 14213

**SOUTHWEST RENEWAL FOUNDATION
OF HIGH POINT, INC.**
501 W. High Avenue
High Point, NC 27260

**TREASURE ISLAND MOBILITY
MANAGEMENT AGENCY**
1455 Market St., 22nd Floor
San Francisco, CA 94103

**WE ACT FOR ENVIRONMENTAL
JUSTICE**
1854 Amsterdam Ave. – 2nd Floor
New York, NY 10031

*Plaintiffs, on behalf of themselves and
all others similarly situated,*

v.                                               Civil Case No.: _____

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY;**
1200 Pennsylvania Ave. NW
Washington, D.C. 20460

**LEE ZELDIN, in his official capacity as
Administrator of the United States
Environmental Protection Agency;**
Mail Code 1101A
1200 Pennsylvania Ave. NW
Washington, D.C. 20460

*Defendants.*

## CLASS ACTION COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

     Plaintiffs, individually and on behalf of a class of others similarly situated, bring this

action against Defendants United States Environmental Protection Agency ("EPA") and

Administrator Lee Zeldin, in his official capacity (collectively, "Defendants").

## INTRODUCTION

1. In February 2025, the Environmental Protection Agency ("EPA"), under direction from President Trump, began to eliminate the Environmental and Climate Justice Block Grant program—a program Congress created and funded by specific appropriations as part of the Inflation Reduction Act ("IRA").

2. Over the next several weeks and months, EPA continued to eliminate the program, without any assessment of the consequences of its actions, and without any attempt to otherwise execute Congress's directive or administer its appropriations.

3. EPA's termination of the program is unlawful. It violates bedrock separation-of-powers principles by effectively repealing a congressional enactment and impounding funds based on nothing more than the President's disagreement with policies Congress duly enacted.

4. Further, it represents textbook arbitrary and capricious agency action by failing to engage in reasoned decision-making, ignoring important aspects of the problem—including the reliance interests of hundreds of entities impacted, ignoring potential alternatives, and relying on considerations Congress did not allow.

5. When Congress enacted the IRA in 2022, it amended the Clean Air Act to include the Environmental and Climate Justice Block Grant program.

6. Congress did so for a simple reason: it wanted to ensure that the benefits of its investments would flow to "disadvantaged communities"—those that face the greatest impacts from pollution and environmental degradation and have historically had little voice in the decision-making processes that affect them. 42 U.S.C. § 7438(b)(1).

7. Congress knew that individual communities would best know what programs and resources they most urgently needed. So, building on a block-grant model first developed by the

Nixon Administration, Congress designated a set of activities—including community-led air monitoring, climate resilience and adaptation projects, and workforce development projects to reduce greenhouse gas emissions—that would be eligible for grant funding. *Id.* § 7438(b)(2).

8. Congress explicitly required EPA to award this grant funding directly to disadvantaged communities—through community-based nonprofit organizations, Indian Tribes, local governments, and institutions of higher education that proposed to carry out eligible activities tailored to those communities' needs. *Id.* § 7438(b)(3).

9. Congress appropriated $3 billion of federal funding specifically to fund these activities. *Id.* § 7438(a). To effectuate Congress's mandate, EPA developed, as relevant here, four grant programs and a technical assistance program, and began a competitive grant-awarding process.

10. EPA reviewed thousands of applications, assessed their merit under strict criteria, selected the best ones, and awarded grants.

11. On the ground, hundreds of grantees, including Plaintiffs and proposed class members, got to work to improve their communities. They began to administer the grant programs they had committed to, and they received periodic reimbursement from EPA.

12. All this work came to a halt once President Trump entered office. On January 20, 2025, the President issued an executive order directing federal agencies to stop disbursement of all funds under the Inflation Reduction Act, including the grant funds at issue here. *Unleashing American Energy*, Exec. Order No. 14,154 (Jan. 20, 2025), 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025) ("Energy EO"). He also mandated the termination of all "equity-related" grants or contracts within 60 days. *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14,151 (Jan. 20, 2025), 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025) ("Anti-Equity EO").

13. EPA then began implementing these executive orders. It first froze all grant funding authorized under the Inflation Reduction Act, then moved to terminate the Environmental and Climate Justice Block Grant program—and all grants providing technical assistance for those grant applications. Ex. 1-A at ¶¶ 3–6; Ex. 1-B at ¶¶ 5–6; Ex. 1-C.

14. EPA terminated the grants *en masse*. As the agency has since admitted, it did not review individual grants—but rather reviewed "grant programs" and terminated them "for policy reasons" without distinguishing among grant recipients or activities. Ex. 1-A at ¶ 3; *see also* Ex. 1-C at 1–2; Ex. 1-D; Ex. 1-E ¶¶ 13-17. Instead, EPA made broad program-level decisions and sent out substantively identical termination notices to all grantees. Ex. 1-G; Ex. 1-I; Ex. 1-J.

15. Plaintiffs and proposed class members are the community-based nonprofit organizations, Tribes, local governments, and higher education institutions that EPA selected to receive those grants.

16. EPA's unlawful termination of the Environmental and Climate Justice Block Grant program thwarts Congress's mandate and has harmed and continues to harm Plaintiffs and proposed class members—as well as communities across the country—who are now unable to address environmental harms through these community-driven environmental, climate, and public health projects.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law including the U.S. Constitution and the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551 *et. seq.*

18. This Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of

Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; the All Writs Act, 28

U.S.C. § 1651; and the Court's inherent equitable powers. The APA further authorizes the Court

to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–06.

19. Plaintiffs and proposed class members bring this action under the U.S. Constitution and

the APA, 5 U.S.C. §§ 702, 704. This Court has federal question jurisdiction pursuant to 28

U.S.C. § 1331 and may issue declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and

2202, as well as vacatur under 5 U.S.C. § 706.

20. Venue is proper under 28 U.S.C. § 1391(b) and (e) because a substantial part of the events

or omissions giving rise to the claims occurred in this judicial district. Defendants are a United

States agency headquartered in Washington, D.C. and an officer of that agency sued in his

official capacity.

## PARTIES

**Plaintiffs**

21. Plaintiffs and proposed class members are nonprofit organizations, Tribes, local

governments, and higher education institutions that each received one or more grants from the

Environmental and Climate Justice Block Grant program. EPA terminated their grants when it

terminated the Environmental and Climate Justice Block Grant program.

22. Plaintiff Appalachian Voices is a nonprofit organization headquartered in North Carolina

that brings people together to protect the land, air, and water of Central and Southern Appalachia,

and advance a just transition to a generative and equitable clean energy economy.

23. Plaintiff 2°C Mississippi is a nonprofit organization headquartered in Mississippi. The

organization partners with Jackson, Mississippi communities to create climate resilience through

adaptation, mitigation, and education projects.

24. Plaintiff Air Alliance Houston is a nonprofit organization headquartered in Texas that uses research, education, and advocacy to reduce the public health impacts of air pollution, primarily in Harris County. The organization routinely partners with smaller local environmental, climate, and community-based organizations and coalitions to achieve its mission.

25. Plaintiff Allegheny County is a municipality established under the laws of the Commonwealth of Pennsylvania. It is the second-most populous county in Pennsylvania and operates under a Home Rule Charter. In recent years, certain communities within the county have endured increased flooding, resulting in property damage and homes left uninhabitable.

26. Plaintiff Bessemer Historical Society (doing business as Steelworks Center of the West) ("Steelworks") is a nonprofit organization headquartered in Colorado. Steelworks operates a museum, provides education programs, and works to meet its community's needs, including by combating food deserts, addressing lack of public transportation, and building community resilience to disasters.

27. Plaintiff City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and a charter city and county. San Francisco is home to several communities that suffer greater environmental burdens than other neighborhoods in the city.

28. Plaintiff City of Sacramento ("Sacramento") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and a charter city. Although it is one of the nation's most integrated and diverse cities, like many cities, it experiences a differential in tree canopy across neighborhoods, with disadvantaged neighborhoods experiencing an up to 15-degree differential in temperatures.

29. Plaintiff City of Springfield ("Springfield") is a municipal corporation existing by virtue

of the laws of the Commonwealth of Massachusetts. Springfield is the third-largest city in the Commonwealth of Massachusetts and the fourth-largest in the New England region. Nestled in a valley that often traps air pollution, Springfield is ranked the #4 asthma capital in the United States. It also has significantly increased risk of childhood lead exposure and pedestrian fatalities.

