Table of Contents – Exhibit 1

| Exhibit Name | Title Document |
|---|---|
| Exhibit 1-A | Declaration of Travis Voyles, EPA Assistant Deputy Administrator |
| Exhibit 1-B | Declaration of Daniel Coogan, EPA Office of Mission Support Deputy Assistant Administrator |
| Exhibit 1-C | Email from T. Voyles re TCTACs |
| Exhibit 1-D | Email from Jacob Burney to ISC |
| Exhibit 1-E | Declaration of Michelle Roos, Environmental Protection Network |
| Exhibit 1-F | Email from D. Coogan to T. Voyles with list of grant programs to terminate |
| Exhibit 1-G | Email from M. Wise re termination template |
| Exhibit 1-H | Email from D. Coogan ordering that a control be placed on listed ASAP accounts |
| Exhibit 1-I | EPA Grant Termination SOP |
| Exhibit 1-J | Sample Termination Letter |
| Exhibit 1-K | CCG Grant Programmatic Terms and Conditions |

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-A

# Declaration of Travis Voyles

# EPA Assistant Deputy Administrator

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

The Sustainability Institute, et. al.,

        Plaintiffs,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United
States, et. al.,

        Defendants

Civil Action No.: 2:25-cv-02152-RMG

## DECLARATION OF TRAVIS VOYLES

I, TRAVIS VOYLES, declare and state as follows:

1.    I am an Assistant Deputy Administrator at the U.S. Environmental Protection Agency. The Assistant Deputy Administrator is the EPA official responsible for providing executive and logistical support for the EPA Administrator. I have held this position since January 2025. I make the following factual statements based on my personal knowledge and belief. If called as a witness, I could and would competently testify thereto.

2.    The following is provided in response to paragraph 1 of the April 29, 2025, Court Order ("the Order"), specifically regarding:

- Grant #2 on Exhibit A to the Order, Grant #5F-03D33625-0 to Earth Island Institute, listed as "Termination in Progress";

- Grant #3 on Exhibit A to the Order, Grant #03D30824[1] to The Sustainability Institute, listed as "Termination in Progress";

- Grant #4 on Exhibit A to the Order, Grant #97T28301 to Leadership Counsel for Justice and Accountability, listed as "Termination in Progress";

---

[1] Exhibit A erroneously omitted a zero from the beginning of this grant number.

1

**Exhibit 4**

- Grant #5 on Exhibit A to the Order, Grant #96272300 to Bronx River Alliance, listed as "Termination in Progress";

- Grant #6 on Exhibit A to the Order, Grant #97T28901 to Earth Island Institute, listed as "Termination in Progress";

- Grant #7 on Exhibit A to the Order, Grant #00A01479 to City of New Haven, listed as "Termination in Progress";

- Grant #8 on Exhibit A to the Order, inadvertently identified as Grant #0E+00000 to the City of Madison, and therefore incorrectly listed as "Closed", and which should be listed as Grant #00E05005 to the City of Madison, and "Termination in Progress";

  and

- Grant #9 on Exhibit A to the Order, Grant #00A01441 to City of New Haven, listed as "Terminated";

- Grant #10 on Exhibit A to the Order, Grant #95336801 to City of Baltimore, listed as "Terminated";

- Grant #11 on Exhibit A to the Order, Grant #03D03424 to CleanAIRE NC, listed as "Terminated";

- Grant #12 on Exhibit A to the Order, Grant #96229424 to Bronx River Alliance, listed as "Terminated".

3. On February 25, 2025, I conducted an individualized review of EPA grant programs for consistency with Agency policy priorities. That day, I decided that certain grant programs, identified by "Assistance Number Listing," should be terminated for policy reasons. I orally communicated my decision to Daniel Coogan, Deputy Assistant Administrator for Infrastructure and Extramural Resources in the Office of Mission Support. That evening, Mr. Coogan sent an

email to me, copying others, documenting the decision I had made earlier that day. *See* Exhibit 1, Bates No. EPA_00289735.

      4.     On March 7, 2025, Mr. Coogan sent an email to leadership in the EPA Office of the Chief Financial Officer instructing them to put a financial control in the Automated Standard Application for Payments (ASAP) system for the grants that had been identified for termination. In a separate email, I elaborated that the purpose of the control was "to prevent any drawdowns in the time between announcement and execution [of grant termination] through [the Office of Mission Support]." *See* Exhibit 2, Bates No. EPA_00048219.

      5.     Later that day, staff in the EPA Office of the Chief Financial Officer executed my instructions, and sent an email back to their leadership with an attached excel spreadsheet verifying the programs they had subjected to the financial control, as well as a list of the individual awards for which drawdowns had been frozen as a result. *See* Exhibit 3, Bates No. EPA_00000735 and Exhibit 4, Bates No. EPA_00000739. Each of the grants listed in Paragraph 1 of this Declaration appears on that spreadsheet.

      6.     Consistent with my instruction, throughout March, EPA began terminating the grants I had originally identified for termination on February 25, 2025, while noting the need to comply with court orders in various cases. *See* Exhibit 5, Bates No. EPA_00292053 and Exhibit 6, Bates No. EPA_00292054. Accordingly:

- Grant #9 on Exhibit A to the Order, Grant #00A01441 to City of New Haven was terminated on March 27, 2025;

- Grant #10 on Exhibit A to the Order, Grant #95336801 to City of Baltimore was terminated on March 26, 2025;

- Grant #11 on Exhibit A to the Order, Grant #03D03424 to CleanAIRE NC, was terminated on March 28, 2025; and

- Grant #12 on Exhibit A to the Order, Grant #96229424 to Bronx River Alliance, was terminated on March 28, 2025.

7. The process of terminating grants while remaining in compliance with court orders continues today. *See* Exhibit 7, Decl. of Daniel Coogan filed in *Woonasquatucket River Watershed Council et al. v. Department of Agriculture et al.*, 1:25-cv-00097 (D.R.I.), April 23, 2025, at para 5.

8. Accordingly, each of the grants identified in Paragraph 1 of this Declaration as "termination in progress" has not been terminated, and, as of the date of this Declaration, each of those recipients currently has access to draw down funding from ASAP.

9. In response to paragraph 4 of the April 29, 2025, Order, regarding Grant #15 on Exhibit A to the Order, Grant #0602.24.082555 to Alliance for the Shenandoah Valley, upon further review, that grant is not from the U.S. Environmental Protection Agency. Therefore, I have no information to provide regarding that grant.

10. In response to paragraph 5 of the April 29, 2025, Order, regarding Grant #8 on Exhibit A to the Order, as indicated in paragraph 1 of this Declaration above, Exhibit A erroneously identified the subject grant as Grant #0E+00000 to the City of Madison, and as a result incorrectly listed as the grant as "Closed." Upon further review, the grant at issue is Grant #00E05005 to the City of Madison, and its status is "Termination in Progress." Funds are currently available to the recipient.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of May 2025.



/s/
TRAVIS
VOYLES

Digitally signed by TRAVIS VOYLES
Date: 2025.05.06 15:00:29 -04'00'

Travis Voyles
Assistant Deputy Administrator
United States Environmental Protection Agency

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-B

## Declaration of Daniel Coogan

## EPA Office of Mission Support Deputy Assistant Administrator

# <u>DECLARATION OF DANIEL COOGAN</u>

I, Daniel Coogan, declare and state as follows:

1.      I am the Deputy Assistant Administrator for Infrastructure and Extramural Resources in the Office of Mission Support, for the United States Environmental Protection Agency ("EPA") located at 1200 Pennsylvania Avenue, NW, Washington, D.C. 20460. I have been in my current position since December 2023, and I have been at the agency since November 2004.   I make the following factual statements based on my personal knowledge and belief.  If called as a witness, I could and would competently testify thereto.

2.      During the transition between the last Presidential Administration and the current Administration, EPA has limited activity on grant awards and actions so career staff can brief the new Administration on the on-going grants and programs and help the new Administration understand how the program aligns with their priorities including ensuring the safeguard of Agency funds.

3.      As part of this effort, and distinct from any Executive Orders or OMB memorandums, EPA leadership conducted an individualized, grant-by-grant review to determine which grants should continue, which should be modified, and which should be terminated based on alignment with Administration priorities or the purposes for which the Federal award was made. EPA began this process for the Administration in January 2025.

4.      The review process resulted in EPA continuing all Infrastructure Investments and Jobs Act ("IIJA") grants, which include 2,004 active grants totaling $27.5 billion. Many Inflation Reduction Act ("IRA") grants remain active following review, including 979 active grants totaling $39.5 billion.

5.      The above review process occurred prior to the issuance of the preliminary injunction on April 15, with decisions to terminate tranches of IRA grants made on the following dates: February 13, March 3, March 10, and April 14.

**Exhibit G**

EPA is in the process of sending out the formal termination/cancellation notices to all of the impacted grantees. EPA has already sent out formal notices to approximately 377 grantees. For the remaining approximately 404 grantees, EPA plans to issue notices within the next two weeks.

6. EPA has only paused access to funding in Automatic Standard Application for Payments ("ASAP") for recipients of the following IRA grant programs which are slated to be terminated as mentioned above: Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program; Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice; Environmental Justice Government-to-Government (EJG2G) Program; Environmental Justice Small Grant Program; Financial Assistance For Community Support Activities To Address Environmental Justice Issues; Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM); Environmental and Climate Justice Block Grant Program; and Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products.

7. EPA understands the Court's Order to require that all funds appropriated under the IRA or IIJA be unfrozen unless there is a pre-existing determination (from before entry of the preliminary injunction) to pause that funding on an individualized basis for some other, independent reason (i.e., apart from the fact that it was appropriated under the IRA or IIJA). The above still-paused, soon-to-be-terminated IRA grants meet those criteria. Accordingly, EPA believes that continued pauses of those grants complies with the Court's Order. EPA is not "freezing, halting, or pausing on a non-individualized basis the processing and payment of funding that (1) was appropriated under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act and (2) has already been awarded." *Woonasquatucket River Watershed Council v. United States Dep't of Agric.*, No.

