# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

APPALACHIAN VOICES, et al.,

         *Plaintiffs,*
*on behalf of themselves and*
*all others similarly situated*

         v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY, et al.,

         *Defendants.*

Civil Action No. 1:25-cv-01982-PLF

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

   I.   Congress mandated that EPA award Environmental and Climate Justice Block
      Grants. ...................................................................................................................... 2

   II.   EPA terminated the grant programs. ...................................................................... 5

   III.  Two other district courts have found EPA's termination of Environmental and
      Climate Justice Block grants unlawful. ................................................................ 9

STANDARD OF REVIEW ............................................................................................ 11

ARGUMENT .................................................................................................................. 11

   I.   Plaintiffs are likely to succeed on the merits. ..................................................... 11

      A.   This Court has jurisdiction over both the constitutional claims and the APA
          claims. ............................................................................................................ 11

      B.   Eliminating the Environmental and Climate Justice Block Grant program
          violated the separation of powers. ................................................................. 17

      C.   Eliminating the Environmental and Climate Justice Block Grant program
          violated the Administrative Procedure Act. ................................................... 20

   II.   Plaintiffs will be irreparably harmed if the grant programs remain shut down
      during litigation. ................................................................................................... 27

   III.  The balance of equities and public interest factors weigh in favor of an injunction.
      .............................................................................................................................. 38

   IV.  The Court should issue a preliminary injunction to restore the status quo that
      existed before Defendants' illegal actions. .......................................................... 41

   V.   The Court should not require a bond. .................................................................. 43

VI.   This Court may provisionally certify the proposed class for the purposes of
      granting this motion for preliminary injunction...................................................... 44

      CONCLUSION ................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.R.P. v. Trump*,
    135 S. Ct. 1364 (2025)..............................................................................................45

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ...........................................................................19, 23

*Am. Bar Ass'n v. U.S. Dep't of Just.*,
    No. 25-cv-1263-CRC, 2025 WL 1388891 (D.D.C. May 14, 2025) ................................15, 17

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
    501 U.S. 1301 (1991) (Scalia, J., in chambers) .......................................................38

*Beacon Assocs., Inc. v. Apprio, Inc.*,
    308 F. Supp. 3d 277 (D.D.C. 2018) .....................................................................34

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)..............................................................................................15, 16

*Bus. Roundtable v. SEC*,
    647 F.3d 1144 (D.C. Cir. 2011) ........................................................................26

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174 (D.D.C. 2020) ....................................................................39

*California v. U.S. Dep't of Educ.*,
    132 F.4th 92 (1st Cir. 2025).....................................................................................16

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ..........................................................................13

*Chamber of Com. of the U.S. v. SEC*,
412 F.3d 133 (D.C. Cir. 2005) ...........................................................................26

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ...........................................................................28

*Chi. Women in Trades v. Trump*,
No. 25-cv-2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) ...............................17

*Cincinnati Soap Co. v. United States*,
301 U.S. 308 (1937) ...........................................................................................18

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ............................................................................19

*City of Houston v. Dep't of Hous. & Urb. Dev.*,
24 F.3d 1421 (D.C. Cir. 1994) ............................................................................42

*Clarke v. Off. of Fed. Hous. Enter. Oversight*,
355 F. Supp. 2d 56 (D.D.C. 2004) ......................................................................33

*Climate United Fund v. Citibank, N.A.*,
No. 25-cv-698-TSC, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) .........14, 15, 17, 41, 42

*Clinton v. City of New York*,
524 U.S. 417 (1998) ...........................................................................................19

*Cmty. Legal Servs. in E. Palo Alto v. U. S. Dep't of Health & Hum. Servs.*,
No. 25-cv-02847, 2025 WL 973318 (N.D. Cal. Apr. 1, 2025) ...............................44

*Colorado v. U.S. Dep't of Health & Hum. Servs.*,
No. 1:25-cv-121, 2025 WL 1017775 (D.R.I. Apr. 5, 2025) ...................................44

*Connecticut v. Schweiker*,
684 F.2d 979 (D.C. Cir. 1982) ............................................................................43

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024) ...........................................................................................18

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) .......................................................................14, 15

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ...............................................................................................25

iii

*Department of Education v. California,*
    145 S. Ct. 966 (2025) ................................................................................16

*Dist. of Columbia v. USDA,*
    444 F. Supp. 3d 1 (D.D.C. 2020) ........................................................34, 38

*DSE, Inc. v. United States,*
    169 F.3d 21 (D.C. Cir. 1999) ................................................................43

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ..............................................................................24

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 505 (2009) ..............................................................................25

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ..........................................................................25, 27

*Fed. Election Comm'n v. Cruz,*
    596 U.S. 289 (2022) ..............................................................................21

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010) ..............................................................................13

*Green & Healthy Homes Initiative, Inc. v. EPA,*
    No. 25-cv-1096 (D. Md.) ....................................................................9, 10

*Green & Healthy Homes Initiative, Inc. v. EPA,*
    No. 25-cv-1096, 2025 WL 1697463 (D. Md. June 17, 2025)............9, 10, 20, 22, 25

*HIAS, Inc. v. Trump,*
    985 F.3d 309 (4th Cir. 2021) ................................................................37

*Huisha-Huisha v. Mayorkas,*
    27 F.4th 718 (D.C. Cir. 2022) ..............................................................42

*Jacksonville Port Auth. v. Adams,*
    556 F.2d 52 (D.C. Cir. 1977) ................................................................43

*Kingdom v. Trump,*
    No. 1:25-cv-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) ........................45

*Larson v. Domestic & Foreign Com. Corp.,*
    337 U.S. 682 (1949) ..............................................................................13

iv

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..................................................................37, 38, 39

*LeBlanc v. United States*,
50 F.3d 1025 (Fed. Cir. 1995) ...................................................................13, 14

*Loc. 2677, Am. Fed'n of Gov't Emp. v. Phillips*,
358 F. Supp. 60 (D.D.C. 1973) ........................................................................22

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..........................................................................................22

*Maine v. USDA*,
No. 1:25-cv-00131, 2025 WL 1088946 (D. Me. Apr. 11, 2025) .....................17

*Marin Audubon Soc'y v. Fed. Aviation Admin.*,
121 F.4th 902 (D.C. Cir. 2024) .......................................................................21

*Maryland v. Corp. for Nat'l and Community Service*,
25-cv-1363, 2025 WL 1585051 (D. Md. June 5, 2025) ...................................37

*Maryland v. USDA*,
770 F. Supp. 3d 779 (D. Md. 2025) .................................................................44

*Massachusetts v. Kennedy*,
No. 25-cv-10814 2025 WL 1371785 (D. Mass. May 12, 2025) .......................17

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
763 F.2d 1441 (D.C. Cir. 1985) .................................................................15, 16

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) .........................................................................14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................24, 25, 26

*Nat. Res. Def. Council, Inc. v. Morton*,
337 F. Supp. 167 (D.D.C. 1971) ......................................................................43

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
767 F. Supp. 3d 243 (D. Md. 2025) .................................................................44

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
763 F. Supp. 3d 36 (D.D.C. Feb. 3, 2025) ..........................................28, 32, 33, 39

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,*
    No. 25-cv-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025)....................................................44

*Nat'l Ctr. for Mfg. Scis. v. United States,*
    114 F.3d 196 (Fed. Cir. 1997)....................................................16

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
    595 U.S. 109 (2022)....................................................21

*Nat'l Lifeline Ass'n v. FCC,*
    921 F.3d 1102 (D.C. Cir. 2019)....................................................26

*New York v. Trump,*
    764 F. Supp. 3d 46 (D.R.I. 2025) ....................................................21

*New York v. Trump,*
    No. 25-cv-39, 2025 WL 1098966 (D.R.I. Apr. 14, 2025) ....................................................17

*Nken v. Holder,*
    556 U.S. 418 (2009)....................................................11, 38

*Off. of Pers. Mgmt. v. Richmond,*
    496 U.S. 414 (1990)....................................................18

*Ohio v. EPA,*
    603 U.S. 279 (2024)....................................................25

*Open Cmtys. All. v. Carson,*
    286 F. Supp. 3d 148 (D.D.C. 2017)....................................................34, 39

*P.J.E.S.v. Wolf,* 502 F. Supp. 3d 492 (D.D.C. 2020)....................................................43, 45

*Perry Cap. LLC v, Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017)....................................................14

*Population Inst. v. McPherson,*
    797 F.2d 1062 (D.C. Cir. 1986)....................................................43

*RFE/RL, Inc. v. Lake,*
    No. 1:25-cv-799, 2025 WL 1232863 (D.D.C. Apr. 29, 2025)....................................................44

*Rochester Pure Waters Dist. v. EPA,*
    960 F. 2d 180 (D.C. Cir. 1992)....................................................18

*Rostker v. Goldberg,*
    448 U.S. 1306 (1980) (Brennan, J., in chambers)....................................................39

*Simms v. Dist. of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) .........................................................................43

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ..............................................................................................18

*Strickland v. United States*,
    32 F. 4th 311 (4th Cir. 2022) ................................................................................13

*Sustainability Inst. v. Trump*,
    No. 2:25-cv-2152 (D.S.C.) ............................................................................9, 10, 19

*Sustainability Inst. v. Trump*,
    No. 2:25-cv-2152, 2025 WL 186978 (D.S.C. Apr. 29, 2025) ...........................9, 17

*Sustainability Inst. v. Trump*,
    No. 2:25-cv-2152, F. Supp. 3d, 2025 WL 1486979 (D.S.C. May 20, 2025)............9

*Sustainability Inst.*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025)............10

*Tex. Children's Hosp. v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) ........................................................................28

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ..............................................................................................41

*Webster v. Doe*,
    486 U.S. 592 (1988) ..............................................................................................14

*Widakuswara v. Lake*,
    No. 1:25-cv-1015-RCL, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ...............12, 17

*Widakuswara v. Lake*,
    No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ...................12, 14, 15, 16

*Widakuswara v. Lake*,
    No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) ..............12, 13

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................................11, 38

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ..............................................................................32

*Woonasquatucket River Watershed Council v. USDA*,
    No. 1:25-cv-97, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) .......................15, 17, 44

*Xiaomi Corp. v. Dep't of Def.*,
    No. 21-cv-280, 2021 WL 950144 (D.D.C. Mar. 12, 2021) ..............................28, 34

**Statutes**

2 U.S.C. §§ 682 ..............................................................................................................20

2 U.S.C. § 682(1) ...........................................................................................................23

2 U.S.C. §§ 682 *et seq.* ................................................................................................23

2 U.S.C. § 683(b) .....................................................................................................23, 24

2 U.S.C. § 684(a) ...........................................................................................................23

2 U.S.C. § 684(b) ...........................................................................................................23

5 U.S.C. § 706(2) .....................................................................................................20, 24

5 U.S.C. § 706(2)(A) ......................................................................................................24

5 U.S.C. § 706(2)(A)–(C) ..............................................................................................24

5 U.S.C. § 706(2)(A)–(D) ..............................................................................................21

5 U.S.C. § 706(2)(A), (B) ..............................................................................................23