30. Plaintiff Deep South Center for Environmental Justice is a nonprofit organization headquartered in Louisiana that conducts research, education, and health and safety training programs for environmental careers in the South and promotes the right of all people to be free from environmental harm.

31. Plaintiff Downwinders at Risk ("Downwinders") is a nonprofit organization headquartered in Texas that works to reduce particulate matter pollution in the Dallas-Fort Worth area and is a leading advocate for clean air in North Texas.

32. Plaintiff Health Resources in Action ("HRiA") is a nonprofit organization headquartered in Massachusetts. The organization partners with and awards grants to individuals, organizations, and communities to develop and implement local public health initiatives.

33. Plaintiff Institute for Sustainable Communities ("ISC") is a nonprofit organization headquartered in Vermont that trains and awards grants to local organizations to address environmental and safety issues. The organization supports small, community-based organizations' access to funding for projects that promote safe, clean, healthy, and resilient environments.

34. Plaintiff Inter-Tribal Council of Michigan is a nonprofit organization headquartered in Michigan that advocates for member tribes in the development of programs and policies which will improve the economy, education, and quality of life for Michigan's Native Americans. The

Council provides technical assistance to member tribes, and assists in the development of tribal regulations, ordinances, and policies applicable to health and human services.

35. Plaintiff Kalamazoo County is a municipal corporation and governmental subdivision organized and existing under the laws of the State of Michigan. As a result of industry historically located along the riverbed in Kalamazoo, certain neighborhoods within the county now experience air quality issues.

36. Plaintiff Lowcountry Alliance for Model Communities is a nonprofit organization headquartered in South Carolina. The organization addresses quality of life concerns, including environmental issues, in North Charleston, through development, education, employment, housing, and community involvement initiatives.

37. Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington. King County experiences several climate-related stressors—including wildfires, flooding, extreme heat events, and poor indoor air quality—that harm community health.

38. Plaintiff the Native Village of Kipnuk ("Kipnuk") is a Federally-recognized Native American Tribe located in Kipnuk, Alaska. 85 Fed. Reg. § 5462. Almost all of Kipnuk's residents identify as of the Yup'ik culture, speak the Native language (Yup'ik), and maintain traditional lifeways, including subsistence hunting, fishing, and gathering to support their families and neighbors and ensure food security. The Village of Kipnuk is built on permafrost, but the permafrost is thawing.

39. Plaintiff Parks Alliance of Louisville, Inc. (also known as Louisville Parks Foundation) is a nonprofit organization headquartered in Kentucky. The organization's mission is to improve public health by equitably investing in and advocating for public parks in Louisville.

40. Plaintiff Pittsburgh Conservation Corps (d/b/a Landforce) ("Landforce") is a nonprofit organization headquartered in Pennsylvania that recruits and trains Pittsburgh-area adults in ecological restoration, providing them the support and skills to find and keep good-paying, permanent jobs.

41. Plaintiff PUSH Buffalo is a nonprofit organization headquartered in New York that works to create strong neighborhoods by supporting affordable and sustainable housing for local residents; addressing environmental issues including air pollution and lead, mold, and asbestos in homes; and training residents for careers in clean energy and sustainability.

42. Plaintiff Southwest Renewal Foundation of High Point, Inc. is a nonprofit organization headquartered in North Carolina. The organization's mission is to improve environmental health and community prosperity in High Point, which has some of the highest concentrations of poverty and adverse health impacts in the state.

43. Plaintiff Treasure Island Mobility Management Agency ("TIMMA") is a transportation agency existing under and by virtue of the laws of the State of California. TIMMA is responsible for developing and implementing a comprehensive transportation program for Treasure Island, defined also to include Yerba Buena Island. Treasure Island and Yerba Buena Island are located within the City and County of San Francisco. Treasure Island is one of San Francisco's lowest-income neighborhoods, with 42.1% of its residents below the federal poverty level, and it has a pollution score higher than that of 85-90% of all census tracts in California. TIMMA is a separate legal entity from the City and County of San Francisco.

44. Plaintiff WE ACT for Environmental Justice ("WE ACT") is a nonprofit organization headquartered in New York that works to ensure residents participate meaningfully in the creation of environmental health policies through environmental health education, workforce

development, and education about participatory engagement in government decision-making processes.

45. Plaintiffs have all been directly harmed by EPA's unlawful actions. Due to the termination of the Environmental and Climate Justice Block Grant program, Plaintiffs have been forced to lay off employees and cut essential programs.

46. For example, Plaintiff Deep South Center for Environmental Justice laid off three full-time employees and two contractors while Plaintiff Parks Alliance of Louisville terminated a Park Superintendent after losing its EJCPS grant. The Institute for Sustainable Communities has furloughed or laid off nearly 50% of its workforce due to the termination of its grant and the CEO of the Lowcountry Alliance for Model Communities is working without pay to prevent layoffs.

47. Further, Plaintiffs have suffered reputational harms—including a loss of goodwill and erosion of trust within their communities from having to break promises based on the expectation of continued federal support. Plaintiffs have had to cancel contracts, direct subawardees to stop work, and communicate to the public that they can no longer launch or continue their urgently needed projects.

48. These harms are redressable through a favorable decision. Granting Plaintiffs and proposed class members the relief sought here will allow them to continue work on their awarded grant projects and improve the health, safety, and resilience of frontline communities across the country.

**Defendants**

49. Defendant EPA is an independent agency in the executive branch of the United States government. *See* 5 U.S.C. § 552; Reorganization Plan No. 3 of 1970, 84 Stat. 2086 (July 9, 1970).

50. EPA is responsible for enforcing the Nation's environmental laws, for overseeing congressionally mandated grants and programs related to environmental protection, and for distributing funds Congress specifically appropriated to these grants and programs.

51. Defendant Lee Zeldin ("Defendant Zeldin") is the Administrator of the EPA. He is sued in his official capacity.

52. Defendant Zeldin and the EPA are tasked with the implementation of the Energy EO and the Anti-Equity EO's directive to "terminate … 'equity-related' grants or contracts." Anti-Equity EO § 2(b)(i).

53. Defendant Zeldin and the EPA awarded and then terminated the grants authorized by 42 U.S.C. § 7438 to Plaintiffs and proposed class members.

**Class Definition**

54. Plaintiffs bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

55. Plaintiffs seek to represent the following class:

> All entities that received awards from the EPA authorized in whole or in part by 42 U.S.C. § 7438 which EPA then terminated after January 20, 2025 (including statutory partners). The covered awards are Environmental Justice Collaborative Problem Solving Cooperative Agreements (CFDA 66.306); Environmental and Climate Justice Community Change Grants (CFDA 66.616); Thriving Communities Grantmaking Grants (CFDA 66.615); Environmental Justice Government-to-Government Program awards awarded to non-State entities (CFDA 66.312), as well as awards to Thriving Communities Technical Assistance Centers (CFDA 66.309).

This class excludes the plaintiffs in *Sustainability Institute v. Trump*, No. 25-cv-2152-RMG (D.S.C.) or *Green & Healthy Homes Initiative, Inc. v. EPA*, No. 25-cv-01096 (D. Md.) and excludes entities whose awards were expressly terminated for identified financial or performance failures.

## FACTUAL ALLEGATIONS

### EPA's Environmental and Climate Justice Block Grant Program

56. In 2022, when Congress enacted the IRA, it made substantial federal investments in cutting-edge clean energy technology, lower energy costs, and mitigating the impacts of greenhouse gas emissions and toxic air pollution.

57. Congress intended these funds to support communities across the country, prioritizing those that have long borne the brunt of environmental and health harms.

58. As part of the IRA, Congress amended the Clean Air Act to create a new program for "Environmental and Climate Justice Block Grants." Pub. L. No. 117-169 § 60201, 136 Stat. 1818, 2078 (codified at 42 U.S.C. § 7438).

59. Using a block grant model first developed under the Nixon Administration, Congress appropriated $2.8 billion to EPA for projects to directly benefit communities across the country.