1:25-cv-00097-MSM-PAS, 2025 U.S. Dist. LEXIS 71378 (D.R.I. Apr. 15, 2025) (order granting preliminary injunction).

8. Despite the current pause on these grants, EPA will still reimburse all costs incurred prior to the grant formally being terminated, once recipients submit final invoices as part of the grant close-out process as detailed in the grant termination letter and at 2 CFR § 200.334.

9. Restoring access to the paused grants would expose EPA and taxpayers to tremendous risk as recipients would have the ability to draw-down large portions of grant funding in ASAP, and could believe that they have an incentive to make such draws if they believed the pause on the suspension was temporary. Recouping these funds upon termination of the grants would be difficult.

I declare under penalty of perjury that the foregoing is true and correct.


DANIEL COOGAN
Digitally signed by DANIEL COOGAN
Date: 2025.04.23 10:45:40 -04'00'
_____
Daniel Coogan
Deputy Assistant Administrator for
Infrastructure and Extramural
Resources
Office of Mission Support
U.S. Environmental Protection
Agency

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-C

# Email from T. Voyles re TCTACs

6/24/2024

--

Travis Voyles
C: (202) 787-0595

**From:** Voyles, Travis
**Sent:** Thursday, February 20, 2025 8:22 AM
**To:** Killian, Cole <Killian.Cole@epa.gov>; Loving, Kathryn <Loving.Kathryn@epa.gov>
**Cc:** Corlett, Thomas <Corlett.Thomas@epa.gov>; Hanson, Paige (Catherine) <hanson.catherine@epa.gov>;
Vaseliou, Molly <Vaseliou.Molly@epa.gov>
**Subject:** RE: Loving, Kathryn shared "contract_details" with you

Good Morning Team—

Below are the next set of approved to cancel grants. $42,261,933 total in remaining funds it looks like, but OMS
can confirm.

One flag I have is the first few large ones are the EJ Thriving Communities Technical Assistance Centers (TCTACs)— https://www.epa.gov/environmentaljustice/environmental-justice-thriving-communities-technical-assistance-centers. There were 18 in total established, so a number of them are missed here. Not sure why they didn't all get captured (they may not have all gone out yet), but I would want to apply a broad approach and cancel them all in the vein the entire program is inconsistent with Adminstration priorities and I personally do not see the need for these because at the state-level, EPA and the TCTAC grantees refused to engage with the state in any kind of coordination. This should result in a larger $$ amount.

I can flag for OMS separately too that we want the cancellation to extend to every TCTAC grantee.

| Date Cancellation Process Started | Rationale | Terms and Conditions (T&C) | URL |
|---|---|---|---|
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_84061101_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_13746681_6800 |

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_98T65801_6800 |
|---|---|---|---|
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_95314201_6800 |

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_96701501_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_00E03450_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_00E03451_6800 |

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_00I10501_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_95338201_6800 |

EPA_00299080

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_98T88701_6800 |
|---|---|---|---|
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_95334801_6800 |

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_03D03124_6800 |
| --- | --- | --- | --- |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_02F50801_6800 |

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_98T91501_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_02J56601_6800 |

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_00A01436_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_98T91201_6800 |

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_02F50601_6800 |
|---|---|---|---|

| Financial Account Indentifier Number (FAIN) | Award Amount | Total Outlayed Amount (Estimate) | Remaining Amount (Estimate) | Recipient Name |
|---|---|---|---|---|

EPA_00299085

| | | | | |
|---|---|---|---|---|
| 84061101 | $8,000,000 | $1,564,072.97 | $6,435,927.03 | INSTITUTE FOR SUSTAINABLE COMMUNITIES |
| 13746681 | $8,000,000 | $0.00 | $8,000,000.00 | DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE INC |

| | | | | |
|---|---|---|---|---|
| 98T65801 | $5,100,000 | $908,057.59 | $4,191,942.41 | SAN DIEGO STATE UNIVERSITY FOUNDATION |
| 95314201 | $5,000,000 | $449,582.62 | $4,550,417.38 | NATIONAL WILDLIFE FEDERATION |

| | | | | |
|---|---|---|---|---|
| 96701501 | $5,000,000 | $1,069,922.66 | $3,930,077.34 | WICHITA STATE UNIVERSITY |
| 0.00E+00 | $5,000,000 | $1,278,176.09 | $3,721,823.91 | REGENTS OF THE UNIVERSITY OF MINNESOTA |
| 0.00E+00 | $4,000,000 | $1,324,675.77 | $2,675,324.23 | BIG, NFP |

EPA_00299088

| | | | | |
|---|---|---|---|---|
| 00I10501 | $4,000,000 | $91,832.00 | $3,908,168.00 | MONTANA STATE UNIVERSITY |
| 95338201 | $500,000 | | $500,000.00 | APPALACHIAN VOICES |

EPA_00299089

| | | | | |
|---|---|---|---|---|
| 98T88701 | $500,000 | $72,910.10 | $427,089.90 | BAYVIEW HUNTERS POINT COMMUNITY ADVOCATES, INC. |
| 95334801 | $500,000 | | $500,000.00 | NUEVA ESPERANZA, INC. |

| | | | | |
|---|---|---|---|---|
| 03D03124 | $500,000 | $67,487.25 | $432,512.75 | PARKS ALLIANCE OF LOUISVILLE, INC. |
| 02F50801 | $500,000 | | $500,000.00 | EARTH CARE INTERNATIONAL |

EPA_00299091

| | | | | |
|---|---|---|---|---|
| 98T91501 | $500,000 | $11,350.40 | $488,649.60 | THE FRIENDSHIP HOUSE ASSOCIATION OF AMERICAN INDIANS |
| 02J56601 | $500,000 | | $500,000.00 | OREGON COAST VISITORS ASSOCIATION, INC. |

| | | | | |
|---|---|---|---|---|
| 00A01436 | $500,000 | | $500,000.00 | NEW HAVEN ECOLOGY PROJECT INC |
| 98T91201 | $500,000 | | $500,000.00 | COUNCIL FOR NATIVE HAWAIIAN ADVANCEMENT |

| 02F50601 | $500,000 | | $500,000.00 | BLACK UNITED FUND OF TEXAS, INC. |

| Description | Date Signed |
|---|---|

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-D

# Email from Jacob Burney to ISC

Message

| | |
|---|---|
| **From:** | Burney, Jacob [Burney.Jacob@epa.gov] |
| **Sent:** | 2/23/2025 9:52:52 PM |
| **To:** | Segovia, Theresa [Segovia.Theresa@epa.gov]; Park, Susan [Park.Susan@epa.gov]; Belle, Kara [Belle.Kara@epa.gov]; Clarke, Rosita [clarke.rosita@epa.gov]; Triantafillou, Kathy [triantafillou.kathy@epa.gov] |
| **CC:** | Drummond, James [Drummond.James@epa.gov]; Quenemoen, Marianna [Quenemoen.Marianna@epa.gov] |
| **Subject:** | TCTAC Terminations - Copies of Amendments w/ substantial noncompliance Termination Provision |
| **Attachments:** | OMB Form 00110501-1.pdf; OMB Form 95314201-2.pdf; OMB Form 13746681-2.pdf; OMB Form 00E03450-2 (1).pdf; OMB Form 98T65801-2 (1).pdf; OMB Form 96701501-2 (1).pdf; Termination_Memo_Template_Feb21.docx_XJ00E03450-4.docx |

**Importance:**    High

Greetings Theresa, Susan and Lead Region:

I wanted to consolidate information for everyone for easier reference.

Attached are the 6 TCTAC grants who received termination letters over the weekend yet have the termination provision that states only substantial noncompliance and/or adequate evidence of waste, fraud, and abuse can be the bases for EPA to unilaterally terminate the award:
1.    Montana State University (R8)
2.    Wichita State University (R7)
3.    University of Minnesota (R5)
4.    Deep South Center for EJ (R4/R6)
5.    San Diego State University Foundation (R9)
6.    National Wildlife Federation (R3)

These amendments also updated each of the grants requiring the recipient to comply with the FY25 EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later.  Also, please note that according to the substantial noncompliance termination provision, any uncommitted funds from a termination must come back to the program for re-obligation to another TCTAC within 90 days.

For reference purposes, I've also included one of the **Termination Form Memos** that was sent to the TCTACs detailing the reason for the unilateral termination.

I think it's important that we run this information up our respective leadership chains this week to ensure leadership is aware.

Hope this helps in keeping everything sorted.

Regards,
Jacob

Jacob J. Burney  |  Division Director |  Grants Management Division  | Office of Environmental Justice and External Civil Rights |
Tel:202.564.2907 | US EPA 1200 Pennsylvania Ave. NW (2201A) Washington, DC 20460 | Burney.Jacob@epa.gov

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-E

# Declaration of Michelle Roos

# Environmental Protection Network

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF MICHELLE ROOS**
**ENVIRONMENTAL PROTECTION NETWORK**

I, Michelle Roos, declare as follows:

1.  My name is Michelle Roos. I live in the Bronx, New York. This declaration is based on
    my personal knowledge, professional education, and experience with EPA grant-making
    practices and procedures. I am over the age of eighteen and suffer from no legal
    incapacity. I am the Executive Director of the Environmental Protection Network
    ("EPN"), a nonprofit organization that has both been directly affected by federal funding
    terminations and is currently assisting over 500 Environmental Protection Agency
    grantees and subrecipients who have been subject to federal funding freezes and
    terminations.