5 U.S.C. § 706(2)(C) ......................................................................................................22

28 U.S.C. § 1491(a)(1) ...................................................................................................14

42 U.S.C. § 7401(b) .......................................................................................................27

42 U.S.C. § 7438 .......................................................................................3, 8, 9, 22, 41

42 U.S.C. § 7438(a)(1) .....................................................................................................3

42 U.S.C. § 7438(a)(2) .....................................................................................................3

42 U.S.C. § 7438(b)(1) ..........................................................3, 4, 17, 20, 21, 27, 28

42 U.S.C. § 7438(b)(1)–(2) ...........................................................................................19

42 U.S.C. § 7438(b)(2) ...............................................................................................4, 17

42 U.S.C. § 7438(b)(3) .....................................................................................................3

42 U.S.C. § 7438(c) ...............................................................................................3

**Other Authorities**

90 Fed. Reg. 8339 (Jan. 29, 2025) .......................................................................6

90 Fed. Reg. 8353 (Jan. 29, 2025) ...........................................................5, 6, 25

U.S. Const. art. I, § 1 ..........................................................................................18

U.S. Const. art. I, § 8, cl. 1 .................................................................................18

U.S. Const. art. I, § 9, cl. 7 .................................................................................18

U.S. Const. art. II, § 3 ........................................................................................19

# INTRODUCTION

In February 2025, the Environmental Protection Agency ("EPA") and Administrator Lee Zeldin in his official capacity, under direction from President Trump, decided to eliminate the Environmental and Climate Justice Block Grant program—a program Congress created and funded by specific appropriations as part of the Inflation Reduction Act ("IRA"). Defendants did not pause to consider their responsibility to administer Congress's directive, or the consequences for grantees and their communities of refusing to do so. Instead, over the next several months, they proceeded to shut down the program, terminating the individual grants awarded under it.

Defendants' termination of the program was unlawful. It violated bedrock separation-of-powers principles by effectively repealing a federal statute and impounding specifically appropriated funds based on nothing more than the President's disagreement with a program Congress duly enacted. By prioritizing the President's policy objectives over Congress's explicit instructions, it was also contrary to law. And it represented textbook arbitrary and capricious agency action by failing to engage in reasoned decision-making or consider important aspects of the problem—including the reliance interests of hundreds of impacted entities.

Plaintiffs and proposed class members in this litigation received grants under the Environment and Climate Justice Block Grant program. Defendants' abrupt, unlawful termination of their grants has shuttered grant recipients' vital programs, caused staff layoffs, and forced Plaintiffs and proposed class members to go back on promises to their communities, breaking trust. These irreparable harms impact not only Plaintiffs and proposed class members, but their partners, communities, and the public health, and nullify the benefits Congress intended when it enacted Clean Air Act section 138.

Plaintiffs now seek urgent injunctive relief to restore the Environmental and Climate Justice Block Grant program. Plaintiffs are likely to succeed on the merits. In two other cases challenging EPA's termination of grants within this program, district courts have determined that Defendants' actions were unlawful based on a substantial record. Defendants have hardly bothered to argue otherwise. Their only refuge has been to argue that district courts do not have jurisdiction over claims such as these. But in a case challenging grant terminations under the Administrative Procedure Act and the U.S. Constitution, the en banc D.C. Circuit rejected that theory. This Court has jurisdiction to confirm Plaintiffs' likelihood of success on the merits, and—because Plaintiffs can demonstrate considerable harm and that the balance of the equities tips in their favor—should issue a Preliminary Injunction.

Specifically, this Court should enjoin EPA from terminating the Environment and Climate Justice Block Grant program; require EPA to set aside the unlawful terminations of grant awards issued under this program; and require EPA to provide adequate staffing and administrative resources to operate the affected grant programs while the Court considers the merits of this case. And, to ensure the availability of meaningful relief, Plaintiffs request that the Court temporarily prohibit Defendants from de-obligating any funds designated to the Environment and Climate Justice Block Grant program.

## BACKGROUND

### I.      Congress mandated that EPA award Environmental and Climate Justice Block Grants.

As part of the IRA, Congress amended the Clean Air Act to create a new "Environmental and Climate Justice Block Grants" program. Pub. L. No. 117-169, § 60201, 136 Stat. 1818, 2078 (2022) (codified at 42 U.S.C. § 7438) ("Clean Air Act section 138"). Using a block grant model

first developed under the Nixon Administration, Congress appropriated $2.8 billion to EPA for projects to directly benefit communities across the country. 42 U.S.C. § 7438(a)(1). Additionally, recognizing that the communities most in need of assistance might lack the expertise to apply for and implement their projects, Congress appropriated another $200 million for technical assistance to support grant recipients in designing projects, preparing applications, and performing on their grants. *Id*. § 7438(a)(2). Further, Congress required EPA to "reserve 7 percent" of these amounts for administrative costs to "carry out" its section 138 duties. *Id.* § 7438(c).

Congress then set forth the following statutory mandate: EPA "***shall***" use these funds "to award grants for periods of up to 3 years to eligible entities to carry out [certain specified activities] that benefit disadvantaged communities, as defined by the Administrator." *Id.* § 7438(b)(1) (emphasis added). Congress defined eligible entities to include "community-based nonprofit organization[s]," "a partnership of community-based nonprofit organizations," or a partnership between such nonprofits and "an Indian tribe, a local government, or an institution of higher education." *Id.* § 7438(b)(3).

Congress directed EPA to use the funds for specified purposes that address public health:

(A) community-led air and other pollution monitoring, prevention, and remediation, and investments in low- and zero-emission and resilient technologies and related infrastructure and workforce development that help reduce greenhouse gas emissions and other air pollutants;

(B) mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events;

(C) climate resiliency and adaptation;

(D) reducing indoor toxics and indoor air pollution; or

3

> (E) facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes.

*Id.* § 7438(b)(2).

EPA created several grant subprograms to fulfill this mandate:[1] the Thriving Communities Grantmaking Program, the Community Change Grants Program, the Environmental Justice Collaborative Problem-Solving Cooperative Agreements, the Government-to-Government Program, and the Thriving Communities Technical Assistance Centers ("TCTAC") program. Plaintiffs and proposed class members are recipients of grants under one or more of these programs. Grant projects in the first four programs have a performance period of up to three years. *Id.* § 7438(b)(1). Grants for the TCTAC technical assistance grant program are for five years.[2]

To apply for these programs, applicants were required to provide detailed project budgets and plans to complete their projects within a specified timeframe. Grant preparation often took hundreds of hours of work to ensure compliance with rigorous statutory and regulatory requirements. Compl. Ex. 1-E at ¶ 4 (M. Roos Decl.). Some programs also required legally-

---

[1] EPA, *Inflation Reduction Act Environmental and Climate Justice Program* (last updated Mar. 27, 2025), https://www.epa.gov/inflation-reduction-act/inflation-reduction-act-environmental-and-climate-justice-program [https://perma.cc/3BKM-DR5D]. EPA also created the UPLIFT Climate and Environmental Community Action Grant program but awarded no grants under that program. *Id.*

[2] EPA, *FAQs – EJ Thriving Communities Technical Assistance Centers Program (EJ TCTAC)* 1 (Oct. 2022), https://www.epa.gov/system/files/documents/2022-10/faqs_ej_tctac.pdf [https://perma.cc/4QLC-SSY9].

binding statutory partnership agreements.[3] EPA then performed an extensive review of the applications and ultimately awarded over 350 grants across the five programs.

After the grants were awarded, grantees began to stand up their projects as required by their grant awards: They further developed plans, made operational changes to implement their projects, hired staff, worked with partners, engaged their communities, contracted for work, vetted and awarded applications for subawards, and more—all in service of benefitting the communities they serve and achieving the goals laid out by Congress.

## II.     EPA terminated the grant programs.

Grantees were in the midst of furthering Congress's goals when the new Administration suddenly and inexplicably froze disbursements of Inflation Reduction Act funds—and then proceeded to terminate Plaintiffs' and proposed class members' grants, thereby effectively ending these statutorily mandated programs.

Despite the agency's and grantees' extensive work to put these grant programs in place, EPA began to tear them apart shortly after President Trump's inauguration. On January 20, 2025, President Trump issued the *Unleashing American Energy* Executive Order ("Energy EO") declaring "that ***no Federal funding be employed in a manner contrary to the principles outlined in this section***." Exec. Order No. 14154 (Jan. 20, 2025), 90 Fed. Reg. 8353, 8354, § 2(i) (Jan. 29, 2025) (emphasis added). In Section 7 of the Energy EO, titled "Terminating the Green New Deal,"—referring to the Inflation Reduction Act and Infrastructure Investment and Jobs

---

[3] EPA, *Environmental and Climate Justice Community Change Grants Program Notice of Funding Opportunity*, 31 (Oct. 2, 2024), https://www.epa.gov/system/files/documents/2024-10/environmental-and-climate-justice-community-change-grants-program-notice-of-funding-opportunity-nofo-october-3-2024.pdf [https://perma.cc/VR5V-ZBQJ].

Act—the President forbade the disbursement of any funds that the Executive branch deems "[in]consisten[t] with . . . the policy outlined in section 2" of the Order. Energy EO, 90 Fed. Reg. at 8357, § 7.

On January 20, the President also directed agencies to "*terminate* . . . all . . . 'equity-related' grants or contracts" within sixty days, i.e., by March 21, 2025, among other directives. *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14151 (Jan. 20, 2025), 90 Fed. Reg. 8339, 8339, § 2(b)(i) (Jan. 29, 2025) ("Anti-Equity EO") (emphasis added). The Anti-Equity EO instructed agencies to provide the director of OMB with a list of all "Federal Grantees" who received Federal funding for "environmental justice" programs and ordered agencies to "terminate" all "environmental justice" offices and positions. 90 Fed. Reg. at 8339–40, § 2(b)(i), (b)(ii)(C). The Anti-Equity EO did not define "equity-related" grants or "environmental justice," nor did it cite legal authority to categorically terminate all "equity-related" grants and contracts.

Under these instructions, EPA began terminating the Environmental and Climate Justice Block Grant program. It started with awards within the Thriving Communities Grantmakers, Thriving Communities Technical Assistance Centers ("TCTACs"), and Environmental Justice Collaborative Problem-Solving programs identified by EPA Assistant Deputy Administrator Travis Voyles for termination on February 20. Compl. Ex. 1-C (T. Voyles Email re cancelling grants – Feb. 20, 2025).

That same day Assistant Deputy Administrator Voyles made clear he intended to eliminate the TCTAC program altogether, saying:

> Below are the next set of approved to cancel grants. $42,261,933 total in remaining funds it looks like, but OMS can confirm.

**One flag I have is the first few large ones are the EJ Thriving Communities Technical Assistance Centers (TCTACs)—** https://www.epa.gov/environmentaljustice/environmentaljustice-thriving-communities-technical-assistance-centers. There were 18 in total established, so a number of them are missed here. Not sure why they didn't all get captured (they may not have all gone out yet), but **I would want to apply a broad approach and cancel them all in the vein the entire program is inconsistent with Administration [sic] priorities and I personally do not see the need for these because at the state-level, EPA and the TCTAC grantees refused to engage with the state in any kind of coordination.** This should result in a larger $$ amount.