60. Recognizing that some communities most in need of assistance might lack the expertise to apply for and implement their projects, Congress appropriated another $200 million for technical assistance to support grant recipients in designing projects, preparing applications, and performing on their grants. 42 U.S.C. § 7438(a)(2).

61. Further, Congress required EPA to "reserve 7 percent" of these amounts for administrative costs to "carry out" these projects. *Id.* § 7438(c).

62. To ensure that these grants benefited those most impacted by pollution and environmental harms, Congress instructed that the EPA Administrator "***shall***" use these funds "to award grants for periods of up to 3 years to eligible entities to carry out [certain specified] activities . . . that

benefit disadvantaged communities," *id.* § 7438(b)(1) (emphasis added), such as "community-led air and other pollution monitoring, prevention, and remediation"; "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events"; "climate resiliency and adaptation"; "reducing indoor toxics and indoor air pollution"; and "facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes," *id.* § 7438(b)(2).

63. This funding was directed to "community-based nonprofit organizations," "a partnership of community-based nonprofit organizations," or a partnership between such nonprofits and "an Indian tribe, a local government, or an institution of higher education." *Id.* § 7438(b)(3).

64. EPA followed the congressional mandate established in 42 U.S.C. § 7438 and created four grant programs and a technical assistance program.[1]

65. Grant projects in the four grant programs have a performance period of three years or less. *Id.* § 7438(b)(1). Grants for the technical assistance program last for five years.[2]

66. Plaintiffs and proposed class members are recipients of grants under one or more of these programs.

**Community Change Grants**

67. Community Change Grants ("CCGs") fund projects that enhance climate resiliency or adaptation, mitigate climate and health risks, engage in community-led air and water pollution

---

[1] *Inflation Reduction Act Environmental and Climate Justice Program*, EPA (last updated Mar. 27, 2025), https://perma.cc/3BKM-DR5D. Although EPA also created the UPLIFT Climate and Environmental Community Action Grant program, no grants were awarded under that program. *Id.*

[2] *FAQs – EJ Thriving Communities Technical Assistance Centers Program (EJ TCTAC)* at 1, EPA (Oct. 2022), https://perma.cc/4QLC-SSY9.

monitoring, or develop a workforce that supports greenhouse gas reduction in disadvantaged communities most burdened by these environmental and health harms.[3]

68. To ensure meaningful community engagement, these grants are structured as partnerships between two community-based nonprofits, or between a community-based nonprofit and a federally recognized Tribe, a local government as defined in 2 C.F.R. § 200.1, or an institution of higher education.[4]

69. Prior to applying for a CCG, the Lead Applicant and its Statutory Partner must enter into a partnership agreement. If the application is selected for award, the Lead Applicant must enter into a subaward with the Statutory Partner to perform the promised elements of the project.[5]

70. Following Congress's direction, EPA established a competitive bidding process that called on applicants to submit grant proposals. EPA selected 105 recipients from 2,700 applications and awarded a total of nearly $1.6 billion to those proposals the agency judged best able to carry out Congress's mandate.

71. The following Plaintiffs and proposed class representatives received Community Change Grants: 2°C Mississippi, Air Alliance Houston, Inter-Tribal Council of Michigan, Kalamazoo County, the Native Village of Kipnuk, Landforce, PUSH Buffalo, Southwest Renewal Foundation, Springfield, TIMMA, and WE ACT for Environmental Justice.

72. Plaintiffs' Community Change Grants funded projects to develop community resilience hubs, workforce development programs, community education projects, and air quality monitoring, as well as to address high energy costs, among other initiatives.

---

[3] *Frequently Asked Questions: Community Change Grants Program* 2, EPA (Aug. 2023), https://perma.cc/AGH2-X245.

[4] *Id*. at 1.

[5] *Environmental and Climate Justice Community Change Grants Program Notice of Funding Opportunity (NOFO)*, EPA (Oct. 3 2024), https://perma.cc/HB8N-84N2.

73. For example, as part of its Climate Action Plan, Kalamazoo County's project included developing climate resiliency hubs and an associated training program for disaster preparedness and ensuring safe and energy-efficient housing through home energy audits, home weatherization upgrades, and deployment of air quality monitors. The project was designed to benefit low-income, pollution-burdened, and climate-insecure communities, where housing stock with lead pipes, poor weatherization, and other flaws has contributed to air toxicity and high rates of asthma and cardiovascular disease.

74. Air Alliance Houston was awarded a Community Change Grant to create or expand a permit engagement project in ten Texas counties. The project involved the development of tools, trainings, and technical assistance to help residents meaningfully contribute to highly technical permitting decisions for pollution sources in their neighborhoods by submitting comments and participating in permitting hearings.

75. The Native Village of Kipnuk was awarded a Community Change Grant to fund the Kipnuk Riprap Riverbank Stabilization Project, which aims to prevent environmental and cultural catastrophe. As the permafrost thaws in the village, the once-frozen riverbank becomes soft, and the erosion rate from the Kugkaktlik River accelerates. As of 2009, approximately 0.7 acres were lost each year, and the erosion rate has only increased since then. Kipnuk has already lost some of its critical infrastructure. Additional critical infrastructure—including the fuel header and pump house, boardwalks, the village corporation store, wind turbines, and the bulk fuel tank farm—are now all at risk. The grant-funded Stabilization Project aimed to stabilize the riverbank by building a revetment—a structure to keep the riverbank from eroding. The project also included removal of hazardous materials that pose a risk of contaminating the Kugkaktlik

River, and local workforce development and training to enable construction and maintenance of the revetment.

**Thriving Communities Grantmaking Program**

76. The Thriving Communities Grantmaking Program was designed to alleviate the burden of the federal grant process on small, resource-constrained community-based organizations.[6] EPA selects Grantmakers, who then create their own subaward application process and distribute subawards to community-based nonprofits, local governments, institutions of higher education, and Native American organizations planning to address environmental issues with assessment, planning, or development activities.

77. Some Grantmakers were selected to award subawards only in one EPA Region ("Regional Grantmakers"), while others were selected to award subgrants nationally ("National Grantmakers").[7]

78. EPA selected 11 Grantmakers and awarded each up to $60 million.[8]

79. The Grantmakers received their EPA grants in two parts: an initial grant to set up their subaward program and infrastructure, followed by a second installment for the subawards to local recipients.

80. EPA selected Plaintiffs and proposed class representatives HRiA and the Institute for Sustainable Communities as Thriving Communities Grantmakers.

---

[6] *Environmental Justice Thriving Communities Grantmaking (TCGM) Program*, EPA, https://perma.cc/UJ4P-2PNN.

[7] *FAQs – The Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM)* at 6, EPA Office of Environmental Justice and External Civil Rights (June 2023), https://perma.cc/YCJ7-T2PJ.

[8] *Environmental Justice Thriving Communities Grantmaking (TCGM) Program*, EPA, https://perma.cc/L54N-QTY3.

81. HRiA was chosen as a Grantmaker for EPA Region 1.[9] As a Regional Grantmaker, HRiA awarded subgrants to local Tribes and community-based organizations in Region 1 to address local and regional needs such as flooding and stormwater planning, heat resilience, transportation access, forever chemicals, and job training.

82. EPA selected Institute for Sustainable Communities as a National Grantmaker. Like HRiA, the Institute for Sustainable Communities awarded subgrants focused on building capacity in communities. As a National Grantmaker, it awarded subgrants to more than 90 projects across the country before EPA shut down the program. These included projects that reduce exposure to harmful air quality, train youth leaders in weather and its impact on agriculture and water quality, install wastewater treatment systems in rural communities lacking adequate wastewater management, and support the development of affordable, sustainable housing. The funding for these projects is now on hold due to the disruption of the grant.

**Environmental Justice Collaborative Problem Solving Cooperative Agreements**

83. Environmental Justice Collaborative Problem Solving Cooperative ("EJCPS") Agreements are grants designed to fund organizations solving local environmental and public health problems through collaborative partnerships with other stakeholders, such as local businesses, industry, local government, medical service providers, and academic institutions.[10]

---

[9] EPA has ten Regional offices, each of which is responsible for executing programs in specific states and territories. The TCTAC for Region 1 serves local Tribes and community-based organizations in Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

[10] *The Collaborative Problem-Solving Cooperative Agreement Program*, EPA (last updated Mar. 21, 2025), https://perma.cc/29EE-JLBE; *see also Biden-Harris Administration Announces Nearly $1.6 Billion in Environmental and Climate Justice Community Change Grants*, EPA (Dec. 12, 2024),https://perma.cc/8CU2-KPDE.