2.  EPN is a nonpartisan organization composed of over 650 former U.S. Environmental
    Protection Agency ("EPA") career staff and political appointees from both political
    parties. Established in January 2017, EPN serves as a trusted resource, offering objective
    analysis and scientific expertise to protect the integrity of EPA and its mission to
    safeguard human health and the environment. EPN's core initiatives include advocating
    for policies and institutional changes that address environmental injustices, public health,
    and climate challenges and providing pro bono technical assistance and training to
    frontline communities and under-resourced government agencies. Additionally, EPN
    educates Congress and serves as a critical resource for journalists and strategic partners,
    ensuring that environmental policies are informed by rigorous scientific understanding
    and a commitment to public health.

3.  EPN has been providing pro bono capacity building technical assistance on EPA financial assistance opportunities since the spring of 2021 and has assisted nonprofits and local, state, and Tribal government agencies apply for federal funding in the climate, air, and environmental justice programs since early 2022. Over the past four years, EPN and its volunteer network have provided direct and indirect technical assistance to over 1,000 EPA applicants applying for awards under the Environmental and Climate Justice Block Grant Program. Specifically, EPN directly assisted approximately 400 Community Change Grant ("CCG") Program potential applicants, and dozens of Environmental Justice Collaborative-Problem Solving ("EJCPS") and Government-to-Government ("EJG2G") potential applicants during their respective competitive application processes.

4.  In my experience, it often takes grant applicants between 150-300 hours of work to complete complex federal funding applications. EPA's Notices of Funding Opportunities require preparing budgets, documentation, and detailed scopes of work. They also require workplans for achieving environmental results and legally-binding agreements for subawards to statutorily required partners to show their ability to carry out all of the statutory, regulatory and programmatic requirements.

5.  When I worked at EPA as a career employee during the George W. Bush administration, I co-launched and co-managed a bipartisan-supported regional grant program to reduce emissions from diesel engines along the West Coast and learned a tremendous amount about how federal grants programs operate. Years later, I co-launched EPN's pro bono capacity-building technical assistance program. We have directly assisted hundreds of organizations in applying for, and implementing, federal grants. During the last 3 years EPN has become an important hub for pro bono technical assistance to under-resourced

organizations and government agencies interested in applying for and managing EPA grants. I personally circulate resources, help to facilitate webinars and office hours, answer dozens of specific questions each week, and have seen and experienced firsthand the devastating impact of EPA's arbitrary federal funding freezes and terminations.

6. Since the change in Administrations, EPN has been in touch with several hundred EPA grantees and subrecipients who have had their EPA grants frozen without notice of the reasons for the EPA actions and then received vague notifications that their grants were terminated. Specifically, in February, after losing access to their legally-obligated funding award, grantees started to receive termination letters citing general statements without factual support that their grant was inconsistent with, and no longer effectuates, agency priorities.

7. I have followed the public statements by EPA Administrator Zeldin, and I also have reviewed sworn declarations by EPA officials, including Daniel Coogan, in the *Sustainability Institute v. USDA and Woonsaquatucket River Watershed Council v. USDA* cases. For example, Mr. Coogan stated in his April 23, 2025 declaration that "EPA leadership conducted an individualized, grant-by-grant review to determine which grants should continue, which should be modified, and which should be terminated based on alignment with Administration priorities or the purposes for which the Federal award was made." My understanding is that this purported review has led to terminations of all EPA grants funded under Section 138 of the Clean Air Act, which authorized and appropriated funding for Environmental and Climate Justice Block grants.

8. Based on my review of EPA grant termination memos, between February 25, 2025, and May 2, 2025, EPA issued termination notices to grantees who held awards under the

Environmental and Climate Justice Block Grant Program, which is authorized under

Section 138 of the Clean Air Act.

9.  Attached hereto is a true and correct copy of a Freedom of Information Act request made

by EPN on May 13, 2025. The request asks for any communications, records, or analysis

reflecting the individual determinations for the following grant termination decisions:

- Environmental Justice Collaborative Problem-Solving Cooperative Agreement
  Program (CFDA # 66.306; 203 grants)

- Surveys, Studies, Investigations, Training and Special Purpose Activities Relating
  to Environmental Justice (CFDA # 66.309; 56 grants)

- Environmental Justice Government-to-Government (EJG2G) Program (CFDA #
  66.312; 128 grants)

- Environmental Justice Small Grant Program (CFDA # 66.604; 132 grants)

- Financial Assistance For Community Support Activities To Address
  Environmental Justice Issues (CFDA # 66.614; 5 grants)

- Environmental Justice Thriving Communities Grantmaking Program (EJTCGM)
  (CFDA # 66.615; 20 grants)

- Environmental and Climate Justice Block Grant Program (CFDA # 66.616; 103
  grants)

- Reducing Embodied Greenhouse Gas Emissions for Construction Materials and
  Products (CFDA # 66.721; 1 grant)."

10. In my experience at EPA, terminations of grant programs prior to January 20, 2025, were

extremely uncommon. When they did happen, they would involve a number of internal

communications reflecting analyses of specific situations, including emails or other

electronic messages discussing progress reports and other grants-related documents that

establish some kind of non-compliance with the terms of the grant award. That same

practice would be followed if the termination was based on other grounds given the

importance of establishing a record for the basis of a termination decision as

contemplated by the Federal Records Act. There would be documentation of meetings

with project officers, grants specialists, grants management officials, grants attorneys,

grant program managers and/or other decision makers that would be involved in a

termination. In addition, in the past, if an EPA representative identified a potential

non-compliance to justify terminating the grant, they would often work directly with the

grantee to resolve the issue through specific conditions.

11. Also in my experience, EPA personnel are aware of their obligations to preserve agency

records subject to FOIA. EPA requires all employees—both career and political—to

complete annual online FOIA training. This training is provided through the online

FedTalent tool and is designed to educate employees on FOIA basics, processing

procedures, and their responsibilities in handling FOIA requests. The training is

mandatory and tracked by office managers for accountability. Moreover, the evaluations

supporting the "individualized, grant-by-grant review" referred to in Mr. Coogan's

declaration for potential termination would constitute agency records that would be

subject to document preservation rules within the EPA.

12. Accordingly, in making the above FOIA request, it was my expectation that if each grant

had been subject to individual evaluation, there would be substantial records responsive

to the request.

13. Instead, I received the FOIA response dated June 12, 2025, attached hereto as Exhibit 2,

which states: "The Office of Mission Support, Office of Grants and Debarment has

reviewed your request and has located no responsive records."

14. Failure on the part of the EPA to find responsive records seems to contradict the strong language employed by Daniel Coogan in his declaration that there was an in-depth and individualized determination made for all grants before they were terminated.

15. The EPA has appeared to conduct en masse terminations that has had the effect of further punishing communities that already experience disproportionate impacts from pollution.

16. The FOIA response is consistent with my experience to date in working with over 200 grantees who have been either frozen or terminated under the Environmental and Climate Justice Block Grant Program. I have talked with hundreds of grantees when they were first frozen and then terminated who could not understand why this had happened or identify an individualized reason why their grant had been terminated. Most of them shared termination memos with me that used uniform and generic language relating to a vague 'change in Agency priorities.'

17. I spoke with a New York Times (NYT) reporter to share the story regarding the FOIA response.  The NYT reporter contacted EPA for a statement after which time, I was told by the NYT that the EPA said that they had made a mistake, and that they will be following up with EPN to correct the mistake to release additional records. As of the date and time I am executing this, I have not seen any additional documentation to support individualized review of the grant terminations and find it surprising that such documentation was only identified as being in existence after EPA was contacted by the NYT.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United

States, the foregoing is true and correct.


Executed this 24th day of June 2025.

*Michelle Roos*

Michelle Roos

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-F

Email from D. Coogan to T. Voyles with list of grant programs to terminate

awarded); Environmental Justice Government-to-Government (EJG2G) Program ($2M pending); Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) ($29M awarded—these were cancelled right?); Environmental Education Grants Program ($876K pending; $4M awarded).

Hopefully I am not missing anything that is important, but let me know if there is anything else that would helpful in briefing on impacts.

--

Travis Voyles
C: (202) 787-0595

## Controlled by U.S. Environmental Protection Agency

**From:** Coogan, Daniel <Coogan.Daniel@epa.gov>
**Sent:** Tuesday, February 25, 2025 9:29 PM
**To:** Voyles, Travis <voyles.travis@epa.gov>; Loving, Kathryn <Loving.Kathryn@epa.gov>; Jehling, Erica <Jehling.Erica@epa.gov>
**Cc:** Molina, Michael <molina.michael@epa.gov>; Patrick, Kimberly <Patrick.Kimberly@epa.gov>
**Subject:** Next Steps on Grant Actions - Feb 25

# CUI//SP-BUDG

Travis, just wanted to make sure we are all aligned on today's discussion and next steps. Below is the list of grant programs that require some action from OMS (for those that you cleared to continue operating, like Brownfields, I am not including them below and we will just communicate that direction separately with the programs and regions). The one caveat that I forgot to mention is that OMB directed agencies to adopt a new term and condition (based on grant regs) on October 1 that limits agencies' discretion to terminate grants. So as to limit potential dispute and other risk, I recommend that we focus for now on awards prior to October 1 and then work with OGC to get clear direction on how to handle the post-October 1 awards. Please let me know if you have any concerns with what is detailed below. Once we have your approval, we will move out on taking the necessary actions.

| CFDA/Assistance Number Listing | CFDA/Assistance Listing Title | Unawarded Grants | Grants Awarded Prior to October 1, 2024 | Grants Awarded After October 1, 2024 |
|---|---|---|---|---|
| 66.040 | Diesel Emissions Reduction Act (DERA) State Grants | Pause pre-award. OMS direct OAR to clear with OAR political leadership that pending actions align with administration priorities. | No change. | No change. |
| 66.049 | Clean Heavy-Duty Vehicles Program | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |

EPA_00043571

| 66.306 | Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
|---|---|---|---|---|
| 66.309 | Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice | Cancel any unawarded/ unobligated actions and realign with administration priorities. | Confirm funding source before further action. | Confirm funding source before further action. |
| 66.312 | Environmental Justice Government-to-Government (EJG2G) Program | Cancel any unawarded/ unobligated actions and decommit funding. | No change. | No change. |
| 66.604 | Environmental Justice Small Grant Program | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.614 | Financial Assistance For Community Support Activities To Address Environmental Justice Issues | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.615 | Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.616 | Environmental and Climate Justice Block Grant Program | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.721 | Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products | Cancel any unawarded/ unobligated actions and decommit funding. | No change. | No change. |

| 66.951 | Environmental Education Grants Program | Hold any unawarded/ unobligated actions to ensure compliance with Administration priorities. | No change. | No change. |
|---|---|---|---|---|

Controlled by U.S. Environmental Protection Agency

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-G

# Email from M. Wise re termination template

Message

| | |
|---|---|
| **From:** | Durand, Jessica [Durand.Jessica@epa.gov] |
| **Sent:** | 2/21/2025 10:03:35 PM |
| **To:** | Wise, Melissa [wise.melissa@epa.gov]; Lentz, Rachel [Lentz.Rachel@epa.gov] |
| **Subject:** | RE: Termination Memo |

Hi Melissa,

The Memo has been added: https://work.epa.gov/sites/default/files/2025-02/termination_memo_template.docx

And here is the SOP link again: https://work.epa.gov/sites/default/files/2025-02/grant_termination_sop.pdf

For reference, both documents are in the Policy Library. And it looks like this:

| Policy | Description | Topics |
|---|---|---|
| **Grant Termination SOP (pdf)** | **This SOP provides unilateral termination procedures.**<br>**Resources:**<br>1.   **Termination Memo Template (docx)** | 1.      Post-Award<br>2.      Closeout<br>3.      Terms and Conditions |

Jessica Durand
Branch Supervisor, Policy and Training Branch
National Policy, Training, and Compliance Division
Office of Grants and Debarment
Durand.jessica@epa.gov

---

**From:** Wise, Melissa <wise.melissa@epa.gov>
**Sent:** Friday, February 21, 2025 3:55 PM
**To:** Lentz, Rachel <Lentz.Rachel@epa.gov>; Durand, Jessica <Durand.Jessica@epa.gov>
**Subject:** FW: Termination Memo
**Importance:** High

Hi Rachel and Jessica,

I was going to ask Ayo to post the Termination Memo to our intranet site.  Any concerns?

Thanks,
Melissa

---

**From:** Wise, Melissa
**Sent:** Friday, February 21, 2025 3:12 PM
**To:** Brown, Devon <Brown.Devon@epa.gov>; Schindel, Phillip <Schindel.Phillip@epa.gov>; Tocci, Brian F. <Tocci.Brian@epa.gov>; Rose, Kenneth <Rose.Kenneth@epa.gov>; Sherwood, Kelly <Sherwood.Kelly@epa.gov>;

Shelmon, Shantel <Shelmon.Shantel@epa.gov>; Sykes, Karen <Sykes.Karen@epa.gov>; Fields, Robert <Fields.Robert@epa.gov>; Dolan, Sheila <dolan.sheila@epa.gov>; Watkins, Christopher <Watkins.Christopher@epa.gov>; Rawls, Whitney <rawls.whitney@epa.gov>; Hulstein, Sarah <hulstein.sarah@epa.gov>; Seeger, Lindsay <seeger.lindsay@epa.gov>; Truong, Carolyn <Truong.Carolyn@epa.gov>; Mendiola, Angela <Mendiola.Angela@epa.gov>; Johnson, Peggy D. <johnson.peggyd@epa.gov>; Manion, Andrea <Manion.Andrea.L@epa.gov>; Lloyd, Keva <Lloyd.Keva@epa.gov>; Phillips, Lashaun <Phillips.Lashaun@epa.gov>
**Cc:** Segovia, Theresa <Segovia.Theresa@epa.gov>; Johnson, Arthur <Johnson.Arthur@epa.gov>; McManus, Catharine <mcmanus.catharine@epa.gov>; Eubanks, Kristy <Eubanks.Kristy@epa.gov>; Sanders, Amy <Sanders.Amy@epa.gov>; Stanton, MaryA <Stanton.Marya@epa.gov>; Krehbiel, Ben <Krehbiel.Ben@epa.gov>; McCluney, Lance <McCluney.Lance@epa.gov>; Drake, Kerry <Drake.Kerry@epa.gov>; Chung, Angela <Chung.Angela@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>; Tsing-Choy, Kathy <Tsing-Choy.Kathy@epa.gov>; Jones-Peeler, Meshell <Jones-Peeler.Meshell@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Sylvester, Kenneth <Sylvester.Kenneth@epa.gov>
**Subject:** Termination Memo
**Importance:** High

Good afternoon, GMOs,

Here is the final/cleared Termination Memo that should be attached to the email notification.

GMOs:

- Copy/paste email language from Grant Termination SOP to compose the email
- Complete/attach the Termination Memo to the email
- Attach Amendment from NGGS to the email

You are now clear to complete all terminations by COB today.  Please let me know if you have any questions.

Thank you,
Melissa

---

**From:** Wise, Melissa
**Sent:** Thursday, February 20, 2025 6:27 PM
**To:** Brown, Devon <Brown.Devon@epa.gov>; Schindel, Phillip <Schindel.Phillip@epa.gov>; Tocci, Brian F. <Tocci.Brian@epa.gov>; Rose, Kenneth <Rose.Kenneth@epa.gov>; Sherwood, Kelly <Sherwood.Kelly@epa.gov>; Shelmon, Shantel <Shelmon.Shantel@epa.gov>; Sykes, Karen <Sykes.Karen@epa.gov>; Fields, Robert <Fields.Robert@epa.gov>; Dolan, Sheila <dolan.sheila@epa.gov>; Watkins, Christopher <Watkins.Christopher@epa.gov>; Rawls, Whitney <rawls.whitney@epa.gov>; Hulstein, Sarah <hulstein.sarah@epa.gov>; Seeger, Lindsay <seeger.lindsay@epa.gov>; Truong, Carolyn <Truong.Carolyn@epa.gov>; Mendiola, Angela <Mendiola.Angela@epa.gov>; Johnson, Peggy D. <johnson.peggyd@epa.gov>; Manion, Andrea <Manion.Andrea.L@epa.gov>
**Cc:** Segovia, Theresa <Segovia.Theresa@epa.gov>; Johnson, Arthur <Johnson.Arthur@epa.gov>; McManus, Catharine <mcmanus.catharine@epa.gov>; Eubanks, Kristy <Eubanks.Kristy@epa.gov>; Sanders, Amy <Sanders.Amy@epa.gov>; Stanton, MaryA <Stanton.Marya@epa.gov>; Krehbiel, Ben <Krehbiel.Ben@epa.gov>; McCluney, Lance <McCluney.Lance@epa.gov>; Drake, Kerry <Drake.Kerry@epa.gov>; Chung, Angela <Chung.Angela@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>; Tsing-Choy, Kathy <Tsing-Choy.Kathy@epa.gov>; Jones-Peeler, Meshell <Jones-Peeler.Meshell@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Sylvester, Kenneth <Sylvester.Kenneth@epa.gov>
**Subject:** List of Grant Terminations - 2/20
**Importance:** High

Good evening, GMOs,

I am writing to inform you that the grants attached have been identified and cleared for termination.

**The Termination Memo has not yet been cleared.  Therefore, do <u>not</u> take any final action until I send the Termination Memo.**

However, I wanted to provide as much advance notice as possible so you can begin the termination/closeout process, following the Grant Termination SOP finalized today: https://work.epa.gov/sites/default/files/2025-02/grant_termination_sop.pdf (must be on VPN).

If you have any questions, please let me know.

*Melissa Wise*

Director, Office of Grants and Debarment
Office of Mission Support
U.S. Environmental Protection Agency
1300 Pennsylvania Ave., NW
Washington, D.C. 20460
(202) 924-9911

*My working hours may not be your working hours. Please do not feel obligated to reply outside of your normal work schedule.*



APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-H

Email from D. Coogan ordering that a control be placed on listed ASAP accounts

Message

---

**From**:    Treml, Gregg [Treml.Gregg@epa.gov]
**Sent**:    3/7/2025 5:03:52 PM
**To**:    Gulamali, Adil [Gulamali.Adil@epa.gov]; Lavergne, Dany [lavergne.dany@epa.gov]
**CC**:    Kadeli, Lek [Kadeli.Lek@epa.gov]; Jones-Peeler, Meshell [Jones-Peeler.Meshell@epa.gov]; Robinson, Angel [robinson.angel@epa.gov]; Boyd, Wyatt [Boyd.Wyatt@epa.gov]
**Subject**:    FW: Place Hold/ Control in ASAP - 8 programs

Adil/Dany,
Please lock the accounts associated with the list below.  Please confirm when complete.  If it is going to take longer than today, please let me know soonest.

Thank you,
-Gregg

Gregg Treml
Acting Chief Financial Officer
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Room 4402A WJCN
Washington, DC  20460
(202)-564-1151
treml.gregg@epa.gov

---

**From:** Voyles, Travis <voyles.travis@epa.gov>
**Sent:** Friday, March 7, 2025 12:02 PM
**To:** Treml, Gregg <Treml.Gregg@epa.gov>
**Cc:** Molina, Michael <molina.michael@epa.gov>
**Subject:** RE: Place Hold/ Control in ASAP - 8 programs

Thank you for checking.