*Id.* (emphasis added).

EPA sent the same message to the public. In a press release, it identified these terminations as "taxpayer savings"—admitting that it has no intention of spending these funds in compliance with Congress's mandate.[4]

The remaining programs quickly met the same fate. A few days later, on February 25, Voyles declared under oath that he had conducted a review of EPA grant programs "for consistency with Agency policy priorities" and unilaterally—in the course of a single day— decided to terminate all grant programs at issue in this class action "for policy reasons." Compl. Ex. 1-A at ¶¶ 3–6 (T. Voyles Decl.); *see also* Compl. Ex. 1-E (D. Coogan Email to T. Voyles – Feb. 25, 2025). Without notice to grantees or the public, EPA proceeded to eliminate the entire Environmental and Climate Justice Block Grant program and all grants issued under it. EPA did not distinguish amongst the types of eligible activities under 42 U.S.C. § 7438, nor review

---

[4] EPA, *EPA Administrator Lee Zeldin Cancels 20 Grants in 2nd Round of Cuts with DOGE, Saving Americans More than $60M*, (Feb. 25, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-20-grants-2nd-round-cuts-doge-saving-americans [https://perma.cc/KV5D-XK99].

individual grants before terminating them *en masse*. Compl. Ex. 1-E ¶¶ 10–16 (M. Roos Decl.). The agency suspended all remaining access to the payment portal for Plaintiffs and proposed class members. Compl. Ex. 1-H (G. Treml email re account hold – Mar. 7, 2025).

Then EPA sent grantees nearly-identical boilerplate termination letters; the only changeable fields in the template were the grant recipient's name, the grant number, and the contact information for the pertinent EPA official. Compl. Ex. 1-J (Boilerplate Termination Letter).

Not content with simply cancelling the grants, EPA has dedicated itself to thwarting Congress's statutory directive at every turn. EPA has announced that it intends to eliminate all staff that support the Environmental and Climate Justice Block Grant program.[5] Without the staff needed to review and approve reimbursement requests and required grant reports and to ensure ongoing compliance with the terms of the agreements, EPA would not be able to administer these grant programs even if they had not terminated them.

---

[5] Administrator Zeldin announced in March 2025 that EPA would terminate all "Environmental Justice and Diversity, Equity, and Inclusion arms of the agency," placing all staff on administrative leave. EPA, *EPA Terminates Biden's Environmental Justice, DEI Arms of Agency* (Mar. 12, 2025), https://www.epa.gov/newsreleases/epa-terminates-bidens-environmental-justice-dei-arms-agency [https://perma.cc/Q5WB-HQEL]. Further reporting indicates that Zeldin told EPA leaders in an internal memorandum that he was "directing 'the reorganization and elimination' of the offices of environmental justice at all 10 E.P.A. regional offices as well as the one in Washington." Lisa Friedman, *E.P.A. Plans to Close All Environmental Justice Offices*, N.Y.TIMES, at 1 (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/climate/epa-closure-environmental-justice-offices.html [https://perma.cc/ZDK3-GRKL].

### III. Two other district courts have found EPA's termination of Environmental and Climate Justice Block grants unlawful.

The illegality of Defendants' actions has not escaped notice. Two recent cases have found EPA's actions regarding these grants unlawful and have brought key documents to light that evidence EPA's broad-brush approach to terminating this program, in contravention of the clear directives in Clean Air Act section 138. 42 U.S.C. § 7438. In two separate cases, several grantees challenged EPA's termination of Environmental and Climate Justice Block grants in district court. *Sustainability Inst. v. Trump*, No. 2:25-cv-2152 (D.S.C.); *Green & Healthy Homes Initiative, Inc. v. EPA*, No. 25-cv-1096 (D. Md.). In both cases, EPA produced a significant volume of documents detailing the process behind the terminations. The documents provided show the cursory and unlawful nature of the terminations. Faced with this record, in both cases, EPA relied heavily on its theory that district courts lack jurisdiction to check its unlawful behavior. But both courts rejected that theory, and determined that the agency's action was or was likely unlawful. *Sustainability Inst. v. Trump*, No. 2:25-cv-2152, F. Supp. 3d, 2025 WL 1486979, at *6–7 (D.S.C. May 20, 2025); *Green & Healthy Homes Initiative, Inc. v. EPA*, No. 25-cv-1096, 2025 WL 1697463, at *12–15, 22 (D. Md. June 17, 2025).

In *Sustainability Institute*, the court ordered EPA to produce all documents related to the termination of certain grants authorized under 42 U.S.C. § 7438. *Sustainability Inst.*, No. 2:25-cv-2152, 2025 WL 186978, at *7–8 (D.S.C. Apr. 29, 2025). Upon reviewing the documents, the court concluded that "[n]ot a single document . . . evidenced any review" of individual grants "by the EPA." *Sustainability Inst.*, 2025 WL 1486979, at *6. Instead, Assistant Deputy Administrator Voyles submitted a declaration stating that on Feb. 25, 2025, he had conducted a review of "grant programs" writ large and terminated them "for policy reasons." Compl. Ex. 1-A

(T. Voyles Decl.). Following these disclosures, EPA represented to the court that it would no longer "contest judgment on the merits of Plaintiffs' APA [Administrative Procedure Act] claims." Reply to Pls.' Resp. at 1, *Sustainability Inst.*, No. 2:25-cv-2152 (D.S.C. May 16, 2025), ECF No. 153. The court entered judgment for plaintiffs on the conceded APA claims and a preliminary injunction on the remaining claims addressing the EPA grants. *Sustainability Inst.*, 2025 WL 1486979, at *12. The Fourth Circuit stayed the district court order in response to Defendants' jurisdictional arguments, but plaintiffs have petitioned for en banc review. *Sustainability Inst.*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025); Pet. for Reh'g En Banc, *Sustainability Inst.*, No. 25-1575 (4th Cir. June 10, 2025), ECF No. 41.

Similarly, in *Green & Healthy Homes Initiative, Inc. v. EPA*, the court ordered Defendants to produce an administrative record regarding the termination of grants under the Thriving Communities Grantmaking program. Paperless Order, No. 25-cv-1096 (D. Md. May 6, 2025), ECF No. 29. The documents produced were largely the same as those produced in *Sustainability Institute*, No. 2:25-cv-2152 (D.S.C. May 6, 2025), ECF No. 147. *See Green & Healthy Homes Initiative*, No. 25-cv-1096 (D. Md. May 13, 2025), ECF No. 36. Defendants then moved to have the case dismissed, resolved through summary judgment, or transferred to the Court of Federal Claims. *Green & Healthy Homes Initiative*, No. 25-cv-1096 (D. Md. May 21, 2025), ECF No. 44. The court ruled on the merits, holding that EPA's termination of certain Thriving Communities Grantmaking grants exceeded its statutory authority and was arbitrary and capricious, and setting the terminations aside. *Green & Healthy Homes Initiative*, No. 25-cv-1096, 2025 WL 1697463, at *22 (D. Md. June 17, 2025).

**STANDARD OF REVIEW**

To be entitled to preliminary injunctive relief, a movant must show: (1) a likelihood of success on the merits; (2) the movant is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors merge when the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**ARGUMENT**

**I.      Plaintiffs are likely to succeed on the merits.**

Defendants' steps to terminate the Environmental and Climate Justice Block Grant program violated both the Constitution and the Administrative Procedure Act ("APA"), and these violations give rise to Plaintiffs' constitutional claims and claims pursuant to the APA. This court has jurisdiction over both sets of claims, and Plaintiffs will succeed on both.

**A.      This Court has jurisdiction over both the constitutional claims and the APA claims.**

This Court has independent jurisdictional bases to review Plaintiffs' constitutional claims and APA claims.

The current Administration has terminated not only the federal grants at issue in this litigation, but also thousands of other grants of various types throughout the country—often via the same unlawful means present in this case. To evade judicial review of this unlawful campaign, the federal government has argued that the Tucker Act impliedly deprives federal district courts of jurisdiction to enjoin its lawlessness, suggesting instead that all such claims should be brought in the Court of Federal Claims. Not so.

11

The en banc D.C. Circuit laid this issue to rest in *Widakuswara. Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc). In that case, plaintiffs brought APA and constitutional claims challenging the termination of congressionally mandated grant funding for policy reasons—specifically for Radio Free Asia and the Middle East Broadcasting Network. *Id*. at *1. The district court granted plaintiffs a preliminary injunction. *Widakuswara*, No. 1:25-cv-1015-RCL, 2025 WL 1166400, at *18 (D.D.C. Apr. 22, 2025). A panel of the D.C. Circuit initially voiced doubts concerning the district court's jurisdiction and granted a stay pending appeal. *Widakuswara*, No. 25-5144, 2025 WL 1288817, at *1–5 (D.C. Cir. May 3, 2025). But in dissent Judge Pillard explained that the district court had clear jurisdiction because plaintiffs' claims "did not depend on whether their contracts were breached, but on whether the agency's policy directives were unlawful in the face of federal statutes appropriating funds for specific purposes," that the government did not dispute that "the Court of [Federal] Claims could not adjudicate plaintiffs' constitutional claims," and that "constitutional claims for injunctive or declaratory relief face no sovereign immunity bar." *Id.* at *12, 14 (Pillard, J., dissenting). Further, interpreting the Tucker Act to deny district courts' jurisdiction over such claims would "have serious implications for our constitutional structure." *Id.* (internal citations and quotation marks omitted). The full en banc court later agreed, dissolving the stay. *Widakuswara*, 2025 WL 1521355, at *1.

What was true in *Widakuswara* is just as true here: This Court has jurisdiction over Plaintiffs' claims. First, district courts have broad jurisdiction to hear constitutional claims, especially where the Court of Federal Claims cannot hear such claims. In contrast, the scope of constitutional claims the Court of Federal Claims can entertain is restricted to those that

"expressly create[] a substantive right enforceable against the federal government for money damages." *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). Here, Plaintiffs seek prospective declaratory and injunctive relief enjoining Defendants' ongoing constitutional violations to allow them to continue work specifically authorized and funded by Congress.

Second, because Plaintiffs seek equitable forward-looking relief unavailable in the Court of Federal Claims, and because their claims derive from the Constitution and statutes, not the terms of their grant agreements, the APA's waiver of sovereign immunity remains unaffected and this Court can properly hear Plaintiffs' APA claims.

### i.     Plaintiffs' constitutional claims belong in federal district court and are not barred by sovereign immunity.

Federal district courts have broad jurisdiction to consider claims seeking to enjoin federal officials from acting unconstitutionally. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *see also Strickland v. United States*, 32 F. 4th 311, 363–66 (4th Cir. 2022).

For starters, "sovereign immunity does not bar a suit" challenging acts outside an official's constitutional authority. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996); *see also Widakuswara*, 2025 WL 1521355. Because such acts "are considered individual and not sovereign actions," sovereign immunity does not apply. *Larson*, 337 U.S. at 689.