84. The Clean Air Act mandates that applicants be community-based organizations (or partnerships of such organizations) with grant projects addressing challenges like natural disaster preparedness and recovery, lack of access to healthy food, and water quality issues. 42 U.S.C. § 7438(b)(2), (b)(3). Qualifying work under these grants includes projects to develop health impact assessments, emergency response plans, and economic revitalization initiatives.[11]

85. In fiscal year 2023, EPA awarded a total of $43.8 million in EJCPS Grants to 98 recipients.[12]

86. Plaintiffs and proposed class representatives Appalachian Voices, 2°C Mississippi, Downwinders at Risk, HRiA, Lowcountry Alliance for Model Communities, Parks Alliance of Louisville, and Steelworks received EJCPS grants. Their ECJPS projects were designed to improve natural disaster preparedness; mitigate flooding; provide access to low-cost renewable energy, sustainable transportation, and workforce development opportunities; and improve indoor air quality in schools.

87. For example, HRiA received EJCPS funding to develop and implement plans to improve indoor air quality in Massachusetts schools in districts where students are most burdened by asthma and extreme heat.

88. Appalachian Voices received EJCPS funding to implement shovel-ready infrastructure projects in five economically depressed communities in rural Virginia suffering from the impacts of the decline of the coal industry. One flood-prone community in Pound, Virginia, planned to build a flood-mitigating riverwalk to prevent floodwaters from disturbing dilapidated buildings full of mold and asbestos and thereby releasing these harmful substances into the air.

---

[11] *2023 Environmental Justice Collaborative Problem Solving (EJCPS) Program Project Summaries* at 1, EPA, https://perma.cc/A2CR-52AJ.

[12] *Id.*

89. Because EPA terminated the grant, Appalachian Voices is unable to continue the project. Pound cannot fund the project on its own: the town's ability to bring in tax revenue has been so diminished by economic decline that its ability to pay its bills is a continual struggle.

**Government-to-Government Program**

90. The Government-to-Government Program supports government activities that integrate environmental considerations into governmental decision-making and measurably improve environmental and public health.[13] EPA awarded these grants to partnerships between community organizations and either Tribes or local governments.[14]

91. In 2023, EPA awarded roughly $58 million of Government-to-Government Program grants to approximately 62 local governments and Tribes, including Plaintiffs and proposed class representatives Allegheny County, King County, Sacramento, and San Francisco.

92. Plaintiffs' projects aimed to address challenges such as air quality, toxic pollution, water quality, food insecurity, affordable transportation access, and emergency preparedness.[15]

93. For example, King County's project aimed to empower communities to take an active role in improving housing and health outcomes, including by: (1) educating 2,300 frontline community members, caregivers, and childcare providers on healthy homes and climate resilience, and (2) providing 700 homes and childcare providers with in-home assessments to

---

[13] *The Environmental Justice Government-to-Government (EJG2G) Program*, EPA, https://perma.cc/W9C5-9EKN.

[14] While the Government-to-Government program also provides grants to states, states are not "eligible entities" for the purposes of 42 U.S.C. § 7438 funding; accordingly, those grants are not relevant here. 42 U.S.C. § 7438(b)(3).

[15] *2023 Environmental Justice Government-to-Government (EJG2G) Program Project Summaries*, EPA, https://perma.cc/HDU9-Z3JW.

identify indoor air quality concerns and Healthy Homes Kits to support healthier indoor environments.

94. San Francisco's project aimed to engage communities that are most burdened by air pollution levels and predominantly low-income to recommend and implement community-led climate action to inform implementation of San Francisco's 2021 Climate Action Plan. Through partnerships with community-based organizations, the project would increase communities' capacity to understand and act on climate change; improve government response and services; improve health outcomes; and reduce greenhouse gas emissions in local communities. Such community partnership is essential to the success of San Francisco's 2021 Climate Action Plan, which aims to reach net-zero carbon emissions by 2040.

**Thriving Communities Technical Assistance Centers**

95. In partnership with the Department of Energy, EPA created the Environmental Justice Thriving Communities Technical Assistance Centers ("TCTACs") to support the Thriving Communities Grantmaking Program, among other grant programs. TCTACs assist under resourced communities with identifying grant funding sources, writing grant proposals, and managing federal grants, including those authorized under 42 U.S.C. § 7438.[16]

96. EPA awarded $177 million to fund 18 TCTACs across the country. *Id.*

97. Plaintiffs and proposed class representatives Deep South Center for Environmental Justice, Institute for Sustainable Communities, and WE Act for Environmental Justice were designated as TCTACs.

---

[16] *Biden-Harris Administration Announces $177 Million for 17 New Technical Assistance Centers Across the Nation to Help Communities Access Historic Investments to Advance Environmental Justice*, EPA (Apr. 13, 2023), https://perma.cc/KT4B-YZ7E.

98. Deep South Center for Environmental Justice was designated the TCTAC for EPA Regions 4 and 6, which cover the Southeast and South Central United States. Prior to the termination of the grant program, the Deep South Center for Environmental Justices Community Investment Recover Center was serving approximately 70 grassroots partner organizations across 13 states.

99. The Institute for Sustainable Communities was designated as a national TCTAC and also served as the interim TCTAC for EPA Region 1. As a national TCTAC, it supported both regional TCTACs and communities through training and developing centralized resources. Before its award was terminated, it had processed over 100 technical assistance requests from regional TCTACs.

100. WE ACT is the TCTAC for EPA Region 2 and entered into agreements with steering committee partners, a project consultant, and 18 subawardees.

### **EPA's Termination of the Environmental and Climate Justice Block Grant Program**

<u>President Trump Issues Executive Orders Instructing EPA
to Terminate Environmental and Climate Justice Block Grant Program</u>

101. Shortly after his inauguration, on January 20, 2025, President Trump issued an executive order declaring "that *no Federal funding be employed in a manner contrary to the principles outlined in this section*." *Unleashing American Energy*, Exec. Order No. 14,154 (Jan. 20, 2025), 90 Fed. Reg. 8353, 8354 (Jan. 29, 2025) ("Energy EO") at § 2 (emphasis added).

102. Section 7 of the Energy EO, titled "Terminating the Green New Deal," further provided that:

> [a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58) . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any

other financial disbursements of such appropriated funds *for consistency with* the law and *the policy outlined in section 2 of this order*.

Energy EO § 7 (emphases added), 90 Fed Reg. at 8354.

103. The Energy EO forbade the disbursement of any funds that the executive branch deems inconsistent with certain agency policies. *Id.*

104. The Energy EO cited no legal authority for its across-the-board freeze of congressionally appropriated funds.

105. Also on January 20, 2025, President Trump issued an executive order directing federal agencies to "*terminate . . .* all . . . 'equity-related' grants or contracts" within sixty days, i.e., by March 21, 2025, among other directives. *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14,151 (Jan. 20, 2025), 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025) ("Anti-Equity EO") at § 2(b) (emphasis added).

106. The Anti-Equity EO also instructed federal agencies to provide the director of OMB with a list of all "Federal Grantees" who received Federal funding for "environmental justice" programs, *id.* § 2(b)(ii)(C) and ordered agencies to "terminate" all "environmental justice" offices and positions, *id.* § 2(b)(i).

107. The Anti-Equity EO did not define "equity-related" grants or "environmental justice."

108. The Anti-Equity EO cited no legal authority to categorically terminate all "equity-related" grants and contracts.

<u>EPA Terminates the Environmental and Climate Justice Block Grant Program</u>

109. EPA then began implementing these executive orders. On February 20, 2025, EPA Assistant Deputy Administrator Travis Voyles identified a set of certain "approved to cancel" Environmental and Climate Justice Block Grants as well as TCTACs as targets for termination.