Yes, this is the direction. We are proceeding with cancelling these grants and would like to prevent any drawdowns in the time between announcement and execution through OMS.

--

Travis Voyles
C: (202) 787-0595

---

**From:** Treml, Gregg <Treml.Gregg@epa.gov>
**Sent:** Friday, March 7, 2025 12:00 PM
**To:** Voyles, Travis <voyles.travis@epa.gov>
**Cc:** Molina, Michael <molina.michael@epa.gov>
**Subject:** FW: Place Hold/ Control in ASAP - 8 programs

Travis,
Confirming this is your direction?

Thank you,
-Gregg

Gregg Treml
Acting Chief Financial Officer
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Room 4402A WJCN
Washington, DC  20460
(202)-564-1151
treml.gregg@epa.gov

**From:** Coogan, Daniel <Coogan.Daniel@epa.gov>
**Sent:** Friday, March 7, 2025 11:53 AM
**To:** Treml, Gregg <Treml.Gregg@epa.gov>; Kadeli, Lek <Kadeli.Lek@epa.gov>; Jones-Peeler, Meshell <Jones-Peeler.Meshell@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>
**Cc:** Patrick, Kimberly <Patrick.Kimberly@epa.gov>; Wise, Melissa <wise.melissa@epa.gov>
**Subject:** Place Hold/ Control in ASAP - 8 programs

All, we just had a check-in with Travis and as part of a broader effort related to certain grant programs, please put a control on ASAP accounts for all grants funded under the following grant programs so recipients cannot draw funds.

| CFDA/Assistance Number Listing | CFDA/Assistance Listing Title |
| --- | --- |
| 66.306 | Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program |
| 66.309 | Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice |
| 66.312 | Environmental Justice Government-to-Government (EJG2G) Program |
| 66.604 | Environmental Justice Small Grant Program |
| 66.614 | Financial Assistance For Community Support Activities To Address Environmental Justice Issues |

| 66.615 | Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) |
| 66.616 | Environmental and Climate Justice Block Grant Program |
| 66.721 | Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products |

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-I

# EPA Grant Termination SOP

# GRANT TERMINATION SOP
200.340 Unilateral Termination Procedures
Final 02/20/2025

This procedure is applicable to any assistance agreements subject to EPA General Terms and Conditions effective August 13, 2020 and all subsequent updates.

This action is both an Amendment and a Termination Notification under 2 CFR 200.341, meaning that it must be signed by an EPA Decision Official (generally an EPA Award Official/Grants Management Officer), and cannot be delegated.

[ HYPERLINK "https://work.epa.gov/sites/default/files/2024-06/sop_2024_g01.pdf" ] Awarding Official delegation list:

**Awarding Officials**

'✓' indicates delegated awards official(s) by region.

| Region | GMO/Branch Manager (BM) | MSDD/SRO |
|---|---|---|
| Region 1 | | ✓ |
| Region 2 | ✓(GMO *de-obligations/decreases only* < $1M) | ✓ |
| Region 3 | ✓ (BM < $5M) | ✓ (> $5M) |
| Region 4 | ✓ (GMO) | |
| Region 5 | ✓ (GMO) (BM) | |
| Region 6 | ✓ (GMO < $5M) | ✓ (> $5M) |
| Region 7 | ✓ (GMO) | |
| Region 8 | ✓ (GMO) | |
| Region 9 | ✓ (GMO) | |
| Region 10 | ✓ (GMO, BM, Tribal Grant Section Manager) | |
| OGD HQ | ✓ (GMO, BM, Division Director) | |

## The Change Request (CR) and Amendment Process – Grant Specialist (GS)

To prepare the amendment for signature, the GS performs the following actions:

A.  Initiate a Change Request for "General Amendment Requiring Signature"



B.  Document and type on the "Details" of the CR as follows:

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-J

# Sample Termination Letter



# OFFICE OF MISSION SUPPORT
### WASHINGTON, D.C. 20460

March 14, 2025

**MEMORANDUM**

**SUBJECT:**   Termination of EPA Assistance Agreement [Grant Number] under 2 CFR 200.340

**FROM:**      EPA Award Official

**TO:**        FirstName LastName, Title
              Office (Recipient Authorized Organization Representative (AOR))

The purpose of this communication is to notify you that the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. [insert Grant Number] awarded to [recipient organization]. In accordance with 2 CFR 200.340(a)(2) (effective August 13, 2020 – September 30, 2024) and the Termination term and condition contained in the EPA General Terms and Conditions effective August 13, 2020 – September 30, 2024, EPA Assistance Agreement [INSERT Grant Number] is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.

It is a priority of the EPA to eliminate discrimination in all programs throughout the United States. The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives, "environmental justice" initiatives, and conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the civil rights laws, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Agency priorities.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a):
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office has issued an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), [email address of the DDO], must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, [email address of EPA Award Official] within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.


ATTACHMENTS
1.  Amendment Document
2.  Name of file

cc:  FirstName LastName (EPA Grant Specialist)
     (EPA Project Officer)
     (Grantee Program Manager)

EPA_00050317

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-K

# CCG Grant Programmatic Terms and Conditions

# Community Change Grants Terms and Conditions

## REQUIRED FOR ALL COMMUNITY CHANGE GRANTS (CCG) AWARDS

- **A.** **General Award Information**
- **B.** **Programmatic Reporting and Notification**
- **C.** **Plans and Other Deliverables**
- **D.** **Subawards**
- **E.** **Procurement**
- **F.** **Participant Support Costs**
- **G.** **EPA Oversight**
- **H.** **Compliance**

## IF APPLICABLE

- **I.** **General Items**
- **J.** **Construction**
- **K.** **Foreign Entities and Travel**

## REQUIRED FOR ALL CCG AWARDS

## A.  General Award Information

**A.1. Period of Performance**

The period of performance under this award will start on the date specified in the **Budget/Project Period Start Date** of this award and end no later than three years from that date. However, the period of performance may end prior to three years from the start date specified in the Budget Period and Project Period of this award if the:

a.  Recipient has disbursed the entire award amount, and/or
b.  EPA Project Officer has advised the EPA Award Official that all required work of this award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(c), the recipient agrees to liquidate all allowable financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

Under no circumstances can the period of performance for this award exceed three years.

## B.  Programmatic Reporting and Notification

**B.1. Performance Reports: Contents**

a.  In accordance with 2 CFR 200.329, the recipient agrees to submit quarterly performance reports (see Term and Condition "Performance Reports: Frequency" below) that includes information on each of the following areas:

1.  A comparison of the actual accomplishments achieved under the award to the expected outputs/outcomes identified in the assistance agreement for the reporting period;

2.  The reasons why the expected outputs/outcomes were not met and an explanation of how this will be addressed to ensure they are met in the future; and

3.  Other pertinent information, including, when appropriate, analysis and explanation of cost overruns or higher-than-expected unit costs.

The information above may include overall best practices and/or lessons learned over the project performance period, and attachments and links for materials that may be helpful to other Environmental Justice grant recipients or similar organizations (e.g., tip sheets, "how-to" sheets, communication materials, outreach materials, web tools, etc.)

These reports will cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period, including descriptions of activities anticipated during the subsequent reporting period and of equipment, techniques and materials to be used or evaluated. A discussion of expenditures along with a comparison of the percentage of the project completed to the project schedule and an explanation of significant discrepancies will be included in the report. This report will also include any changes of key personnel concerned with the project.

b.  Further these reports must contain a summary of how the activities completed in the EPA-approved Community Change Grants workplan contribute to the Justice40 initiative under which 40% of overall benefits of certain federal investments flow to disadvantaged communities. These summaries may include information on the following activities designed to benefit disadvantaged communities, including:

1.  Activities performed to reduce the risk and/or impact of climate change;

2.  Activities performed to increase the use of clean energy and energy efficiency;

3.  Activities performed to provide better access to affordable and sustainable housing;

4.  Activities performed to provide training and workforce development;

5.  Activities performed for the remediation and reduction of legacy pollution; and

6.  Activities performed for the development of critical clean water and wastewater infrastructure.

The EPA PO will provide a Community Change Grants (CCG) Progress Report template to the recipient after award. Until the Office of Management and Budget (OMB) approves the template for mandatory use (hopefully by the first quarter reporting deadline), use of the template is optional. The template will contain all of the reporting requirements listed above.

Assuming use of the template becomes required, the EPA Project Officer will alert the recipient and provide the date on which the template becomes mandatory. The recipient agrees to use the template following OMB approval and notification of its mandatory use from the EPA Project Officer.

## B.2. Performance Reports: Frequency

The recipient agrees to submit quarterly performance reports electronically to the EPA Project Officer on the designated quarterly due date(s). **If the due date falls on a federal holiday or weekend, it is due the following business day.** The period end and due dates are listed in the below table.

| PERIOD ENDING | QUARTERLY DUE DATES |
|---|---|
| September 30 | October 31 |
| December 31 | January 31 |
| March 31 | April 30 |
| June 30 | July 31 |

The first quarterly report is due at the end of the first full quarter following the execution of the agreement, unless the recipient has incurred pre-award costs. If the recipient is authorized to incur pre-award costs, the grant performance period begins on the Budget/Period Start Date indicated on the Award document., and the recipient would provide a quarterly performance report following the end of the first full quarter after that date. Quarterly reports will continue thereafter and throughout the remainder of the performance period. The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance as identified in this agreement. The final report must document all project activities occurring during the Period of Performance and as outlined in the executed agreement. **However, the statutory three-year performance period for this grant program may not be extended**. Any costs incurred after the end of the performance period are the responsibility of the recipient and may not be charged to the grant.