And these types of claims belong in federal district court, not the Court of Federal Claims. The Tucker Act confers jurisdiction over constitutional claims on the Court of Federal Claims only when they are based on constitutional provisions that create "a substantive right enforceable against the federal government for money damages." *LeBlanc*, 50 F.3d at 1028. The

13

Federal Circuit has held that separation-of-powers claims do not meet this test and therefore cannot be brought in the Court of Federal Claims. *Id*. Because there is no other venue for Plaintiffs to bring their claims, they must properly be brought in federal district court. Finding otherwise would raise "serious constitutional question[s]," and courts must not construe federal statutes to preclude any judicial review of constitutional claims absent a "clear" statement from Congress. *Webster v. Doe*, 486 U.S. 592, 603 (1988).

ii.     **Plaintiffs' APA claims must be heard in federal district court because the claims arise under statutes and the Constitution, and they seek equitable injunctive relief unavailable in the Court of Federal Claims.**

This Court likewise has jurisdiction over Plaintiffs' APA claims. The APA waives sovereign immunity for those claims. And while the Tucker Act vests the Court of Federal Claims with jurisdiction over "express or implied contract[s] with the United States," it does not apply here. 28 U.S.C. § 1491(a)(1). Whether a claim "in 'its essence'" is contractual turns on (1) "the source of the rights" underlying the claims, and (2) "the type of relief sought (or appropriate)." *Perry Cap. LLC v, Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). Under both prongs, Plaintiffs' APA claims are not contractual in nature—and the Tucker Act thus does not apply.

First, the source of rights here is statutory and constitutional, not contractual. When a plaintiff's "asserted rights" arise "from statute" and those rights "exist prior to and apart from rights created under the contract," their claims belong in the district court, not the Court of Federal Claims. *Widakuswara*, 2025 WL 1288817, at *11 (Pillard, J., dissenting) (quoting *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022)); *see also Climate United Fund v. Citibank, N.A.*, No. 25-cv-698-TSC, 2025 WL 1131412, at *9–12

14

(D.D.C. Apr. 16, 2025); *Woonasquatucket River Watershed Council v. USDA*, No. 1:25-cv-97, 2025 WL 1116157, at *12–15 (D.R.I. Apr. 15, 2025). And so it is here.

Plaintiffs assert that EPA has acted contrary to the APA and congressional appropriations. Resolving these claims will require this Court to "address clear regulatory and statutory questions" regarding EPA's actions and, ultimately, whether it violated the APA and the Clean Air Act. *Climate United Fund*, 2025 WL 1131412, at *9. They will not require this Court to look at, let alone interpret, the terms of an "agreement negotiated by the parties" in order to make a decision. *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985). Thus, the claims here are not "essentially"—or even conceivably— contract claims. *Am. Bar Ass'n v. U.S. Dep't of Just.*, No. 25-cv-1263-CRC, 2025 WL 1388891, at *5 (D.D.C. May 14, 2025) (internal citations and quotation marks omitted); *see also Woonasquatucket*, 2025 WL 1116157, at *13 (finding district court jurisdiction was proper because Plaintiffs' claims "'turn[ed] on federal statute and regulations put in place by Congress' and the agencies" (internal citations omitted)).

The type of relief sought here also underscores why these claims must be heard in district court. The "crux of this inquiry . . . boils down to whether the plaintiff effectively seeks to attain money damages." *Widakuswara*, 2025 WL 1288817, at *13 (quoting *Crowley*, 38 F.4th at 1107). Here, Plaintiffs request an order declaring that the termination of the Environmental and Climate Justice Block Grant program was unlawful, setting that termination aside, and imposing an injunction against future withholding of congressionally appropriated funds. This type of relief is not available in the Court of Federal Claims, which "has no power to grant equitable relief." *Id.* at *13 (citing *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988)).

While the practical effect of reinstating the grant programs and restarting the grants would include the disbursement of funds, that "is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. Instead, like the plaintiffs in *Bowen*, the relief Plaintiffs request seeks to preserve their ongoing and prospective agreements with the government. When a private entity funded by federal appropriations has "'a cooperative, ongoing relationship' with the agency 'in the allocation and use of the funds,' a simple money judgment is unlikely to be fitting relief." *Widakuswara*, 2025 WL 1288817, at *13 (citing *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 201 (Fed. Cir. 1997)). Accordingly, these are the sorts of claims the D.C. Circuit has long held belong in district court, not the Court of Federal Claims. *See, e.g.*, *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1448–51 (D.C. Cir. 1985).

Finally, the Supreme Court's four-paragraph, per curiam order in *Department of Education v. California*, 145 S. Ct. 966 (2025), does not compel a different result. To start, *California*, which addressed APA claims only, has no bearing on Plaintiffs' constitutional claims. *California*, 145 S. Ct. at 968; *see also Widakuswara*, 2025 WL 1288817, at *13 (noting *California* "plaintiffs raised no constitutional claim"). And Plaintiffs' APA claims differ in important ways from those at issue in *California*. *California* examined claims that placed "the terms and conditions of each individual grant award . . . at issue." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025). Not so here, where Plaintiffs charge that EPA

dismantled an entire grant program for "policy reasons" without considering the terms and conditions of any individual agreement.[6] Compl. Ex. 1-A ¶ 3 (T. Voyles Decl.).

**B.    Eliminating the Environmental and Climate Justice Block Grant program violated the separation of powers.**

Plaintiffs are likely to succeed on the merits because Defendants' shutdown of the Environmental and Climate Justice Block Grant program and refusal to spend funds appropriated under the governing statute violated the separation of powers principles enshrined in the Constitution. The President and Executive branch cannot refuse to spend funds Congress appropriated for a specific purpose simply because of a policy disagreement. Nor can Defendants effectively repeal a duly enacted statute by eliminating the program it creates.

Here, Congress appropriated $3 billion and directed that EPA "shall use" the money to award grants for up to three years to carry out certain eligible activities to "benefit disadvantaged communities." 42 U.S.C. § 7438(b)(1). These specific eligible activities included, among others, community-led air and other pollution monitoring; mitigating climate and health risks from wildfires; climate resiliency and adaptation; and reducing indoor toxics and indoor air pollution. *Id.* § 7438(b)(2).

---

[6] For these reasons, numerous cases post-*California* have found that constitutional or statutory challenges to agency actions belong in federal district court, and not the Court of Federal Claims. *See, e.g. Widakuswara*, 2025 WL 1166400, at *9–10; *Climate United Fund*, 2025 WL 1131412, at *9–12; *Massachusetts v. Kennedy*, No. 25-cv-10814 2025 WL 1371785, at *3–9 (D. Mass. May 12, 2025); *Woonasquatucket*, 2025 WL 1116157, at *12–15; *Chi. Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 1114466, at *8–10 (N.D. Ill. Apr. 14, 2025); *New York v. Trump*, No. 25-cv-39, 2025 WL 1098966, at *1–3 (D.R.I. Apr. 14, 2025); *Maine v. USDA*, No. 1:25-cv-00131, 2025 WL 1088946, at *18–20 (D. Me. Apr. 11, 2025); *Sustainability Inst.*, 2025 WL 1486978, at *1–6; *Am. Bar. Ass'n*, 2025 WL 1388891, at *5. This Court should do the same.

The Constitution grants the power of the purse to Congress, not the President. U.S. Const. art. I, § 9, cl. 7; art. I, § 8, cl. 1; art. I, § 1; *see also, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 420 (2024); *see also* Mem. from John G. Roberts, Jr. to Fred F. Fielding (Aug. 15, 1985), https://www.levernews.com/content/files/2025/01/1985RobertsMemo-Budget.pdf [https://perma.cc/G5AA-GJAU] ("[N]o area seems more clearly the province of Congress than the power of the purse.").

This power is "exclusive" to Congress, which "has absolute control of the moneys of the United States" under our Constitution. *Rochester Pure Waters Dist. v. EPA*, 960 F. 2d 180, 185 (D.C. Cir. 1992) (internal citation and quotation marks omitted). "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990).

Congress's power over the purse is rooted in two constitutional provisions. First, the Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause expressly "was intended as a restriction upon the disbursing authority of the Executive department." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937). Second, the Spending Clause provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Through these multiple grants of authority, the Constitution gives Congress broad power to legislate spending and to decide how and when its appropriations are spent. *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987).

18

In light of those powers, the Executive cannot "unilateral[ly] . . . refuse" to spend money appropriated by Congress. *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Rather, the Executive has a duty to spend appropriated funds on the terms set by Congress. *See* U.S. Const. art. II, § 3 (Take Care Clause). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Nor can the Executive branch "repeal[] or amend[] parts of duly enacted statutes." *Clinton v. City of New York*, 524 U.S. 417, 439 (1998).

Yet that is precisely what EPA has done here. Congress explicitly directed EPA to create the Environmental and Climate Justice Block Grant program and use the $3 billion it allotted for the program to award grants that address environmental and health harms in communities. 42 U.S.C. § 7438(b)(1)–(2). By eliminating that program, EPA contravenes this directive. Its refusal to spend money appropriated by Congress for the purposes prescribed by Congress for no reason other than its own policy disagreement with those objectives substitutes the Executive's role for the Legislature's. That violates the Constitution.

That the Executive disagrees with Congress's duly-enacted funding decisions is of no consequence to its obligation to faithfully execute them. As a federal district judge in South Carolina noted when considering the freeze and termination of grants, including several within these programs, "[t]hese grants were funded by legislation that mandated that the funds be expended for a specific purpose and left no discretion to agency heads to disregard the legislative mandates because current officials did not approve of the purposes of the previously appropriated programs." *Sustainability Inst.*, 2025 WL 1486979 at *3. Similarly, a federal

district judge in Maryland, considering the termination of Thriving Communities Grantmakers Grants, recently found that EPA violated its statutory authority when it "cancelled these grants precisely *because* they are 'environmental justice' programs"—contrary to the statutory mandate. *Green & Healthy Home Initiatives*, 2025 WL 1697463, at *18.

Defendants have usurped the legislative and appropriations powers of Congress, violating the Constitution's separation of powers.

### C. Eliminating the Environmental and Climate Justice Block Grant program violated the Administrative Procedure Act.

EPA's elimination of the $3 billion Environmental and Climate Justice Block Grant program, and the termination of the grants within its various subprograms, is unlawful action that violates the APA. It is (1) contrary to law and in excess of the EPA's statutory authority, and (2) arbitrary, capricious, and an abuse of discretion. Because Plaintiffs are likely to succeed on the merits of their APA claims, Defendants' discontinuation of this program and the grant awards within it should be set aside under 5 U.S.C. § 706(2).

### i. EPA's termination of the Environment and Climate Justice Block grants was contrary to law.

Defendants' termination of the Clean Air Act section 138 grant programs is contrary to law, in violation of the APA, for at least four independent reasons, any one of which is sufficient to justify preliminary relief in this case. Defendants' termination (1) violates the Clean Air Act in multiple ways, 42 U.S.C. § 7438(b)(1); (2) exceeds its statutory power; (3) violates the constitution, *see* Sec. I.B.; and (4) violates the Impoundment Control Act, 2 U.S.C. §§ 682 *et seq.*

The APA requires courts to hold unlawful and set aside agency actions "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," "not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D).