24

Ex. 1-C (T. Voyles Email re cancelling grants - Feb. 20, 2025). EPA terminated these grants shortly thereafter and identified the terminations as "taxpayer savings" in a press release.[17]

110. EPA then proceeded to cancel all Environmental and Climate Justice Block Grants. On February 25, 2025, Mr. Voyles conducted a review of EPA grant programs "for consistency with Agency policy priorities." Ex. 1-A ¶ 3 (T. Voyles Decl.). He did so based on the "Assistance Number Listing" identifying entire grant programs. *Id.*

111. Mr. Voyles then unilaterally—in the course of a single day—decided to terminate Environmental Justice Collaborative Problem-Solving Cooperative Agreements (CFDA 66.306); Environmental and Climate Justice Community Change Grants (CFDA 66.616); Thriving Communities Grants (CFDA 66.615); the Environmental Justice Government-to-Government Program (66.312); and the TCTAC program (66.309) "for policy reasons." Ex. 1-A ¶ 3 (T. Voyles Decl.); Ex. 1-F (D. Coogan Email to T. Voyles – Feb. 25, 2025).

112. This decision expanded on Mr. Voyles' earlier instructions to staff to "apply a broad approach and cancel them all [TCTACs] in the vein the program is inconsistent with Administration priorities." Ex. 1-C (T. Voyles Email re cancelling grants - Feb. 20, 2025).

113. While this termination was in process, EPA put a "control" in the Automated System for Administrative Payment ("ASAP") system, and grantees could not draw down any funds. Ex. 1-H (G. Treml email re account hold – Mar. 7, 2025). EPA applied this control at the grant program level, meaning that the single "control" applied to all Environmental and Climate Justice Block Grants.

---

[17] *EPA Administrator Lee Zeldin Cancels 20 Grants in 2nd Round of Cuts with DOGE, Saving Americans More than $60M*, EPA (Feb. 25, 2025), https://perma.cc/KV5D-XK99.

114. In February through May 2025, EPA sent form letters to grantees purporting to formally terminate the grants. EPA instructed its grant managers to terminate grants with a boilerplate template response to each grantee. EPA directed grant managers to "Copy/paste email language from Grant Termination [memo]" and then attach a form termination letter to the email. Ex. 1-G at 2 (M. Wise email re termination procedure – Feb. 21, 2025); *see also* Ex. 1-I (EPA Grant Termination Standard Operating Procedure); Ex. 1-J (Boilerplate Termination Letter).

115. EPA has stated its intent to terminate all grants awarded to Plaintiffs and proposed class members under the Environmental and Climate Justice Block Grant program for "policy reasons." Ex. 1-A ¶ 3 (T. Voyles Decl.); *see also* Ex. 1-B ¶¶ 5–6 (D. Coogan Decl.).

## LEGAL FRAMEWORK

### I.    Congress's Legislative Authority

#### A.    The Power of the Purse

116. The United States Constitution grants Congress the power to make the laws of this nation. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. art. I, § 1.

117. Congress's lawmaking powers are at their apex on matters of federal funding. The Constitution grants the power of the purse to Congress, not the President. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am. Ltd.*, 601 U.S. 416, 420 (2024); *see also* Mem. from John G. Roberts, Jr. to Fred F. Fielding at 1 (Aug. 15, 1985), https://perma.cc/G5AA-GJAU ("[N]o area seems more clearly the province of Congress than the power of the purse.").

118. This power is "exclusive" to Congress, which "has absolute control of the moneys of the United States" under our Constitution. *Rochester Pure Waters Dist. v. EPA*, 960 F. 2d 180, 185

(D.C. Cir. 1992) (citation and quotations omitted). "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990).

119. Congress's power over the purse is rooted in two constitutional provisions. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause expressly "was intended as a restriction upon the disbursing authority of the Executive department." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

120. The Spending Clause provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

121. Through these multiple grants of authority, the Constitution gives Congress broad power to legislate spending and to decide how and when its appropriations are spent. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

122. When Congress passes a law appropriating money for a particular purpose, the President must spend that money for that purpose. This duty stems from the Take Care Clause, which states that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . 'faithfully execute[s]' them.").

123. "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances,

even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).

124. If a President disagrees with Congress's spending decision, he can veto the legislation; but once a spending law has passed, the executive branch must spend the money on the terms Congress has provided. *See Train v. City of New York*, 420 U.S. 35, 40–44 (1975).

125. The executive branch has no constitutional power to amend or repeal statutes, *Clinton v. City of New York,* 524 U.S. 417, 438 (1998) and doubly lacks the power to supplant Congress's spending directives with his own.

126. When the executive branch intrudes on Congress's power over the purse, it violates the separation of powers. "Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive," *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015), and acts as a "bulwark of the Constitution's separation of powers," *U.S. Dep't of Navy v. Fed. Labor Rel. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012). Allowing the Executive to usurp this power "would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838).

127. "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring). Nowhere is this more apparent than when a President attempts to unilaterally seize the Nation's purse strings and nullify a congressional enactment to serve his policy goals.

### B.   The Presentment Clauses

128. The Presentment Clauses form equally "integral parts of the constitutional design for the separation of powers." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 946 (1983).

129. These Clauses provide that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States," and that "before [a law] shall take Effect, [it] shall be approved by [the President], or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill." U.S. Const. art. I, § 7, cl. 2–3.

130. The Presentment Clauses grant the President "a limited and qualified power to nullify proposed legislation by veto." *Chadha*, 462 U.S. at 947. This "finely wrought and exhaustively considered" constitutional procedure precludes by implication the President's power "to enact, to amend, or to repeal statutes" in any other way. *Clinton*, 524 U.S. at 438–39 (quoting *Chadha*, 462 U.S. at 951).

131. The Constitution's careful limitations on the President's role in lawmaking are designed to protect the people from tyranny. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 633 (1952) (Douglas, J., concurring) ("The Framers with memories of the tyrannies produced by a blending of executive and legislative power rejected that political arrangement.").

C.    **Jurisdiction over constitutional claims**

132. Federal district courts have jurisdiction over nonstatutory claims to enjoin federal officials from acting unconstitutionally. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *see also Strickland v. United States*, 32 F. 4th 311, 363-66 (4th Cir. 2022). These claims arise when federal officials act "beyond the scope of their powers" and "in an unconstitutional manner." *Strickland*, 32 F.4th at 366.

133. Claims for nonstatutory review of constitutional infirmities are deeply rooted in the history of the judiciary. "Indeed, the most famous case of all, *Marbury v. Madison*, was a nonstatutory review case." Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612, 1625 (1997).

134. Where plaintiffs bring nonstatutory claims for injunctive or declaratory relief against federal officials for alleged unconstitutional action, "sovereign immunity does not bar a suit." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996); *see also Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) (adopting J. Pillard's dissent in *Widakusawara*, 2025 WL 1288817).

135. Sovereign immunity does not bar such claims because actions that exceed constitutional authority "are considered individual and not sovereign actions." *Strickland*, 32 F. 4th at 366 (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949)).

136. "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

137. The Tucker Act does not confer jurisdiction over constitutional claims on the Court of Federal Claims unless they are based on constitutional provisions that create "a substantive right enforceable against the federal government for money damages." *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995).

138. Separation-of-powers and Presentment Clauses claims are not based on such provisions, and are not reviewable in the Court of Federal Claims. *Id*.

## II.    **The Administrative Procedure Act**

139. Congress enacted the APA to ensure fairness and stability in agency action by mandating reasoned decision-making, and to guard against agencies' pursuit of a political agenda

without adherence to legal process. *See United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950) (describing the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices"); *see also N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring) (noting that the APA prohibits policy change based on "political winds and currents" without adherence to "law and legal process").

140. To effectuate these goals, the APA imposes both substantive and procedural constraints on final agency action. *See Cent. Tex. Tel. Coop., Inc. v. Fed. Commc'ns Comm'n*, 402 F.3d 205, 209 (D.C. Cir. 2005). As to the former, the APA requires courts to set aside agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(C).

141. The APA tasks courts—not the Executive—with "deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). This is because the APA "codifies" the "elemental proposition reflected by judicial practice dating back to *Marbury*," that "courts, not agencies" decide what the law is. *Id.* at 371.

142. As to process, the APA requires an agency to "acknowledge and explain" and show "good reasons" for changes in position. *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 706–07 (D.C. Cir. 2016) (citation and quotations omitted).