## B.3. Notification Requirements

The recipient's Project Manager must notify the EPA Project Officer within five working days of becoming aware of a significant development occurs that could impact the award. Significant developments include events that enable meeting milestones and objectives sooner (or later), or at less (or more) cost than anticipated or that produce different beneficial results than originally planned. Significant developments also include problems, delays, or adverse conditions which will impact the ability to meet the milestones or objectives of the award, including the outputs/outcomes specified in the assistance agreement work plan, and/or the need to change statutory partners or other collaborative entities and subrecipients.

If the significant developments negatively impact the award, the recipient must include information on their plan for corrective action and any assistance needed to resolve the situation.

EPA requires each recipient's chief executive officer or equivalent review and submit each of these reports. EPA will use information from these reports as a part of program-side public reporting, except to the extent that such information includes confidential business information (CBI) or personally identifiable information (PII) pursuant to 2 CFR 200.338.

## B.4. Subaward Performance Reporting

In addition to the EPA General Terms and Condition "Establishing and Managing Subawards" in effect October 1, 2024 or later, the recipient must report on its subaward monitoring activities under 2 CFR 200.332(e) which includes, but is not limited to, reporting on the following items:

a.  Summaries of financial and programmatic reports;

b.  Summaries of findings from site visits and/or desk reviews to ensure effective subrecipient performance;

c.  Environmental results from the subrecipient(s) achieved, including a narrative discussion of impacts of program on improvement of environmental conditions in the target community;

d.  Summaries of audit findings and related pass-through entity management decisions;

e.  Any disagreements or potential challenges with subrecipients that may interfere with the completion of subgrant performance, and action the pass-through entity has taken to mitigate them such as those specified at 2 CFR 200.332(f), 2 CFR 200.208, and the 2 CFR Part 200.339 Remedies for Noncompliance; and

f.  Summaries of the actions taken to ensure that the subawards are benefitting disadvantaged communities.

NOTE: EPA will only collect reporting information from the Recipient (rather than from any subrecipients), but each recipient may need to collect reporting information from subrecipients (e.g., Collaborating Entities, Statutory Partners) to meet these reporting requirements.

## B.5. Final Performance Report

The recipient agrees to submit a final report in the same OMB-approved format (if available) as the quarterly progress reports. The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance as identified in this agreement. **The statutory three-year performance period for this grant program will not be extended**. Any costs incurred after the end of the performance period are the responsibility of the recipient and may not be charged to the grant.

The final report must document all project activities occurring during the Period of Performance as outlined in the executed agreement, including but not limited to detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Workplan.

Submitted reports must be ready to be published on the EPA website for public access and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personally Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI in publishable reports.

Reports submitted with CBI and/or PII will not comply with this requirement and may result in remedial action by EPA. Should EPA identify CBI and/or PII in reports, the EPA Project Officer will require that the recipient re-submit the report without that information so that it can be published without redaction.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

### B.6. Post-Project Follow-Up and Engagement

The EPA Community Change Grants Program is invested in the long-term success of each Community Change Grants recipient and the grant's impact on addressing the disproportionate environmental and public health impacts affecting communities.  For no less than three years after completion of the project, the recipient agrees to periodically update its designated EPA Project Officer on current community-based and environmental justice work the recipient is performing and how/if that work relates to its now completed Community Change Grants project. These periodic updates may include (but are not limited to) recent local media reports, additional grant funding received, new initiatives, and developing partnerships.

These post-project period updates allow the Community Change Grants Program to provide current and past recipients with additional guidance about applicable funding opportunities, potential collaborations, and technical assistance that may assist recipients in their future work.* The periodic updates also allow the program to track best practices that lead to greater project sustainability and long-term community revitalization for impacted community residents. The frequency of these periodic updates will be by mutual agreement and will be discussed with the recipient before the end of the project period. Recipients are also encouraged (but not required) to continue providing updates and engaging with their EPA Project Officer beyond the additional three years after the end of the project.

*NOTE – Compliance with this term & condition is strongly encouraged but not required, and non-compliance will not impact the recipient's subsequent application(s) for federal funding in any way. Compliance will not give the recipient any preference or priority during future EPA grant competitions and is not a guarantee for future EPA grant funding. Additionally, the recipient agrees not to submit a claim for compensation to EPA for providing these updates.

### B.7. Public or Media Events

The recipient agrees to notify the EPA Project Officer immediately when known, or at least within 15 calendar days in advance of planned public or media events it is organizing to publicize projects under this award, to provide the opportunity for attendance and participation by federal representatives.

### B.8. Additional Reporting Requirements

Additional reporting requirements and details are available in the EPA General Terms and Conditions, including but may not be limited to:

a.  Annual Federal Financial Reporting (FFR);
b.  Reporting Subawards and Executive Compensation;
c.  Annual MBE/WBE Utilization Under Federal Grants and Cooperative Agreements Report;
d.  Tangible Personal Property Report form series (SF-428);
e.  Reporting fraud, conflict of interest, bribery, or gratuity violations; and
f.  Closeout Reports.

## C.  Plans and Other Deliverables

**C.1. Quality Assurance**

Quality Assurance applies to all awards involving environmental information as defined in 2 CFR 1500.12 Quality Assurance. Quality assurance requirements apply to the collection of environmental data. Environmental data is any measurements or information that describe environmental processes, location, or conditions; ecological or health effects and consequences; or the performance of environmental technology. Environmental data includes information collected directly from measurements, produced from models and compiled from other sources, such as databases or literature.

a. **Quality Management Plan (QMP):** Prior to beginning environmental information operations, the recipient must complete one of the two following options:

   1. QMP Option 1: **Develop a QMP**
      a) Prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard. Submit the document for EPA review; and
      b) Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

   **OR**:

   2. QMP Option 2: **Submit a Current, Approved QMP**
      a) Submit a current QMP that was previously approved by the EPA to your EPA Project Officer.
      b) The EPA Quality Assurance or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the QMP is acceptable for this agreement.
      c) The recipient must submit the QMP within 60 days after the grant award.
      d) The recipient must review their approved QMP at least annually. These document reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.
      e) The recipient must submit a QMP crosswalk with the QMP.

NOTE: Contractor support for the development of the QMP is an eligible cost under this program provided that the costs are reasonable. In addition, technical assistance may be available at no cost. Reach out to your EPA Project Officer if you are interested in obtaining assistance with developing your QMP.

b. **Quality Assurance Project Plan (QAPP):** The recipient may need to develop at least one QAPP. A QAPP describes how environmental information operations are planned, implemented, documented, and assessed during the life cycle of a project. Requirements for QAPPs are found in the most recent version of EPA's Quality Assurance Project Plan Requirements/Standard Quality Assurance Project Plans (QAPP), available here.

Once the award is made, if a Quality Assurance Project Plan is required for the project, the recipient will draft a QAPP prior to beginning work on the project. You must reserve time and financial resources in the beginning of your project to prepare your QAPP. Recipients cannot begin data collection until EPA approves the QAPP.

Prior to beginning environmental information operations, the recipient must complete one of the three following options:

1. QAPP Option 1: **Develop a QAPP**

   a) Prepare QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard;

   b) Submit the document for EPA review, and

   c) Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

   **OR**

2. QAPP Option 2: **Submit Previously EPA-Approved QAPP**
   a) Submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s).
   b) The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QAPP is acceptable for this agreement.

   **OR**

3. QAPP Option 3: **Provide EPA a Recipient-Approved QAPP, with EPA-Approved QMP**
   Provide EPA a copy of the recipient-approved QAPP if the recipient has an EPA-approved Quality Management Plan and a current EPA delegation to review and approve QAPPs.

   a) The recipient must submit the QAPP no more than 60 days after the grant award.
   b) The recipient shall notify the EPA Project Officer and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.
   c) The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the EPA Project Officer and the QAM at least annually and may also be submitted when changes occur.
   d) The recipient must submit a QAPP checklist with the QAPP.

**Note:** Contractor support for the development of the QAPP may be an eligible cost under this award, provided that the costs are reasonable. In addition, technical assistance may be available at no cost. Reach out to your EPA Project Officer if you are interested in obtaining assistance with developing your QAPP(s).

**c. Quality Assurance and Subrecipients**

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement (or implement existing) Quality Assurance (QA) planning documents in accordance with this term and condition.

d. **For Reference:**

- Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

- EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

- EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

- The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## C.2. Competency of Organizations Generating Environmental Measurement Data

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.

Demonstration of competency may include (but not be limited to):

a. Current participation in accreditation or certification programs that are applicable to the environmental data generated under the EPA-funded assistance;
b. Ongoing participation by the organization in proficiency testing (PT) or round robin programs conducted by external organizations;
c. Ongoing U.S. EPA accepted demonstrations and audits/assessments of proficiency; and
d. Other pertinent documentation that demonstrates competency (e.g., past performance to similar statement of work [SOW]).

## C.3. Cost Allocation Plan

A cost allocation plan is a narrative description of the procedures that the recipient will use in identifying, measuring, and allocating costs incurred in support of programs administered or supervised by the recipient. A cost allocation plan is required when activities under the award will also be undertaken under other EPA grants or other funding sources.

Technical assistance may be available for assistance with developing cost allocation plans. Contact the EPA Project Officer if you would like to request assistance with your cost allocation plan.

## D. Subawards

### D.1. Subrecipient Capacity

Community Change Grant recipients making pass-through subawards must comply with applicable provisions of 2 CFR Part 200 and the EPA Subaward Policy.

In addition to the EPA General Term and Condition "Establishing and Managing Subawards", prior to making subawards, the recipient must ensure that the subrecipient has the capacity and capabilities to perform its subaward responsibilities and requirements in a timely, effective, and efficient manner.

### D.2. Statutory Partnership

The recipient must seek prior written approval from the Award Official if it wants to change the statutory partner for this grant from the entity identified in the selected application documented in the Partnership Agreement.