*First*, by refusing to expend appropriated funds based on the *President's* priorities rather than *Congress's* "stated statutory factors," the "Executive has acted contrary to law and in violation of the APA." *New York v. Trump*, 764 F. Supp. 3d 46, 50 (D.R.I. 2025). No federal law or regulation gives EPA the power to terminate funding appropriated by Congress and obligated by executive agencies, let alone to do so based on policies that are entirely different from, and in many cases directly in conflict with, the directives and purposes specified by Congress for expending the funds. Federal agencies "are creatures of statute" and therefore subject to the limits prescribed by Congress. *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). They "'literally ha[ve] no power to act' except to the extent Congress authorized them." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912 (D.C. Cir. 2024) (quoting *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022)).

And Congress did not authorize *any* of Defendants' actions here. To the contrary, their elimination of this grant program violates the statutory requirements to create, fund, and carry it out. *See* 42 U.S.C. § 7438(b)(1). In this case, the law clearly directed that EPA "shall" establish the Environmental and Climate Justice Block Grant program, and award grants to non-profits, local governments, Tribes, and higher education institutions for specifically enumerated types of projects "that benefit disadvantaged communities." *Id*.

By instead eliminating the program, terminating the grants within it, and refusing to reallocate those funds within the statutorily mandated grant program, EPA acted contrary to section 138's plain command. That EPA cannot do. When Congress authorizes a program, "the Executive must continue to operate" that program "until the funds expire or Congress declares otherwise." *Loc. 2677, Am. Fed'n of Gov't Emp. v. Phillips*, 358 F. Supp. 60, 76 (D.D.C. 1973). Refusing to do so was contrary to law and thus violated the APA.

*Second*, when EPA terminated the grants at issue, "it exceeded its statutory authority under § 7438 because it cancelled these grants precisely *because* they are 'environmental justice' programs." *Green & Healthy Homes Initiative*, 2025 WL 1697463, at *18. Some termination letters specifically state that the grants are being terminated because they provide "funding for programs that promote or take part in DEI initiatives or environmental justice initiatives." Compl. Ex. 1-I (Form Termination Letter).

EPA's decision to eliminate this program because it runs counter to the Administration's new position on "DEI" or "environmental justice" violates the APA. And if an agency exceeds its statutory power, under the APA, the Court must step in to set that action aside. *See* 5 U.S.C. § 706(2)(C). It is the role of "[c]ourts"—not the Executive—to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). The APA thus "codifies" the "elemental proposition reflected by judicial practice dating back to *Marbury*," that "courts, not agencies" decide what the law is. *Id.* at 392–93.

*Third,* EPA also violated the APA because its actions are unconstitutional in that they violate separation of powers principles, as stated above. Actions "not in accordance with law"

and "contrary to constitutional right, power, privilege, or immunity" violate the APA. 5 U.S.C. § 706(2)(A), (B).

*Fourth,* Defendants have unlawfully withheld the expenditure of funds contrary to the Impoundment Control Act of 1974 ("ICA"). The Impoundment Control Act, Pub. L. No. 93-344, 88 Stat. 297 (codified as amended at 2 U.S.C. §§ 682 *et seq.*), expressly prohibits the President from declining to obligate or disburse congressionally appropriated funds. Appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b). The Act also permits the President to "defer[]" a budget authority—to withhold or delay the obligation or expenditure of appropriated funds—but only for limited purposes, for a limited time, and after transmitting a special message to Congress. *Id.* § 684(a); *see id.* § 682(1).

Deferral is permissible for three purposes only: "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." *Id.* § 684(b). "No officer or employee of the United States may defer any budget authority for any other purpose." *Id.* Neither the President nor any executive officer may defer obligation or expenditure of appropriated funds merely for policy reasons. *In re Aiken County*, 725 F.3d at 261 n.1.

By withholding appropriated funds in order to better align spending with the President's policy agenda, Defendants violated the ICA. Defendants initially deferred the funds for impermissible policy reasons and without following the ICA's requirements for notifying Congress, and then unilaterally rescinded the funds. In doing so, Defendants contravened the

ICA's requirement that, should the President seek such a rescission, he must request it of Congress and *Congress* must act to rescind the funds. 2 U.S.C. § 683(b).

EPA's decision to terminate the Clean Air Act section 138 grant programs is in excess of the agency's statutory authority, unconstitutional, and not in accordance with law. 5 U.S.C. § 706(2)(A)–(C). These agency actions must be held unlawful and vacated under the APA. *Id.* § 706(2).

ii.     **Defendants' termination of the Environment and Climate Justice Block Grant program was arbitrary, capricious, and an abuse of discretion.**

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A federal agency cannot rely "on factors which Congress has not intended it to consider, entirely fail[] to consider an important aspect of the problem, [or] offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). EPA exhibited none of these characteristics of reasoned decision-making required under the APA. EPA's actions here were arbitrary and capricious for three independent reasons, any one of which is sufficient to justify preliminary relief in this case.

*First*, EPA failed to provide a "reasoned analysis" for the terminations as the APA requires. *Id*. at 57. Nor could it. EPA has confirmed that it terminated the programs after generally reviewing them "for consistency with Agency policy priorities" and then deciding that "certain grant programs . . . should be terminated for policy reasons." Compl. Ex. 1-A ¶ 3 (T. Voyles Decl.). An agency must give "good reasons for the new policy," *Encino Motorcars, LLC*

*v. Navarro*, 579 U.S. 211, 223 (2016) (internal citation and quotations omitted), including "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 505, 515–16 (2009). Nowhere and at no time has EPA ever provided a reasoned explanation as to why terminating the entire Environmental and Climate Justice Block Grant program was necessary to effectuate the Administration's general "policy priorities."

*Second*, prior to terminating the program, the Agency "entirely failed to consider an important aspect of" its decision—specifically reliance interests of grant recipients and economic impacts. *State Farm*, 463 U.S. at 43. As such, the Agency's decision was "not 'reasonable'" or "reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)); *see also Green & Healthy Homes Initiative*, 2025 WL 1697463, at *19–21.

EPA did not consider grantees' "serious reliance interests." *Fox*, 556 U.S. at 515 (internal citation omitted). The APA requires agencies changing course "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). Plaintiffs have made major decisions and invested significant resources in response to congressional direction and in reliance on appropriated and awarded grants under this program, all in service of work that now can no longer move forward. The termination of this program has caused significant harm, upending projects and significantly impacting organizational budgets. *See* Section II, *infra* (discussing reliance and resulting harms). Defendants failed entirely to

acknowledge reliance interests, let alone determine their significance and weigh them against its competing "policy reasons."

EPA also failed to consider the broader economic impact of immediately and permanently terminating billions of dollars in federal funds. *See State Farm*, 463 U.S. at 43. There is no evidence that anyone at EPA took any steps to assess the consequences of suddenly cutting funding to hundreds of nonprofits, Tribes, local governments, universities, and the communities they serve. *See generally* Compl. Ex. 1-A (T. Voyles Decl.). *See Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (explaining that an agency's failure to "apprise itself . . . of the economic consequences" of potential action is "arbitrary and capricious and not in accordance with law" (quoting *Chamber of Com. of the U.S. v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005)). This abrupt action caused layoffs and furloughs, resulted in lost business for contractors, and disrupted workforce development programs—causing economic damage in communities across the country.

*Third*, EPA failed to consider how the wholesale termination of the Environmental and Climate Justice Block Grant program would impact the "primary goal[s]" of Clean Air Act section 138. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111 (D.C. Cir. 2019) (finding agency action arbitrary and capricious where it failed to "consider the impact of the change on [the agency program's] 'primary purpose' or otherwise explain how it is compatible with that purpose").

In passing the Inflation Reduction Act, Congress aimed to make federal investments to mitigate the impacts of greenhouse gas emissions and toxic air pollution. It included the

Environmental and Climate Justice Block Grant program by amending the Clean Air Act[7] to ensure that the benefits of these investments flowed to those communities that face the greatest impacts from pollution and environmental degradation and have historically had little voice in the decision-making processes that affect them. 42 U.S.C. § 7438(b)(1) (targeting "disadvantaged communities"). EPA failed to consider how its termination of grants in the precise communities Congress intended to serve through the IRA, via implementation of projects that work to achieve the goals of the Clean Air Act, would affect these important purposes.

Because EPA did not "reasonably consider[] the relevant issues" nor "reasonably explain[]" its decision-making, its termination of the Environmental and Climate Justice Block Grant program must be set aside. *Prometheus Radio Project*, 592 U.S. at 423.

## II. Plaintiffs will be irreparably harmed if the grant programs remain shut down during litigation.

The abrupt termination of the Environmental and Climate Justice Block Grant program has caused and will continue to cause irreparable harm during the pendency of this litigation—to Plaintiffs, proposed class members, and beyond. Because the Grant program funded work to mitigate the harms of pollution, build climate resiliency, and promote public health across the United States, communities throughout the country—from schoolchildren in Texas to Tribal members in Alaska to residents of Buffalo—have been and continue to be harmed by Defendants' decision to terminate it. Congress created this program to benefit disadvantaged

_____

[7] When Congress passed the Clean Air Act, it did so to prevent and control air pollution, enhance the quality of the Nation's air resources, provide technical and financial assistance to State and local governments in connection with air pollution and control programs, and promote the public health and welfare. 42 U.S.C. § 7401(b).

communities. 42 U.S.C. § 7438(b)(1). But the ensuing projects created benefits that crossed socioeconomic lines, and their termination harms people throughout the country. These injuries are "certain and great," "actual and not theoretical," and demonstrate "a clear and present need for equitable relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation marks omitted).

Plaintiffs and proposed class members suffer irreparable harm in this case in multiple ways, from the impediment of their internal operations, *see Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 57 (D.D.C. Feb. 3, 2025), to reputational harm with partner organizations, *see Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *9–10 (D.D.C. Mar. 12, 2021) ("[B]ecause 'injury to reputation or goodwill is not easily measurable in monetary terms' it is typically 'viewed as irreparable.'" (quoting Wright & Miller's Federal Practice & Procedure § 2948.1 (3d ed. 1998))), to inability to continue sorely needed programmatic work in their communities, *see Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 244 n.7 (D.D.C. 2014) (finding irreparable harm where nonprofit organizations "may not be driven out of business, but programs they provide may be").

For many Plaintiffs and proposed class members, the termination of their grants means the loss of critical infrastructure and potentially lifesaving projects. Plaintiff Native Village of Kipnuk in Alaska, for example, is facing rapid erosion from the Kugkaktlik River that has already destroyed critical infrastructure and threatens additional destruction. Kipnuk planned to use its grant award for a riverbank stabilization project to protect the village. Now that EPA terminated its grant, Kipnuk cannot move forward. Because construction is limited to the summer months, each day lost furthers the risk that the project will be delayed by a full year,

subjecting the village to an additional year of erosion and flooding and likely preventing the completion of the project within the grant's three-year performance period. Ex. A ¶¶ 9–10, 18, 21 (Kipnuk Decl.).