143. To enforce these principles, the APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

144. An agency fails to engage in "reasoned decisionmaking," and its actions are arbitrary and capricious, when the agency "has relied on factors which Congress has not intended it to consider, [or] entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52 (1983).

145. An agency must "examine the relevant data and articulate a satisfactory explanation for its action," *id.* at 43, "including a rational connection between the facts found and the choice made," *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm*, 463 U.S. at 43). "This foundational precept of administrative law is especially important where, as here, an agency changes course." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020).

146. When an agency is not writing on a "blank slate" but is "changing [its] position," the agency must "provide a more detailed justification than what would suffice for a new policy" if, "for example, . . . its prior policy has engendered serious reliance interests that must be taken into account." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

147. When changing policy, agencies must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020). "[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy." *Id.* at 30 (citation and quotations omitted).

148. At bottom, an agency must give "good reasons for the new policy," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (citation and quotations omitted), including "a

reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," *Fox*, 556 U.S. at 515-16.

149. Section 702 of the APA waives sovereign immunity and vests jurisdiction over APA claims for injunctive or declaratory relief in the federal district courts. 5 U.S.C. § 702.

150. That waiver does not apply where another statute grants consent to suit explicitly or expressly or impliedly forbids the relief which is sought. *Id.*

151. The Tucker Act, 28 U.S.C. § 1491, does not grant consent to suit over claims for equitable relief, nor does it expressly or impliedly forbid federal district courts from granting that relief. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 at *13 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting),[18] *citing Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988).

## CLASS ACTION ALLEGATIONS

152. The allegations in the preceding paragraphs are incorporated herein by reference. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

153. Plaintiffs seek to represent the following class (the "proposed class"):

> All entities that received awards from the EPA authorized in whole or in part by 42 U.S.C. § 7438 which EPA then terminated after January 20, 2025 (including statutory partners). The covered awards are Environmental Justice Collaborative Problem-Solving Cooperative Agreements (CFDA 66.306); Environmental and Climate Justice Community Change Grants (CFDA 66.616); Thriving Communities Grantmaking Grants (CFDA 66.615); Environmental Justice Government-to-Government Program awards awarded to non-State entities (CFDA 66.312), as well as awards to Thriving Communities Technical Assistance Centers (CFDA 66.309).

> This class excludes the plaintiffs in *Sustainability Institute v. Trump*, No. 25-cv-2152-RMG (D.S.C.) or *Green & Healthy Homes Initiative, Inc. v. EPA*, No. 25-cv-01096 (D.

---

[18] Judge Pillard's dissent in the *Widakuswara* panel decision was substantially adopted by the D.C. Circuit sitting en banc. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (denying stay pending appeal "substantially for the reasons explained by Judge Pillard.").

Md.) and excludes entities whose awards were expressly terminated for identified financial or performance failures.

154. Plaintiffs reserve the right to modify or amend the class definition prior to the Court's determination on certification.

155. Certification of a class is appropriate where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The disposition of the claims of all class members will provide substantial benefits to all parties and the Court.

## Rule 23(a)(1) - Numerosity

156. The proposed class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). Defendants terminated approximately 350 awards[19] under these programs to entities across the country.

## Rule 23(a)(2) - Commonality

157. The proposed class's claims turn on common questions of fact or law that are capable of classwide resolution. *See* Fed. R. Civ. P. 23(a)(2). The legality of Defendants' mass terminations is a common question capable of resolution in one stroke. The proposed class representatives seek common declaratory and injunctive relief concerning the legality of Defendants' mass termination actions, and relief mandating Defendants cease these constitutional and statutory violations.

158. Among the common questions of law and fact for the class are:

---

[19] The exact number of proposed class members is readily identifiable and known to Defendants.

a) Whether EPA engaged in a course of conduct that unlawfully terminated the Environmental and Climate Justice Block Grant program under which class members received their grants;

b) Whether EPA's termination of the Environmental and Climate Justice Block Grant program violated the Constitution's Separation of Powers and Presentment Clauses;

c) Whether EPA's termination of the Environmental and Climate Justice Block Grant program violated the APA;

d) Whether Plaintiffs and the other class members are entitled to injunctive and/or declaratory relief.

### Rule 23(a)(3) - Typicality

159. Plaintiffs' claims are typical of the proposed class as a whole. *See* Fed. R. Civ. P. 23(a)(3). Each class member's claim arises from the same course of events (Defendants' termination of the Environment and Climate Justice Block Grant program) and each class member has experienced the same injury (the termination of their grants) if relief is denied.

### Rule 23(a)(4) - Adequacy

160. Plaintiffs will fairly and adequately represent the proposed class. *See* Fed. R. Civ. P. 23(a)(4). They are committed to seeking a declaration and injunction that will benefit all members of the proposed class equally by declaring their award terminations illegal and restoring those awards and grant programs as they existed before the terminations. Plaintiffs are aware of their obligations as class representatives and willing to dedicate time and effort to vigorously pursue this matter on behalf of every member of the proposed class.

161. Proposed class counsel have extensive relevant experience and are committed to zealously representing the proposed class. *See* Fed. R. Civ. P. 23(a)(4), 23(g). Proposed class counsel are attorneys from Southern Environmental Law Center, Public Rights Project, and Earthjustice with extensive complex civil litigation experience in administrative law, constitutional law, and class actions, including work on IRA funding freezes and terminations in

*Sustainability Institute et al. v. Trump et al.*, No. 25-cv-2152 (D.S.C.) and *Cultivate KC et al. v. USDA et al.*, No. 25-cv-00737 (D.D.C.), and extensive knowledge of both the details of Defendants' unlawful actions and the relevant law. *See* Fed. R. Civ. P. 23(a)(4), (g). Counsels' relevant qualifications are more fully set forth in the declarations to be filed with a forthcoming Motion for Class Certification and its accompanying memorandum and exhibits.

162. The combined efforts of counsel and proposed class counsel have included significant time and resources helping disadvantaged communities obtain IRA and IIJA federal funding for climate resilience, clean energy and climate justice projects, and securing access to clean, affordable drinking water.

163. Since January 2025, counsel and proposed class counsel have investigated and challenged unlawful grant freezes, disruptions, and terminations. This work has included providing legal and technical guidance to affected grantees, and engaging in consultations with coalitions, stakeholders, attorneys, and national experts working to address these funding disruptions.

164. Proposed class counsel have devoted significant time and resources to becoming knowledgeable about Defendants' unlawful grant freeze and termination practices.

## **Rule 23(b)(2)**

165. Certification of the proposed class is appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants acted on grounds generally applicable to the class when they terminated the grant programs *en masse*, for the same purported policy reasons. Fed. R. Civ. P. 23(b)(2). EPA's actions violate the Constitution and the APA in the same way for all class members. Accordingly, injunctive and declaratory relief are appropriate for the class as a whole.

## CLAIMS FOR RELIEF

## COUNT I

### *Violation of Separation of Powers*

166. The allegations in the preceding paragraphs are incorporated herein by reference.

167. "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins*, 594 U.S. at 245.

168. The U.S. Constitution grants Congress, not the President, exclusive power over the nation's purse and the power to legislate. U.S. Const. art. I, § 9, cl. 7; art. I, § 8, cl. 1; art. I, § 1.

169. When Congress appropriates funds for a specified purpose, the President has a duty to spend those funds on the terms set by Congress. *See* U.S. Const. art. II, § 3 (Take Care Clause).

170. The President has no constitutional power to terminate funds appropriated by Congress, particularly when the termination is based on Presidential policies rather than Congress's spending directives. *See, e.g.*, *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231–35 (9th Cir. 2018).

171. Congress has enacted the Environmental and Climate Justice Block Grant program under the IRA and Clean Air Act and appropriated $3 billion in funding for those programs to serve enumerated purposes specified in these statutory programs. 42 U.S.C. § 7438.

172. Consistent with its constitutional and statutory duties, EPA obligated these funds to specific entities via a rigorous, regulated, and competitive grantmaking process.

173. Defendants are constitutionally required to carry out these congressionally mandated programs, and to obligate and distribute the funds that Congress appropriated for these programs.