Due to the competitive nature of the Community Change Grant program, EPA approval will only be provided in very limited circumstances at EPA's sole discretion and will not be subject to dispute from the recipient. EPA approval is necessary to ensure that any proposed new statutory partner is an eligible subrecipient with comparable qualifications/expertise/experience to the original statutory partner such that performance of the grant will not be adversely impacted.

Requests for approval must be sent, along with any requested documentation, to the EPA Award Official, who will consult with the EPA Project Officer. EPA decides in its sole discretion whether to consider and/or approve the request.

### D.3. Collaborative Entities

The recipient must seek prior written approval from the Award Official if it wants to change collaborative entities for this grant from entities identified in the selected application.

Due to the competitive nature of the Community Change Grant program, EPA approval will only be provided in very limited circumstances at EPA's sole discretion and will not be subject to dispute from the recipient. EPA approval is necessary to ensure that any proposed collaborative entities are eligible subrecipients with comparable qualifications/expertise/experience to the original collaborative entities such that performance of the grant will not be adversely impacted.

Requests for approval must be sent, along with any requested documentation, to the EPA Award Official, who will consult with the EPA Project Officer. EPA decides in its sole discretion whether to consider and/or approve the request.

## E. Procurement

### E.1. Procurement Standards

The recipient agrees to conduct all procurement actions under this assistance agreement in accordance with the procurement standards set forth in 2 CFR 200.317 through 2 CFR 200.327, 2 CFR Part 1500, 40 CFR Part 33, and the EPA General Terms and Conditions. EPA provides additional guidance on complying

with these requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements. Any costs incurred by the recipient under contracts and/or small purchases that EPA determines to be in noncompliance with EPA procurement standards shall be unallowable for Federal reimbursement.

As provided by 2 CFR 200.310, recipients must ensure that subrecipients acquire insurance to protect against loss, damage, and theft if a subaward includes cost for equipment. Costs for such insurance are allowable under this agreement.

### E.2. Equipment Disposition

Notwithstanding EPA General Term and Condition "Tangible Personal Property", in accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA, unless the equipment is sold during the period of performance. Proceeds of sales of equipment purchased with EPA funds during the period of performance are program income.

### E.3. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. The property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests except as provided by the EPA.

### E.4. Recording the Purchase and/or Improvement of Real Property

a.  If the recipient acquires real property in whole or in part with EPA grant funds, the recipient must execute and record a statement of Federal interest (e.g., lien) on the deed that reflects the Federal contribution to the acquisition price. Liens on single family housing are required if EPA funds are used to acquire the real property and title to the property remains with the recipient.

    Liens on improvements to real property are not required, including energy efficiency upgrades to homes and individual apartment units, remediation of asbestos or lead based paint in homes and apartment units, or installation of residential solar without regard to whether EPA funds were used to acquire the real property.

    The statement of interest must, as applicable:

    1. State the real property is subject to the Federal interest;
    2. State that certain use and disposition requirements apply to the property;
    3. Be acceptable in form and substance to the EPA Award Official;
    4. Be placed on record in accordance with applicable State and local law;
    5. Provide the percentage of the purchase price funded by the EPA;
    6. Provide the EPA grant number;
    7. Provide that use of the real property is restricted to the authorized purpose of the grant; and
    8. Provide that the recipient is required to request disposition instructions when it ceases using the real property for the authorized purpose.

    An example of a lien for the purchase of real property is:

**NAME OF RECIPIENT** purchased this land with **X%** federal funds under a grant program from the U.S. Environmental Protection Agency (EPA). **NAME OF RECIPIENT** may only use this land [STATE PURPOSE – e.g., as part of the Richland Creek Water Quality Project, delineated in the legal description attached as Exhibit A,] as described in EPA Grant No. **AB-1235678. NAME OF RECIPIENT** will be responsible for maintaining this deed restriction in perpetuity. In the event **NAME OF RECIPIENT** wishes to change the use of the land from the identified grant purpose or encumber the property, **NAME OF RECIPIENT** must contact the EPA, Region **#**, and request written instructions for disposition pursuant to 2 CFR 200.311.

The recipient shall provide a copy of the deed (stamped by the appropriate recording office), reflecting the recordation of the Federal Interest to the EPA Project Officer and Grant Specialist.

## E.5. Appraisals

Recipients must obtain an appraisal of the property conducted by an independent licensed appraiser, prior to using grant funds to purchase the property. All appraisals must be conducted in accordance with 49 CFR 24.103. Recipients must provide a copy of the appraisal to the EPA Project Officer.

## E.6. Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA)

The URA applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs.

a. **Property/Land Acquisition.** Recipients and subrecipients must comply with the Uniform Relocation Act and Federal Highway Administration's implementing regulations at 49 CFR Part 24, which require recipients and subrecipients to follow certain procedures for acquiring property for grant purposes, such as notice, negotiation, and appraisal requirements.
b. **Relocation.** The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing.

The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 24 if an EPA-funded acquisition of property results in temporary or permanent displacement of individuals or businesses. Please note that projects for community or Tribal relocation are not eligible under this grant program. If a construction project has the incidental effect of temporarily or permanently displacing people or businesses, the URA will apply.

## E.7. Real Property Disposition

Pursuant to 2 CFR 200.311(d), when real property purchased with EPA grant funding is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

a. Retain title after compensating EPA. The recipient must pay an EPA an amount calculated by multiplying the percentage of EPA's contribution towards the cost of the original purchase (and costs of any improvements) by the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring

replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

b.  Sell the property and compensate EPA. When the recipient sells the property, it must pay EPA an amount calculated by multiplying the percentage of EPA's contribution towards the cost of the original purchase (and cost of any improvements) by the proceeds of the sale after deducting any actual and reasonable expenses paid to sell or fix up the property for sale. When the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When directed to sell property, the recipient must sell the property using procedures that provide for competition to the extent practicable and that result in the highest possible return.

c.  Transfer title to the Federal government or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by multiplying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) by the current fair market value of the property.

d.  Use the net sales proceeds as Program Income for the sustainability of the EPA-funded project or program.

# F. Participant Support Costs

## F.1. Participant Support Cost Requirements

*Participant support costs* are defined at 2 CFR 200.1 as direct costs that support participants and their involvement in the federally funded project, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants.

a.  Examples of participant support costs in EPA financial assistance agreements include but are not limited to:
    1.  Costs paid directly to or on behalf of participants;
    2.  Stipends for interns, fellows, trainees, or attendees at community meetings;
    3.  Registration fees, training materials;
    4.  Temporary dependent care and travel costs when the purpose of the trip is to participate in the project activity;
    5.  Travel assistance to non-employee program beneficiaries (e.g. travel assistance that nonprofit "co-regulator" organizations provide to State and Tribal workgroup members), including per diem; and
    6.  Stipends and other incentives paid to participants in research experiments, focus groups, surveys or similar research activities.
    7.  Participant Support Costs allowable under 2 CFR 1500.1(a)(2) to the extent authorized in the EPA-approved scope of work.

b.  In accordance with 2 CFR 200.456, the recipient must establish written guidelines for participant support costs as applicable. These guidelines must:

    1. Provide eligibility, restrictions, timelines, and other programmatic requirements;

    2. Describe the activities that will be supported by the participant support costs;

    3. Specify the range of funding to be provided through the participant support costs;

4. Identify which party will have title to equipment (if any) purchased with a rebate or subsidy;

5. Establish reporting and source documentation requirements (e.g., invoices) for accounting records; and

6. Describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

Participant support costs must be treated consistently across all Federal awards. See the EPA Guidance on Participant Support Costs for more information.

### F.2. Training and Tuition Stipend Limitation

Individuals who are not U.S. citizens or lawfully admitted to the U.S. as permanent residents can receive training under Track I and Track II, as appropriate, as described in the approved workplan. However, in accordance with RAIN-2019-G09: EPA Policy on Participation in Fellowship, Internship, Scholarship and Similar Programs Funded by EPA Assistance Agreements, individuals who are not U.S. citizens or lawfully admitted to the U.S. as permanent residents cannot receive EPA funded stipends or tuition for participating in training. The recipient may fund these tuition and stipend costs through other, non-EPA sources.

### F.3. Tax Liability for Participant Support Costs

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

### F.4. Individuals Excluded from Participant Support Costs under 2 CFR Part 180

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are covered transactions for the purposes of 2 CFR 180.300 and EPA General Term and Condition "Suspension and Debarment". Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal non-procurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants. See EPA Guidance on Participant Support Costs.

## G. EPA Oversight

### G.1. EPA Project Officer Oversight and Monitoring

The Community Change Grants are awards under a new environmental justice program authorized under Clean Air Act Section 138 that has features, and scopes of work, that are atypical of most EPA environmental justice grants. Therefore, pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary in this award to

ensure that recipients effectively carry out the award. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official, after consultation with the Project Officer and any other appropriate EPA staff determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary to ensure the effective performance of the award.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement throughout the performance period. This includes but is not limited to:

a. Determining next steps if a Statutory Partner or other collaborating entity (subrecipient) is unable to participate in the grant as provided in the approved work plan. See also the Terms and Conditions in Section D above;

b. Monthly telephone calls, video calls, site visits, and/other form of communication for monitoring (emails, video conference, etc.);

c. Reviewing evidence of completion of project phases (e.g., planning) before providing approval for the recipient to begin work on the next project phase (e.g. implementation);

d. Reviewing the substantive terms included in the contracts or subawards (EPA's Project Officer will not suggest, recommend, or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of the EPA's Subaward Policy). See also the "Procurement Standards" Term and Condition above, and, for grants that contain construction activities, the construction clauses in Section J below;

e. Reviewing proposed procurement, in accordance with the Procurement Standards in 2 CFR Part 200 and 2 CFR Part 1500). See also the "Procurement Standards" Term and Condition above.

f. Reviewing and commenting on performance reports prepared under the grant (the final decision on the content of reports will rest with the recipient);

g. Approving qualifications of key personnel if the recipient changes key personnel named in the application for funding or EPA approved scope of work as provided in 2 CFR 200.308(f)(2) (EPA will not select employees or contractors employed by the recipient;

h. Addressing compliance with Buy America Preferences, in accordance with 2 CFR Part 184, and the Build America Buy America Act, and providing technical assistance, if necessary, on compliance with CAA 314 and the Davis Bacon and Related Act; and/or

i. Addressing compliance with the National Historic Preservation Act and subsequent consultation if applicable.