Across the country, the City of Buffalo faces a similar problem. Plaintiff PUSH Buffalo planned to use its grant funding to build community resilience hubs, provide portable network devices and solar power kits in 150 Buffalo neighborhoods, and train first responders for disaster response—resources the community needs for its safety in the face of increasing extreme weather events. Ex. B ¶ 20 (PUSH Buffalo Decl.). In the last major winter storm, forty-one people died in Erie County, where Buffalo is located. *Id.* 911 services were not restored for three days in some areas, and some Buffalo neighborhoods were without electricity for two weeks. *Id.* Now, unless the Grant program is restored soon so that they can move forward, PUSH Buffalo has no reason to believe outcomes from the next storm will be different. *Id.* ¶ 21.

Looking to the South, in West Jackson, Mississippi, Plaintiff 2°C Mississippi planned to use its grant funding to build a 35,000 square-foot resilience hub to provide overnight shelter for 150 people and an independent water and energy supply for use following hurricanes, power outages, and periods of extreme heat. Ex. C ¶ 20 (2°C Mississippi Decl.). The resilience hub would also serve as a shelter for emergency responders during crises. *Id.* The loss of the hub means that "[p]eople in the community do not have a place to go when the power is out or when their homes are being flooded." *Id.* ¶ 30. *See also* Ex. D ¶¶ 9, 16 (Allegheny County Decl.) (grant terminated three days before County was to break ground on vital water diversion portion of project to prevent severe flooding events that have left homes uninhabitable for days to weeks at a time); Ex. E ¶¶ 8–9, 14 (Stay Ready NOLA Decl.) (plans to build resilience hub in area of

New Orleans that lost power for a full month after prior storm stalled, leaving "underserved communities [that] will continue to be deprived of life-saving services").

Defendants' termination of the Grant program has stalled projects that promised jobs, job training, and transportation. Plaintiff Treasure Island Mobility Management Agency ("TIMMA") planned to connect residents of Treasure Island—an island within the City of San Francisco whose population is planned to grow from 2,000 to more than 20,000 by 2042—to key resources on the mainland, such as jobs and other amenities. Ex. F ¶¶ 4-7 (TIMMA Decl.). The plan included a Transportation Resource Center to "provide high quality jobs, training and affordable transit planning for low-income Treasure Island residents." *Id.* ¶ 7. Without the grant funding, Treasure Island residents are left without access to sufficient transportation, making the growth of the island's population more challenging. *Id.* ¶ 14. *See also* Ex. G ¶¶ 10, 33–34 (Steelworks Decl.) (plan to provide e-bikes to residents in area with poor public transit, increasing access to employment opportunities paused following grant termination); Ex. H ¶¶ 43, 46 (Contra Costa Decl.) (employment opportunities that would have been created by the projects, along with workforce training, now "prevent[ed]" by "[d]elays in funding) Ex. I ¶ 13 (Kalamazoo Decl.) (inability to move forward with first 50 enrollments in workforce development program due to termination); Ex. J ¶¶ 18–19 (Rochester Decl.) (project would have benefited skilled laborers by creating jobs and expanding the capacity of the City's clean energy workforce, but will likely be abandoned absent prompt reinstatement of grant funding).

Several Plaintiffs and proposed class members focused their projects on benefitting children. Plaintiff Health Resources in Action planned to expand its work in schools, focusing on districts most burdened by asthma and extreme heat, to "improve environmental health

conditions . . . by improving indoor environmental quality and supporting healthy childhood development." Ex. K ¶ 29 (HRiA Decl.). Following the grant termination, this work "has stopped entirely." *Id*. ¶ 45. Proposed class member Children's Environmental Literacy Foundation ("CELF") planned to provide stipends, project supplies, and field trip funding to teacher cohorts each year for the three-year project period, targeting Title I schools that typically lack funding for special projects and "prioritizing teachers in communities that are especially impacted by air and water quality concerns." Ex. L ¶ 6 (CELF Decl.). CELF's project would then engage teachers and students to explore sustainability challenges in their community and develop "action plans" to address the issues, building data literacy, science, and engineering skills and cultivating workforce readiness along the way. *Id*. at ¶¶ 6–7; *see also* Ex. M ¶ 9 (Southwest Renewal Foundation Decl.) (grant funding for clean air facility upgrades for public elementary schools). Following EPA's termination of the Environmental and Climate Justice Block Grants, CELF has been forced to scale back its plans and "go back on [its] promise" to schools due to Defendants' action. Ex. L ¶ 20 (CELF Decl.). *See also* Ex. N ¶¶ 6, 13 (Sixth Street Community Center Decl.) (reduction of after-school program involving direct-action learning experiences on urban sustainability, farming, food justice, and more, from day-long programming four days a week to only 20 hours or less total).

For some Plaintiffs who were set to act as grant hubs—connecting grassroots organizations, local governments, and Tribes with technical assistance or other grant opportunities—the scale of the project, and thus the harm of the termination, spanned an entire region or even the nation. Plaintiff Institute for Sustainable Communities, for example, was selected as both a National TCTAC and a National Grantmaker. Ex. O ¶ 10 (ISC Decl.). As a

National TCTAC, it supported regional TCTACs and communities through trainings, technical assistance, and centralized resources. *Id*. ¶ 12. Before the Grant program termination, Plaintiff Institute for Sustainable Communities had processed over 100 technical assistance requests and awarded subawards to more than 90 projects across the country—projects that included reducing exposure to harmful air pollutants, installing wastewater treatment systems in rural communities lacking adequate wastewater management, and supporting the development of affordable, sustainable housing. *Id*. ¶¶ 18, 32. The funding for these projects is now on hold due to Defendants' action. *Id*. ¶¶ 30–33; *see also* Ex. P ¶ 25 (WE ACT Decl.) (designated as TCTAC for EPA Region 2); Ex. K ¶¶ 10–11 (HRiA Decl.) (as Regional Grantmaker for EPA Region 1, awarded subawards to Tribes and community-based organizations in the region to address issues such as flooding and stormwater planning, heat resilience, transportation access, forever chemicals, and job training).

Along with these immense impacts on program work comes harm to Plaintiffs' and proposed class members' internal operations. In some cases, the harm is so severe that Plaintiffs or their subawardees are concerned about the future existence of their organization if the funding is not restored. Plaintiff 2°C Mississippi, for example, received 93% of its funding from its two Clean Air Act section 138 program grants. Ex. C ¶ 31 (2°CM Decl.). Plaintiff Landforce had 60% of its budget covered by its grant. Ex. Q ¶ 21 (Landforce Decl.). When loss of funding "threatens the very existence of the movant's business," irreparable harm exists. *Nat'l Council of Nonprofits*, 763 F. Supp. 3d at 56 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Plaintiffs have also suffered irreparable harm by being "forced to dismiss employees, cut essential programs, and pay workers out of their own pockets." *Id.* at 57. Plaintiff Institute for Sustainable Communities had planned to hire 14 additional staff members in 2025 to support the national scope of the TCTAC and Thriving Communities Grantmaker programs and scale up operations. Ex. O ¶ 28. Instead, due to the termination of the program and the lack of accessible funds, ISC has been forced to lay off or furlough nearly 50% of its staff, significantly setting back the organization's trajectory. *Id.* Plaintiff 2°C Mississippi planned to triple its staff after being awarded two Clean Air Act section 138 grants; instead, it has reduced both staff hours and staff pay to avoid layoffs following Defendants' termination of the Grant program. Ex. C ¶¶ 29, 31 (2°CM Decl.). *See also* Ex. R ¶ 17 (Parks Alliance Decl.); Ex. S ¶ 14 (Deep South Center for Environmental Justice Decl.); Ex. A ¶¶ 35–36 (Kipnuk Decl.). The CEO of Plaintiff Lowcountry Alliance for Model Communities has begun working without pay to avoid laying off employees, Ex. T ¶ 17 (Lowcountry Alliance Decl.), and Day One, a proposed class member, is "quickly approaching the point of exhausting [its] financial resources to pay salaries of existing staff," Ex. U ¶ 15 (Day One Decl.). Some Plaintiffs and subawardees have paused hiring due to the Grant program termination. *See, e.g.*, *id.*; Ex. V ¶ 26 (Air Alliance Houston Decl.); Ex. W ¶ 17 (Inter-Tribal Council of Michigan Decl.); Ex. I ¶ 16 (Kalamazoo Decl.); Ex. X ¶ 26(b)–(c) (Springfield Decl.). These "unrecoverable" economic harms constitute irreparable harm. *Clarke v. Off. of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 65 (D.D.C. 2004).

Further, Plaintiffs and proposed class members now are spending additional staff time—which, absent the termination, could be focused on programmatic work and advancing their goals—fundraising to try to make up for the financial hole left by the termination of the

Environmental and Climate Justice Block Grant program and all the funding that came with it. *See, e.g.*, Ex. T ¶ 18 (Lowcountry Alliance Decl.); Ex. P ¶ 24 (WE ACT Decl.); Ex. M ¶ 29 (Southwest Renewal Foundation Decl.); Ex. L ¶ 16 (CELF Decl.). Some have diverted financial resources to cover costs that were supposed to be borne by the grant. *See, e.g.*, Ex. R ¶¶ 20, 22 (Parks Alliance Decl.). "[H]arms from the forced diversion of resources" are irreparable harms. *Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 42 (D.D.C. 2020); *see, e.g.*, *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 178 (D.D.C. 2017) (finding irreparable harm where plaintiff has "changed its activities" and "diverted scarce resources away from previously planned projects" due to agency inaction). In this case, Plaintiffs, proposed class members, and their subawardees expended "significant time, resources, and energy" complying with the "immense" "demands of participating" in the Environmental and Climate Justice Block Grant program, motivated by "the promise of deeply needed investments to build livable and healthy communities." Ex. K ¶ 57 (HRiA Decl.). But that commitment came at a cost: these organizations "were unable to pursue other opportunities that may have ultimately led to more impactful and sustainable change" if they had devoted their energy to securing reliable funding elsewhere. *Id*.

Finally, Plaintiffs have also suffered and continue to suffer reputational injury, which this court has repeatedly found constitutes irreparable harm, due to Defendants' action. *See, e.g.*, *Xiaomi Corp.*, 2021 WL 950144, at *9–10; *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018). Many Plaintiffs and proposed class members have longstanding, deeply valued relationships within their communities that they have worked hard to build over years—if not decades. That trust depends on continued follow-through on the promises that they make.

Especially so for those Plaintiffs who work with communities that have legitimate mistrust of the federal government. That mistrust required Plaintiffs to assure their community that working with the federal government on the Environmental and Climate Justice Block Grant program was a worthwhile risk—only to have the rug pulled out from beneath them. Plaintiff Deep South Center for Environmental Justice ("DSCEJ"), for example, has worked for "several years" to change its community's "well-founded and hard-earned skepticism . . . regarding the federal government." Ex. S ¶ 18 (DSCEJ Decl.). Now, EPA's grant program termination means that, for the first time in DSCEJ's 35-year history—and as a direct result of the federal government's action—it cannot deliver on a promise it made to its community. *Id*. *See also* Ex. C ¶ 19 (2°CM Decl.) (Residents of some of the poorest census tracts in the entire country "started believing they could make meaningful changes and formed a neighborhood association to work on th[e] project" after receiving the grant award. Because of the termination, "that hope has been taken away.").