174. EPA terminated these entire grant programs *en masse* for "policy reasons." Ex. 1-A ¶ 3 (T. Voyles Decl.).

175. EPA's decision to terminate the Environmental and Climate Justice Block Grant program contravenes Congress's directives in the Clean Air Act as amended by the IRA to fund the statutory programs at issue in this case. *See, e.g.*, 42 U.S.C. § 7438(b)(1) (directing that EPA "shall" award grants for certain activities "that benefit disadvantaged communities").

176. EPA did not identify any statutory, regulatory, or constitutional authority to terminate congressionally appropriated funds based on the President's policy preferences.

177. Indeed, the President's policy preferences as articulated in the Anti-Equity EO conflict with the very purposes for which Congress created the Environmental and Climate Justice Block Grants—namely to "benefit disadvantaged communities" and advance "environmental and climate justice."

178. All the relevant constitutional powers here—the powers to appropriate, spend, and legislate—belong solely to Congress. The President has no constitutional power to unilaterally withhold funds appropriated by Congress, much less based on policies that conflict with what Congress specified.

179. EPA's decision to terminate the grant programs authorized by 42 U.S.C. § 7438 violates Congress's spending power, *see* U.S. Const. art. I, § 8, cl. 1 (Spending Clause), art. I, § 9, cl. 7 (Appropriations Clause), and Congress's power to legislate, *see* U.S. Const. art. I, § 1 (Legislative Power), and thus violates the separation of powers.

## COUNT II

### *Violation of the Presentment Clauses*

180. The allegations in the preceding paragraphs are incorporated herein by reference.

181. The Presentment Clauses limit the President's role in lawmaking to vetoing an "entire bill . . . *before* the bill becomes law." *Clinton*, 524 U.S. at 439. "Presidential action that either

repeals or amends *parts of duly enacted statutes*" violates the Presentment Clauses. *Id.* (emphasis added).

182. EPA's termination of the grant programs mandated by 42 U.S.C. § 7438 violates the Presentment Clauses because it seeks to "terminat[e]" parts of the IRA after they were passed by Congress and signed by the President. *See* Energy EO § 7; Anti-Equity EO § 2(b)(i).

183. In purpose and in effect, EPA's termination of grant programs required by 42 U.S.C. § 7438 unlawfully amends the spending provisions of the IRA by ending grant programs mandated by Congress, based on *presidential* policies that are wholly different than *Congress's* directives for the funds and programs. *See supra* ¶¶ 109-115.

184. By cancelling Congress's spending directives and replacing them with the President's policy preference to withhold appropriated funds, EPA's termination of the grant programs authorized by 42 U.S.C. § 7438 seeks to repeal that section and amend the IRA in violation of the Presentment Clauses. *See* U.S. Const. Art. I, § 7, cl. 2–3.

185. For these reasons, EPA's termination of the grant programs authorized by 42 U.S.C. § 7438 violates the Presentment Clauses.

## COUNT III

### *Violation of the APA – Arbitrary and Capricious*

186. The allegations of the preceding paragraphs are incorporated herein by reference.

187. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

188. EPA's termination of the Environmental and Climate Justice Block Grant program for policy reasons, and each subsequent termination of Plaintiffs' grants and TCTACs, are final agency actions subject to review under the APA.

189. EPA's termination of the grant programs, and its subsequent termination of all grants, is arbitrary and capricious for multiple reasons.

190. First, EPA terminated grant programs for which Congress had appropriated $3 billion under the IRA without engaging in a "reasoned analysis" for the terminations as the APA requires. *State Farm,* 463 U.S. at 57. EPA has not provided an explanation as to why terminating the entire Environmental and Climate Justice Block Grant program was necessary to effectuate the Administration's general "policy priorities."

191. Second, EPA terminated the Environmental and Climate Justice Block Grant program without consideration of "an important aspect of the problem." *Id.* at 43. Specifically, EPA failed to consider the "serious reliance interests" of Plaintiffs and proposed class members of the class on those funds. *Fox*, 556 U.S. at 515. EPA also failed to consider the consequences of suddenly cutting funding to hundreds of nonprofits, Tribes, local governments, universities and the communities they serve.

192. Instead, EPA "cut the fuel supply to a vast, complicated, nationwide machine— seemingly without any consideration for the consequences of that decision." *Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025). To say that EPA "'failed to consider an important aspect of the problem' would be putting it mildly." *Id.*

193. Third, EPA's decision to terminate the grant programs authorized by 42 U.S.C. § 7438 relies "on factors which Congress has not intended [EPA] to consider." *State Farm*, 463 U.S. at

43. Specifically, this action terminated funds based on the *agency's* policies, contrary to Congress's specific directives and purposes for appropriating funds in the IRA.

194. Fourth, EPA failed to consider how the wholesale termination of the Environmental and Climate Justice Block Grant program would impact the "primary goal[s]" of Clean Air Act Section 138. *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1111, 1115 (D.C. Cir. 2019) (finding agency action arbitrary and capricious where it failed to "consider the impact of the change on [the agency program's] 'primary purpose' or otherwise explain how it is compatible with that purpose").

195. The unexplained termination of these grant funds epitomizes agency action by "whim and caprice of the bureaucracy." *N.C. Growers' Ass'n*, 702 F.3d at 772 (Wilkinson, J., concurring).

196. EPA's actions that terminated the grant programs authorized by 42 U.S.C. § 7438 and its subsequent termination of all grants must be vacated as arbitrary and capricious under the APA. 5 U.S.C. § 706(2)(A).

## COUNT IV

### *Violation of the APA – Contrary to Law*

197. The allegations of the preceding paragraphs are incorporated herein by reference.

198. The APA requires courts to hold unlawful and set aside agency actions "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," or "not in accordance with law." 5 U.S.C. § 706(2)(A)–(C).

199. "Courts"—not the Executive—"must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.

200. For four reasons, EPA's termination of the Environmental and Climate Justice Block Grant program is outside of the agency's statutory authority, contrary to law, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A)–(C). These agency actions must be held unlawful and vacated under the APA. *Id.* § 706(2).

201. First, EPA's termination of the grant programs is outside of its statutory authority. *Id.* § 706(2)(C). No federal law or regulation gives EPA the power to terminate funding appropriated by Congress and obligated by executive agencies. The executive branch has terminated these grant programs based on policies that are entirely different than, and in many cases directly in conflict with, the directives and purposes specified by Congress for expending the funds.

202. By refusing to expend appropriated funds based on the *President's* priorities rather than "stated statutory factors," the "Executive has acted contrary to law and in violation of the APA." *New York*, 2025 WL 357368, at *2.

203. Second, these agency actions are unconstitutional on the grounds set forth in Counts I–II and are thus "not in accordance with law" and "contrary to constitutional right, power, privilege, or immunity" under the APA, 5 U.S.C. § 706(2)(A), (B).

204. Third, these agency actions are "not in accordance with" the Clean Air Act, as amended by the IRA, 42 U.S.C. § 7438(b)(1), which appropriated money to the grant programs at issue here. 5 U.S.C. § 706(2)(A). Defendants' actions are not in accordance with the statutory requirements to create, fund, and carry out these programs. *See* 42 U.S.C. § 7438(b)(1) (directing that EPA "shall" award grants for certain activities "that benefit disadvantaged communities" and enumerating specific categories of eligible activities and eligible recipients).

205. Fourth, these agency actions are "not in accordance with" the Impoundment Control Act of 1974 ("ICA"). 5 U.S.C. § 706(2)(A); *see* 2 U.S.C. § 683. By terminating the grant programs

and individual grants, Defendants have unlawfully withheld the expenditure of funds.

Defendants initially deferred the funds for impermissible policy reasons and without following

the ICA's requirements for notifying Congress, and then unilaterally rescinded the funds,

contravening the ICA's requirement that should the President seek such a rescission, he must

request it of Congress and *Congress* must act to rescind the funds. 2 U.S.C. § 683(b).

## COUNT V

### *Violation of the APA – Contrary to Law*
### De-Obligation of All Environment and Climate Justice Block Grants

206. The allegations of the preceding paragraphs are incorporated herein by reference.

207. In enacting the federal grant programs at issue in this case, Congress mandated that $3

billion in funding for those programs be obligated to serve enumerated purposes. 42 U.S.C.

§ 7438(a), (b)(2).

208. In recognition of Congress's instruction, EPA issued programmatic terms for the grant

programs that recognize the requirement to fully obligate the funds that Congress appropriated

for the Environmental and Climate Justice Block Grant program.