**Method for Reconsideration**

If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

**G.2. Sufficient Progress**

The EPA Project Officer will assess whether the recipient is making sufficient progress in implementing the work plan under this award within 30 calendar days after the recipient submits its quarterly progress report as outlined in the Performance Reporting Term and Condition above. "Sufficient progress" will be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes and other project activities. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing this award under its subaward agreement. In addition, the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 Requirements for Pass-Through Entities.

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Community Change Grants Workplan, the recipient, if directed to do so under 2 CFR 200.208, must implement a corrective action plan concurred with by the EPA Project Officer and approved by the Award Official or Grants Management Officer within 30 calendar days of the request to do so.

# H. Compliance

### H.1. Compliance with Laws and Regulations

All funded activities under this program must comply with applicable federal, state, and local laws, and regulations, including but not limited to:

a. 2 CFR 200.435(b), which restricts the use of grant funds to defend a recipient that is subject to a criminal, civil or administrative proceeding against it commenced by any government for fraud or similar offenses;
b. 2 CFR 200.435(g), which precludes the use of grant funds to prosecute claims against the Federal Government; and
c. 2 CFR 200.450(c), which restricts the use of federal funds by nonprofit organizations for certain lobbying or electioneering activities but does not preclude the use of federal funds to promote adoption of local ordinances, including those related to zoning.
d. 40 CFR Part 5 and 40 CFR Part 7, which prohibit discrimination on the basis of race, color, national origin (including limited-English proficiency), disability, sex, and age by recipients and subrecipients of federal financial assistance.*

*For grants awarded to any entity in the State of Louisiana: pursuant to a permanent injunction issued by the U.S. District Court for the Western District of Louisiana, EPA will not impose any disparate-impact or cumulative-impact-analysis requirements under Title VI of the Civil Rights Act of 1964 in any pre-award assurances or terms and conditions accompanying the application for and receipt of this grant award.

### H.2. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of this award agreement. Should the recipient fail to adhere to the terms and conditions of this award agreement, the EPA may seek remedies under 2 CFR 200.208 and/or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 138 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 138 by failing to use grant funds in accordance with Section 138 or by failing to ensure that the activities of its subrecipients are in accordance with Section 138, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

## H.3. Termination

In addition to the EPA General Term and Condition "Termination," EPA maintains the right to terminate the grant when the noncompliance with the terms and conditions is substantial, such that effective performance of the grant is materially impaired or there is adequate evidence of fraud, waste, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. The term "fraud, waste or abuse" had the meaning given in the EPA General Term and Condition "Reporting Requirement" in effect as of October 1, 2024 and defines fraud, waste, and abuse as "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733. Refer also to EPA General Term and Condition "Reporting Waste, Fraud and Abuse".

In accordance with 2 CFR 200.341, EPA will provide the recipient notice of termination.

If EPA partially or fully terminates the Assistance Agreement, EPA must:

a. De-obligate uncommitted funds and re-obligate them by an award to another Community Change Grant recipient receiving an award pursuant to Notice of Funding Opportunity EPA-R-OEJECR-OCS-23-04 to effectuate the objectives of Section 138 of the Clean Air Act, 42 USC § 7438 within 90 days of the de-obligation; and,
b. If partially terminated, amend the recipient's grant to reflect the reduced amount, based on the de-obligation.

## H.4. Community Change Grants Limitation on Indirect Costs

In addition to the EPA General Terms and Condition "Indirect Cost Rate Agreements", indirect costs charged against any grant  or subgrant awarded shall not exceed 20 percent of the total amount of the federal award, unless the recipient or subrecipient is an Indian Tribe as defined in section 302(r) of the Clean Air Act,  or an Intertribal consortium that meet the requirements of 40 CFR 35.504(a) and (c), even if the Intertribal consortium is eligible for funding as a Community Based Nonprofit Organization. There is no indirect cost cap for Tribal entities under this program.

## H.5. Fundraising

In accordance with 2 CFR 200.442(a) costs of organized fundraising, including financial campaigns, endowment drives, solicitation of gifts and bequests, and similar expenses incurred to raise capital or

obtain contribution are unallowable. Fundraising costs for meeting the Federal grant program objectives are allowable with the prior written approval of the Federal agency.

2 CFR 200.442(a) provides coverage on fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients.

## H.6. Cybersecurity

a.  The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

b.  EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

c.  If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

d.  The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## H.7. Suing the Government

In accordance with 2 CFR 200.435(g) costs for prosecuting claims against the Federal Government, including appeals of final Federal agency decisions, are unallowable.

Further, costs for suing state, tribal, and local governments are unallowable costs under this program.

## IF APPLICABLE

# I.  General Items

**I.1. Leveraging**

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in the EPA-approved Community Change Grants workplan, if applicable. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the EPA may consider this factor in evaluating future proposals from the recipient.

In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award. If EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

**I.2. Program Income**

In accordance with 2 CFR 200.307(b) and 2 CFR 1500.8(b), the recipient and any subrecipient is authorized to earn program income during the period of performance. Program income will be added to funds committed to the program by EPA. In accordance with 2 CFR 200.307(a), program income earned during the period of performance may only be used for costs incurred during the period of performance or allowable closeout costs. Program income must be expended prior to requesting additional Federal funds.

In accordance with 2 CFR 200.307(d), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

The recipient must provide as part of its quarterly performance report, a description of how program income is being used. A report on the amount of program income earned during the award period must be submitted with the annual Federal Financial Report, Standard Form 425.

**I.3. Use of Logos**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

**I.4. Geospatial Data Standards**

(Track I and some Track II) All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at The Federal Geographic Data Committee website. The EPA Geospatial Policies and Standards web page contains updated links to EPA policies and standards. National policies and standards include:
1. Geospatial Data Act
2. Evidence Based Policymaking Act

## J. Construction

If this award contains construction activities, the Terms and Conditions in this Construction section apply. If your award does not contain construction activities, you may disregard this Construction section. The Terms and Conditions below provide definitions and guidelines. Also refer to the EPA General Term and Condition "Build America Buy America".

### J.1. Davis-Bacon and Related Acts (DBRA)

**a.  Program Applicability**
As provided in Section 314 of the Clean Air Act (42 USC § 7614), Davis-Bacon and Related Act (DBRA) (42 USC §§ 3141-3144) labor standards apply to projects assisted by awards made under the Community Change Grant Program. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects over $2,000 under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Community Change Grant Program, the relevant construction type and prevailing wage classifications will be "Building," "Residential," and "Heavy." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipients must ensure that any construction work financed in whole or in part with funds under this award, as defined in these Terms and Conditions, complies with DBRA requirements and the requirements of these Terms and Conditions.  The recipient must ensure that these requirements apply to all construction projects assisted by funds under this award without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this award, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the DBRA requirements, the recipient agrees to promptly inform the Department of Labor for guidance or enforcement action, and copy the EPA Project Officer.

Consistent with the definitions at 29 CFR 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR 5.2.

**b.  Labor Laws**
DBRA is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

1. Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

2. Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
3. Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**c.   Recipient Responsibilities When Entering Into and Managing Contracts:**

1. Solicitation and Contract Requirements:
   a) Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.
   b) Include DBRA Requirements in All Contracts: Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
2. After Award of Contract:
   a) Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
   b) Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**d.   Recipient Responsibilities When Establishing and Managing Additional Subawards:**

1. Include DBRA Requirements in All Subawards (including Loans): Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."
2. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.
3. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements: Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

To the extent permitted by law, the contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract and subcontract covered by Davis-Bacon and Related Acts in 29 CFR 5.1, and will be effective by operation of law, whether or not they are included or incorporated by reference into each contract and subcontract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**e.   DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5 for all construction projects assisted under this award.

**J.2. Cross Cutters**

The recipient must comply with federal cross-cutting requirements. Cross-cutting federal authorities are the requirements of federal laws and Executive Orders that apply to most federal financial assistance programs. These requirements include, but are not limited to, National Historic Preservation Act (16 USC § 470); Endangered Species Act (P.L. 93-205); federal nondiscrimination laws, financial management policies, and executive orders on the protection of wetlands and flood plains and other crosscutters can be accessed here: https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

Sometimes, these authorities are expressly applied by the statute authorizing the assistance itself. More frequently, the requirements are not cited in the authorizing statute, but apply broadly by their own terms to a wide range of federal financial assistance programs. It is the responsibility of the Project Officers and the grantees to reach out to EPA Subject Matter Experts to understand the compliance required by each grant's activities.

# L.  Foreign Entities and Travel

**L.1. Foreign Entity of Concern**

As part of carrying out this award, the recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of the funding under this grant agreement are not –

a.  Owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);
b.  Headquartered in a covered nation under 10 U.S.C 4872(d); or
c.  A subsidiary of an entity described in 1. or 2.

As of the date these terms and conditions became effective, covered nations under 10 U.S.C § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

**L.2. Foreign Travel**

Recipients must work with EPA's Project Officer to obtain the written consent of EPA's Office of International and Tribal Affairs (OITA) prior to:

a.  Performing work in a foreign country, and/or
b.  Awarding a subaward to a foreign or international organization, or a subaward to be performed in a foreign country even if that subaward is described in a proposed scope of work.