The Inter-Tribal Council of Michigan ("ITCMI") also made promises to tribal nation members and subawardees that it now cannot keep. Ex. W ¶ 21 (ITCMI Decl.). "Given that tribes have a fraught and often tragic history with the federal government, there is a healthy associated distrust," which is exacerbated by the lack of delivery on these promised programs. *Id*. ITCMI is concerned that this experience will make tribes "much more wary in the future of partnering with [ITCMI]." *Id*.

Similarly, Appalachian Voices works with "Appalachian communities that have experienced years of systemic underinvestment and have been left out of opportunities." Ex. Y ¶ 20 (Appalachian Voices Decl.). When the organization held a previously-scheduled community

listening session following the Grant program termination, community members "expressed feeling like their time had been wasted now that the funding has been terminated by the EPA." *Id*. Steelworks has heard community members bring up their project in City Council meetings as yet another example of a "false promise" from the government. Ex. G ¶ 27 (Steelworks Decl.). *See also* Ex. Z ¶ 17 (Steps Coalition Decl.) ("[T]his latest slight from the federal government just provides further evidence that the government cannot be trusted" in a Mississippi community that has "seen consistent underinvestment for decades.").

　　As a direct result of Defendants' actions, Plaintiffs and proposed class members have had to go back on their word, canceling contracts, directing subawardees to stop work, and communicating to the public that they can no longer guarantee that the projects they promised will come to fruition. Because these groups rely on these community relationships, the loss of trust threatens future work beyond this Grant program. *See, e.g.*, Ex. AA ¶ 20 (Sacramento Decl.) ("Termination of the grant has brought the Project to a halt and severely impacted the City's standing with its residents, leading to a loss of public confidence and making future community-based initiatives more challenging."); Ex. BB ¶ 24 (King County Decl.) ("The sudden termination . . . has strained King County's relationships with partners . . . and hindered the County's ability to establish and maintain trust with community-based organizations and their constituents."); Ex. CC ¶ 20 (Ironbound Decl.) ("After months of outreach with the community and local partners, this sudden termination risks undermining the trust of the community."); Ex. X ¶ 26(j) (Springfield Decl.) ("[I]n the aftermath of several catastrophic natural disasters the City has invested significant time and capital building trust[] . . . [and] two-way communications with residents . . . . [The] abrupt termination of grant funding and inability to honor programmatic

commitments, undermines and erodes the trust the City has worked to build within the community and jeopardizes future emergency communications with residents."); Ex. H ¶¶ 41–42 (Contra Costa Decl.) (noting that termination also creates contractual problems with partner organizations, including the inability to honor agreements).

Even with longstanding relationships, "trust can be broken quickly." Ex. CC ¶ 21 (Ironbound Decl.). This erosion of trust also constitutes irreparable harm. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (finding a "significant and irreparable" injury where, even if an organization's affiliates survived, "the community connections they have developed are likely to erode"). And as time goes on, this trust further degrades. The faster relief is granted, the easier it will be for Plaintiffs to follow through on their contracts and promises, and to rebuild trust within their communities. *See, e.g.*, Ex. K ¶ 68 (HRiA Decl.); Ex. G ¶ 34 (Steelworks Decl.); Ex. P ¶ 29 (WE ACT Decl.).

Courts have already found that the unanticipated closure of community-serving grant programs causes irreparable harm warranting preliminary relief. *See Maryland v. Corp. for Nat'l and Community Service*, 25-cv-1363, 2025 WL 1585051, at *33–34 (D. Md. June 5, 2025) (finding irreparable harm where agency terminated AmeriCorps grants "out of the blue" and required AmeriCorps members be removed from service). Notably, Plaintiffs need only show a likelihood of irreparable harm—"Damocles's sword does not have to actually fall" before an injunction issues. *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

Here, the harm from EPA's termination of the Environmental and Climate Justice Block Grant program is already occurring and will continue—and worsen—absent immediate relief. From organizations that have already administered millions of dollars in federal grant money to

those for whom this was their very first federal award, these Plaintiffs and proposed class members sought this funding in order to benefit their communities. Defendants' decision to terminate their grants has "perceptibly impair[ed]" Plaintiffs' and proposed class members' work, *Dist. of Columbia v. USDA*, 444 F. Supp. 3d at 41 (quoting *League of Women Voters*, 838 F.3d at 8), and left them scrambling—to navigate the termination, try to preserve programs that are vital to their communities' health and wellbeing, and minimize damage to trust with partners and community members that they have often worked decades to build.

The impacts are already immense. But without prompt relief, many Plaintiffs and proposed class members face even greater harm. With each passing week, budgets grow tighter, with some Plaintiffs and proposed class members not knowing how they will make payroll as soon as this fall, and community and partner trust further erodes. And as we move into summer storm season, several Plaintiffs fear that, without the ability to implement their disaster preparedness projects, their staff and communities will be left unnecessarily vulnerable to the next natural disaster. Because irreparable injury to Plaintiffs and proposed class members is not only "likely," but is occurring and exacerbated as time goes on, preliminary relief is warranted to avoid these imminent irreparable harms. *Winter*, 555 U.S. at 22.

### III. The balance of equities and public interest factors weigh in favor of an injunction.

A preliminary injunction is warranted where "the balance of equities tips in [its] favor, and [] an injunction is in the public interest." *Id.* at 20. "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. This evaluation requires a consideration of the "relative harms" of the parties and "the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991)

(Scalia, J., in chambers) (quoting *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)). Here, these factors strongly favor preliminary injunctive relief.

Plaintiffs face certain and irreparable injury that will only grow in the absence of preliminary relief. Plaintiffs and proposed class members are experiencing and will continue to experience significant disruption to their operations, ongoing harms to their reputations and partnerships, and economic harms that would cause irreparable damage if not halted pending the resolution of this case. By contrast, Defendants face no cognizable harm from being enjoined from withholding or de-obligating funds Congress appropriated for the Environmental and Climate Justice Block Grant program. For the reasons explained above, doing so violates constitutional principles as well as the APA. "It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmtys. All.*, 286 F. Supp. at 179).

Preliminary relief would also serve the public interest. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. Enjoining Defendants from shuttering a grant program Congress authorized on behalf of the American people would respect our constitutional design and guard against the Executive's unlawful exercise of power. In addition to lawful governance, the public interest favors not harming or disrupting organizations and programs that benefit and serve the public. *See Nat'l Council of Nonprofits*, 763 F. Supp. 3d at 57 ("Each day that the pause continues to ripple across the country is an additional day that Americans are being denied access to programs" because the funding freeze threatens "the lifeline that keeps countless organizations operational.").

The Environmental and Climate Justice Block Grant program serves communities across the country. It was specifically designed by Congress to serve those most vulnerable—those disadvantaged communities who would most benefit from community-based projects designed to improve the environment, health, and resilience of their local communities and have the least resources to address these issues absent such federal intervention. The shutdown of the program, and the shuttering of the projects grantees had begun to undertake, will have significant near-term impacts on community resources, resilience, health, and wellbeing. For example, Defendants' termination of this $3 billion program translates into:

- Children's continued, avoidable exposure to heat and asthma triggers, Ex. K ¶ 64 (HRiA Decl.);

- Communities next to polluting facilities left without the training and tools needed to engage in permitting processes for polluters in their backyards, Ex. V ¶¶ 8, 27–28 (Air Alliance Houston Decl.);

- People left unnecessarily vulnerable to extreme weather, from a remote Native village in Alaska, Ex. A ¶¶ 17–18, 21 (Kipnuk Decl.), to the City of Buffalo, New York, Ex. B ¶¶ 20–21 (PUSH Buffalo Decl.); *see also* Ex. DD ¶ 16 (Trinity Alliance Decl.);

- Communities unable to engage in air quality monitoring—sometimes near major, known sources of pollution—and thus unable to make informed decisions about their own exposure, Ex. EE ¶¶ 22, 27 (Downwinders Decl.); Ex. FF ¶¶ 20, 22–23, 27 (Glynn Environmental Coalition Decl.); Ex. N ¶¶ 9–10, 15 (Sixth Street Decl.);

- Lack of progress addressing significant public health concerns caused by air pollution, including higher than average asthma rates, Ex. X ¶ 26(a) (Springfield Decl.);

- Communities left without information about how to access home weatherization resources and emergency preparedness resources in case of wildfire or drought, Ex. GG ¶¶ 24, 29–30 (EcoAction Partners Decl.);

- Lost employment opportunities, workforce training, and transportation access that would increase access to jobs, Ex. HH ¶ 9 (Southwestern Michigan Planning Commission Decl.); Ex. DD ¶¶ 9–10 (Trinity Alliance Decl.); Ex. I ¶¶ 13, 15 (Kalamazoo Decl.);

- Continued harms of urban heat islands, Ex. AA ¶ 17 (Sacramento Decl.), and risk of illness and death due to extreme heat exposure, Ex. II ¶ 5, 20 (NYC Decl.)—as well as frequent flooding in heavily populated areas without planned mitigation efforts, Ex. D ¶¶ 9, 19 (Allegheny Decl.); Ex. JJ ¶¶ 9, 11, 22 (EcoWorks Decl.);

- Reduced remediation of lead contamination in water supplies and homes, Ex. KK ¶ 10(a) (Center for Community Energy and Environmental Justice Decl.); Ex. LL ¶¶ 8(a), 18(d)–(e) (Young, Gifted & Green Decl.), Ex. X ¶¶ 14(c), 26(f) (Springfield Decl.);

- Lost opportunities for communities to provide input on local environmental and climate policy to their local governments, Ex. MM ¶¶ 4, 12 (San Francisco Decl.); Ex. NN ¶¶ 15–16, 31–33, 38 (El Puente Decl.);

- Hundreds of small organizations left without technical assistance to apply for federal funds going forward, including 90 projects that are ready to begin and waiting for funding, Ex. O ¶¶ 29, 32, 35 (ISC Decl.); Ex. S ¶ 16 (DSCEJ Decl.).

The balance of equities weighs heavily in Plaintiffs' favor, warranting immediate relief.

### IV. The Court should issue a preliminary injunction to restore the status quo that existed before Defendants' illegal actions.

Plaintiffs seek a preliminary injunction that would require EPA to reinstate all grant programs and awards authorized by 42 U.S.C. § 7438, enjoin EPA from any future termination of these programs and awards, and require EPA to provide adequate staffing and administrative resources to operate the affected grant programs. In addition, Plaintiffs request the Court to temporarily prohibit Defendants from de-obligating any funds designated to the Environment and Climate Justice Block Grant program. This relief is appropriate here as it is necessary to restore the status quo ante—the last uncontested status between the parties.