209. For example, the Community Change Grant Program terms stipulate that if EPA de-

obligates any awarded funds it must "re-obligate them by an award to another Community

Change Grant recipient receiving an award pursuant to Notice of Funding Opportunity EPA-R-

OEJECR-OCS-23-04 to effectuate the objectives of Section 138 of the Clean Air Act, 42 USC

§ 7438 within 90 days of the de-obligation." Ex. 1-K at 16 (Community Change Grant

Programmatic Terms and Conditions).

210. Yet EPA's termination of the grant programs at issue here includes no effort to comply

with Congress's requirement that the funds remain obligated to the Environmental and Climate

Justice Block Grant program. Instead, EPA viewed these terminations as "immediate taxpayer savings," evidencing its intent to specifically *not obligate* the funds.[20]

211. Contrary to Congress's instruction, upon information and belief, EPA now seeks to de-obligate the entirety of the remaining appropriated funds without any provision for the funds to be re-obligated.

212. For the reasons set forth above, EPA's termination of the Environmental and Climate Justice Block Grants violates the Constitution; the Clean Air Act, as amended by the IRA; and the Impoundment Control Act. It also violates Congress's express instruction that the appropriated funds be obligated.

213. EPA's termination of the grant programs authorized by 42 U.S.C. § 7438 and intention to de-obligate the previously awarded funds is in excess of the agency's statutory authority, unconstitutional, and not in accordance with law. 5 U.S.C. § 706(2)(A)–(C). These agency actions must be held unlawful and vacated under the APA. *Id.* § 706(2).

## PRAYER FOR RELIEF

For the reasons set forth above, Plaintiffs respectfully request that the Court grant the following relief:

A.  Certify this class as a Class Action pursuant to Federal Rule of Civil Procedure 23(b)(2);

B.  Issue a declaratory judgment that the termination of grant programs mandated by Section 138 of the Clean Air Act, 42 U.S.C. § 7438, and the termination of legally-obligated grant awards issued under those programs violate the United States Constitution and the APA, 5 U.S.C. § 706;

---

[20] *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th Round of Cuts with DOGE, Saving Americans More than $1.7B*, EPA (Mar. 10, 2025), https://perma.cc/6FSC-GKFJ.

C.  Pursuant to 5 U.S.C. § 706 of the Administrative Procedure Act, hold unlawful and set aside EPA's termination of federal grant programs authorized by Section 138 of the Clean Air Act., 42 U.S.C. § 7438;

D.  Preliminarily and permanently enjoin EPA from taking action to terminate grant programs authorized by Section 138 of the Clean Air Act, 42 U.S.C. § 7438;

E.  Require EPA to reinstate all grant awards previously authorized by Section 138 of the Clean Air Act, 42 U.S.C. § 7438, for all class members, that were terminated beginning in February 2025;

F.  Require EPA to make adequate staffing and other resources available to effectuate the grant programs mandated by Section 138 of the Clean Air Act, 42 U.S.C. § 7438;

G.  Require EPA to extend the period of performance to allow Plaintiffs and class members to complete the period of performance specified in their grant agreements, accounting for the time between the time they lost access to their grant funding and this Court's order;

H.  Retain jurisdiction over this matter to ensure compliance with the above relief;

I.  Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, in accordance with law pursuant to 28 U.S.C. § 2412; and

J.  Grant such other and further relief as this Court may deem just and proper.

Respectfully submitted this 25th day of June 2025,

/s/ Ben Grillot
Ben Grillot (D.C. Bar No. 982114)
Kimberley Hunter (N.C. Bar No. 41333)
(Pro Hac Vice forthcoming)
Irena Como (N.C. Bar No. 51812)
(Pro Hac Vice forthcoming)
James Whitlock (N.C. Bar No. 34304)
(Pro Hac Vice forthcoming)
SOUTHERN ENVIRONMENTAL LAW CENTER
122 C St NW, Suite 325

Washington, DC 20001
Telephone: (202) 828-8382
Facsimile: (202) 347-6041
bgrillot@selc.org
kmeyer@selc.org
icomo@selc.org
jwhitlock@selc.org

*Counsel for Appalachian Voices, 2°C Mississippi,
Lowcountry Alliance for Model Communities, Parks
Alliance of Louisville, Pittsburgh Conservation
Corps (Landforce) and Southwest Renewal
Foundation and Proposed Class Counsel*

/s/ Hana V. Vizcarra
Hana V. Vizcarra (D.C. Bar No. 1011750)
Deena Tumeh (D.C. Bar No. 1741543)
Linnet Davis-Stermitz (WA Bar No. 63190)
(Pro Hac Vice forthcoming)
Molly Prothero (D.C. Bar No. 1779237)
Andrew Saavedra (N.Y. Bar No. 6062814)
(Pro Hac Vice forthcoming)
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, D.C. 20001
Telephone: (202) 667-4500
hvizcarra@earthjustice.org
dtumeh@earthjustice.org
ldavisstermitz@earthjustice.org
mprothero@earthjustice.org
asaavedra@earthjustice.org

*Counsel for Air Alliance Houston, Bessemer
Historical Society (d/b/a Steelworks Center of the
West), Deep South Center for Environmental
Justice, Downwinders at Risk, Health Resources in
Action, Institute for Sustainable Communities,
Inter-Tribal Council of Michigan, PUSH Buffalo,
and WE ACT for Environmental Justice and
Proposed Class Counsel*

/s/ Toby Merrill
Toby Merrill (D.C. Bar ID MA0006)
Graham Provost (D.C. Bar No. 1780222)
Elaine Poon (VA Bar No. 91963)
(Pro Hac Vice forthcoming)

46

PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
toby@publicrightsproject.org
graham@publicrightsproject.org
elaine@publicrightsproject.org

*Counsel for Allegheny County, Kalamazoo County,
King County, Native Village of Kipnuk, City of
Sacramento, City and County of San Francisco,
City of Springfield, and Treasure Island Mobility
Management Agency and Proposed Class Counsel*

/s/ Gary DiBianco
Gary DiBianco (D.C. Bar No. 458669)
Jillian Blanchard (CA Bar No. 203593)
(Pro Hac Vice forthcoming)
Larissa Koehler (CA Bar No. 289581)
(Pro Hac Vice forthcoming)
LAWYERS FOR GOOD GOVERNMENT
6218 Georgia Avenue NW, # 5001
Washington, D.C. 20011
Telephone: (202) 258-6826
Gary@lawyersforgoodgovernment.org
Jillian@lawyersforgoodgovernment.org
Larissa@lawyersforgoodgovernment.org

*Co-Counsel for Institute for Sustainable
Communities, Inter-Tribal Council of Michigan,
Kalamazoo County, and Native Village of Kipnuk*

/s/ Yvonne R. Meré
David Chiu (CA Bar No. 189542)
SAN FRANCISCO CITY ATTORNEY
Yvonne R. Meré (CA Bar No. 175394)
(Pro Hac Vice forthcoming)
Chief Deputy City Attorney
Mollie M. Lee (CA Bar No. 251404)
(Pro Hac Vice forthcoming)
Chief of Strategic Advocacy
Sara J. Eisenberg (CA Bar No. 269303)
(Pro Hac Vice forthcoming)
Chief of Complex and Affirmative Litigation
Julie Wilensky (CA Bar No. 271765)
(Pro Hac Vice forthcoming)

Deputy City Attorney
1390 Market Street, 7th Floor
San Francisco, CA 94102
Telephone: (415) 554-4274
yvonne.mere@sfcityatty.org
mollie.lee@sfcityatty.org
sara.eisenberg@sfcityatty.org
julie.wilensky@sfcityatty.org

*Counsel for Plaintiffs City and County of San Francisco and Treasure Island Mobility Management Agency*

/s/ David J. Hackett
David J. Hackett (WA Bar No. 21234)
(pro hac vice forthcoming)
General Counsel to King County Executive &
Special Deputy Prosecutor
Alison Holcomb (WA Bar No. 23303)
(pro hac vice forthcoming)
Deputy General Counsel to King County Executive
& Special Deputy Prosecutor
OFFICE OF KING COUNTY PROSECUTING ATTORNEY
LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr. County*