The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Climate United Fund*, 2025 WL 1131412, at *6 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also* Wright & Miller's Federal Practice and Procedure § 2947 (3d ed. 1998) (the purposes of a preliminary injunction

are "to protect the moving party from irreparable injury and to preserve the court's power to issue a final remedy"). The status quo to be preserved is "the last uncontested status which preceded the pending controversy." *Climate United Fund*, 2025 WL 1131412, at *6 (quoting *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733–34 (D.C. Cir. 2022)).

The D.C. Circuit has repeatedly emphasized the importance of preserving the availability of appropriated funds during the pendency of litigation to enable effective relief. As the court of appeals has instructed in case after case, no relief is possible in cases addressing congressional appropriations if the appropriated funds become unavailable during the course of litigation. "Thus, to avoid having its case mooted, a plaintiff must both file its suit before the relevant appropriation lapses *and* seek a preliminary injunction preventing the agency from disbursing those funds." *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1427 (D.C. Cir. 1994).

Here, reinstating all grant awards authorized by Clean Air Act section 138 and requiring EPA to provide adequate staffing and administrative resources to operate the affected grant programs would allow Plaintiffs and proposed class members to perform on their projects as they were doing before EPA's unlawful termination of the program began. Enjoining EPA from any further unwinding of this program would prevent additional disruption during the pendency of this case.

Finally, Plaintiffs are concerned that Defendants may take action to de-obligate some of the funds at issue in this litigation and release them to the Treasury, which could deprive Plaintiffs of the possibility of effective relief. The director of the Office of Management and Budget has indicated that the Administration might use delay and pocket rescission tactics to cut

funding that already has been authorized by Congress. Tony Romm, *White House Eyes Rarely Used Power to Override Congress on Spending*, New York Times, June 17, 2025, https://www.nytimes.com/2025/06/17/us/politics/trump-vought-congress-spending-rescission.html [https://perma.cc/M25G-X29R][8]. Accordingly, Plaintiffs request the Court prohibit Defendants from de-obligating funds during the pendency of this case. *See Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986); *see also Connecticut v. Schweiker*, 684 F.2d 979, 999 (D.C. Cir. 1982) (remanding to district court to enter injunction preventing funds in the program from reverting to the Treasury to avoid foreclosing relief for "unlawful decision by [agency] not to process appellants' claim"); *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58 (D.C. Cir. 1977) (reversing denial of temporary restraining order as abuse of discretion because at the very least "uncertainty in the law concerning the effect of the expiration of the FAA's authority to obligate" funds threatened to render relief on the merits unavailable).

## V.     The Court should not require a bond.

The Court has "broad discretion" regarding bonds under Federal Rule of Civil Procedure 65(c). *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). This discretion includes "requir[ing] no bond at all." *P.J.E.S.v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). Where a bond "would have the effect of denying the plaintiffs their right to judicial review of administrative action," it is not required. *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting

---

[8] *See also*, Jeff Stein, et al., *Trump Administration is preparing to challenge budget law, U.S. officials say,* The Washington Post, June 25, 2025, https://www.washingtonpost.com/business/2025/06/25/trump-budget-law-challenge/ [https://perma.cc/FUV8-UJ5U].

cases). Accordingly, numerous courts in this district and elsewhere have declined to require

bonds in funding freeze and termination cases. *See, e.g.*, *RFE/RL, Inc. v. Lake*, No. 1:25-cv-799,

2025 WL 1232863, at *8 (D.D.C. Apr. 29, 2025); *Nat'l Council of Nonprofits v. Off. of Mgmt. &*

*Budget*, No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) ("In a case where the

government is alleged to have unlawfully withheld [large sums] of previously committed funds

to countless recipients, it would defy logic—and contravene the very basis of this opinion—to

hold Plaintiffs hostage for the resulting harm."); *Colorado v. U.S. Dep't of Health & Hum.*

*Servs.*, No. 1:25-cv-121, 2025 WL 1017775, at *6 (D.R.I. Apr. 5, 2025), *reconsideration denied*,

2025 WL 1426226 (D.R.I. May 16, 2025); *Cmty. Legal Servs. in E. Palo Alto v. U. S. Dep't of*

*Health & Hum. Servs.*, No. 25-cv-02847, 2025 WL 973318, at *4 (N.D. Cal. Apr. 1, 2025),

*appeal dismissed*, No. 25-2358, 2025 WL 1189827 (9th Cir. Apr. 18, 2025); *Maryland v. USDA*,

770 F. Supp. 3d 779, 820 (D. Md. 2025) ("[I]t would be prohibitive to require plaintiffs to bear

up front the total cost of the alleged governmental wrongdoing."); *Woonasquatucket*, 2025 WL

1116157, at *24; *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d

243, 291 (D. Md. 2025) (setting a nominal bond of zero dollars because the requested bond

"would essentially forestall [the] [p]laintiffs' access to judicial review"). Plaintiffs request that

the court set a nominal bond of zero.

**VI.     This Court may provisionally certify the proposed class for the purposes of granting this motion for preliminary injunction.**

Plaintiffs meet the requirements to be certified as a class under Federal Rules of Civil

Procedure 23(a) and (b)(2). *See* Plaintiffs' Mot. for Class Certification. But if this Court desires

further proceedings regarding the Motion for Class Certification, it may grant provisional class

certification for the purpose of ruling on this Motion for Preliminary Injunction. "Preliminary

relief is 'customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'" *A.A.R.P. v. Trump*, 135 S. Ct. 1364, 1368 (2025) (internal citations omitted). When granting provisional class certification, the court's analysis is "tempered [] by the understanding that such certifications 'may be altered or amended before the decision on the merits.'" *P.J.E.S.*, 502 F. Supp. 3d at 530 (internal citations omitted).

Courts in this District have provisionally certified classes where the motion for class certification was filed concurrently with a motion for preliminary injunction for purposes of ruling on the latter. *See id*.; *Kingdom v. Trump*, No. 1:25-cv-691-RCL, 2025 WL 1568238, at *13 (D.D.C. June 3, 2025). If the Court determines that additional briefing is necessary to certify the class, Plaintiffs respectfully request provisional class certification to allow for prompt resolution of this motion for class-wide preliminary relief.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' Motion and preliminarily enjoin the termination of the Environmental and Climate Justice Block Grant program and the termination of Plaintiffs' and class members' grants and any actions to implement or enforce the terminations, including any effort to de-obligate the awardees' funds during the pendency of this litigation.

DATED: June 27, 2025          Respectfully submitted,

*/s/ HANA V. VIZCARRA*
Hana V. Vizcarra (D.C. Bar No. 1011750)
Deena Tumeh (D.C. Bar No. 1741543)
Molly Prothero (D.C. Bar No. 1779237)
Andrew Saavedra (N.Y. Bar No: 6062814)
(*Pro Hac Vice*)
Linnet Davis-Stermitz (WA Bar No. 63190)
(*Pro Hac Vice*)
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
hvizcarra@earthjustice.org
dtumeh@earthjustice.org
mprothero@earthjustice.org
asaavedra@earthjustice.org
ldavisstermitz@earthjustice.org

*Counsel for Plaintiffs Air Alliance Houston, Bessemer Historical Society (d/b/a Steelworks Center of the West), Deep South Center for Environmental Justice, Downwinders at Risk, Health Resources in Action, Institute for Sustainable Communities, Inter-Tribal Council of Michigan, PUSH Buffalo, and WE ACT for Environmental Justice and the Proposed Class Counsel.*

*/s/ Ben Grillot*
Ben Grillot (D.C. Bar No. 982114)
Kimberley Hunter (N.C. Bar No. 41333)
(*Pro Hac Vice* forthcoming)
Irena Como (N.C. Bar No. 51812)
(*Pro Hac Vice* forthcoming)
SOUTHERN ENVIRONMENTAL LAW CENTER
122 C St NW, Suite 325
Washington, DC 20001
Telephone: (202) 828-8382
Facsimile: (202) 347-6041
bgrillot@selc.org
kmeyer@selc.org

46

icomo@selc.org

*Counsel for Plaintiffs Appalachian Voices, 2°C Mississippi, Lowcountry Alliance for Model Communities, Parks Alliance of Louisville, Pittsburgh Conservation Corps (Landforce) and Southwest Renewal Foundation and Proposed Class Counsel.*

*/s/ Toby Merrill*
Toby Merrill (D.D.C. Bar No. MA0006)
Graham Provost (D.C. Bar No. 1780222)
(*Pro Hac Vice* forthcoming)
Elaine Poon (VA Bar No. 91963)
(*Pro Hac Vice* forthcoming)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
toby@publicrightsproject.org
graham@publicrightsproject.org
elaine@publicrightsproject.org

*Counsel for Plaintiffs Allegheny County, Kalamazoo County, King County, Native Village of Kipnuk, City of Sacramento, City and County of San Francisco, City of Springfield and Treasure Island Mobility Management Agency and Proposed Class Counsel.*

*/s/ Gary DiBianco*
Gary DiBianco (D.C. Bar No. 458669)
Jillian Blanchard (CA Bar No. 203593)
(*Pro Hac Vice* pending)
Larissa Koehler (CA Bar No. 289581)
(*Pro Hac Vice* pending)
LAWYERS FOR GOOD GOVERNMENT
6218 Georgia Avenue NW, # 5001
Washington, D.C. 20011
(202) 258-6826
Gary@lawyersforgoodgovernment.org
Jillian@lawyersforgoodgovernment.org
Larissa@lawyersforgoodgovernment.org

*Counsel for Plaintiffs Institute for Sustainable Communities, Inter-Tribal Council of Michigan, and Kalamazoo County.*

<u>/s/ Julie Wilensky</u>
David Chiu (CA Bar No. 189542)
SAN FRANCISCO CITY ATTORNEY
Yvonne R. Meré (CA Bar No. 175394)
Chief Deputy City Attorney
*Pro Hac Vice* forthcoming)
Mollie M. Lee (CA Bar No. 251404)
(*Pro Hac Vice* forthcoming)
Chief of Strategic Advocacy
Sara J. Eisenberg (CA Bar No. 269303)
(*Pro Hac Vice* forthcoming)
Chief of Complex and Affirmative Litigation
Julie Wilensky (CA Bar No. 271765)
(*Pro Hac Vice* forthcoming)

Deputy City Attorney
1390 Market Street, 7th Floor
San Francisco, CA 94102
Telephone: (415) 554-4274
yvonne.mere@sfcityatty.org
mollie.lee@sfcityatty.org
sara.eisenberg@sfcityatty.org
julie.wilensky@sfcityatty.org

*Counsel for Plaintiffs City and County of San Francisco and Treasure Island Mobility Management Agency*

<u>/s/ Alison Holcomb</u>
David J. Hackett (WA Bar No. 21234)
(*Pro Hac Vice* forthcoming)
General Counsel to King County Executive & Special Deputy Prosecutor
Alison Holcomb (WA Bar No. 23303)
(*Pro Hac Vice* forthcoming)

48

Deputy General Counsel to King County
Executive & Special Deputy Prosecutor
OFFICE OF KING COUNTY PROSECUTING
ATTORNEY LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov

*Attorneys for Plaintiff Martin Luther King, Jr.
County*