# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

APPALACHIAN VOICES, *et al*.,

     Plaintiffs,

     v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al*.,

     Defendants.

Case No. 25-cv-01982 (RJL)

**DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.    Statutory Background ........................................................................ 3

    B.    Relevant Executive Orders ............................................................... 4

    C.    Plaintiffs' Claims............................................................................. 5

LEGAL STANDARDS ....................................................................................... 6

ARGUMENT ...................................................................................................... 7

I.     THE COURT LACKS JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS AND MUST DISMISS THIS CASE. ................................................. 7

    A.    Because Funding For the Grant Program Has Been Rescinded, Plaintiffs' Claims for Relief are Moot ...................................................... 8

    B.    Plaintiffs' Termination-Related Claims are in Essence Contract Claims That Must Be Brought in the Court of Federal Claims .................. 10

    C.    The Court Lacks Jurisdiction to Review the Agencies' Discretionary Decisions Regarding How to Allocate Funds. ........................................ 16

II.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM.......................................................................................... 18

    A.    The Challenged Actions are Committed to Agency Discretion by Law. .............. 19

          i.    Defendants have authority to select recipients for funding under applicable law.............................................................................. 19

          ii.    Plaintiffs' allegations do not show arbitrary and capricious decision-making........................................................................ 21

          iii.    Impoundment Control Act ........................................................ 23

    B.    Defendants' Actions Did Not Violate the Constitution. ........................................ 24

III.    PLAINTIFFS DO NOT FACE IRREPARABLE HARM. ............................................... 25

IV.    THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION......................................................................... 29

V.      ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED AND
        ACCOMPANY A BOND........................................................................................... 31

CONCLUSION.......................................................................................................................... 33

# TABLE OF AUTHORITIES

## CASES

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014)...................................................................... 7

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
  357 F.3d 62 (D.C. Cir. 2004)................................................................11, 12, 15

*Amica Center for Immigrant Rights v. Department of Justice*,
  No. CV 25-298 (RDM), 2025 WL 1852762 (D.D.C. July 6, 2025) .................. 15, 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................ 6

*Barton v. U.S. Dep't of Lab.*,
  757 F. Supp. 3d 766 (E.D. Ky. 2024)............................................................. 32

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................ 6

*Boaz Hous. Auth. v. United States*,
  994 F.3d 1359 (Fed. Cir. 2021) ....................................................................11

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)...................................................................................... 14

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)...................................................................................... 29

*\*California v. U.S. Dep't of Educ.*,
  132 F.4th 92 (1st Cir. 2025) .......................................................................... 12

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006)..................................................................... 7, 25

*Cincinnati Soap Co. v. United States*,
  301 U.S. 308 (1937)........................................................................................ 8

*Corbel Commc'ns Indus. LLC v. Lat Long Infrastructure LLC*,
  No. LA CV 21-8097 JAK, 2021 WL 6104231 (N.D. Cal. Oct. 29, 2021)............................. 27

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022) ....................................................................10, 11

*Dalton v. Spector,
   511 U.S. 462 (1994) ................................................................... 15, 16

Davis v. Pension Benefit Guar. Corp.,
   571 F.3d 1288 (D.C. Cir. 2009) ........................................................... 7

Dennis Melancon, Inc. v. City of New Orleans,
   703 F.3d 262 (5th Cir. 2012) ............................................................. 30

*Dep't of Educ. v. California,
   604 U.S.---, 145 S. Ct. 966 (2025) ............................................. passim

Di Biase v. SPX Corp.,
   872 F.3d 224 (4th Cir. 2017) ............................................................. 28

Direx Israel, Ltd. v. Breakthrough Med. Corp.,
   952 F.2d 802 (4th Cir. 1991) ......................................................... 26, 27

FERC v. Elec. Power Supply Ass'n,
   577 U.S. 260 (2016) .......................................................................... 22

Fund for Animals v. Frizzell,
   530 F.2d 982 (D.C. Cir. 1975) .......................................................... 26

Gen. Land Off. v. Biden,
   722 F. Supp. 3d 710 (S.D. Tex. 2024) .............................................. 23

Gonzalez v. Thaler,
   565 U.S. 134 (2012) ............................................................................ 6

Heckler v. Chaney,
   470 U.S. 821 (1985) .......................................................................... 20

Holbrook v. Tenn. Valley Auth.,
   48 F.4th 282 (4th Cir. 2022) .............................................................. 17

Hughes Network Sys. v. InterDigital Commc'ns Corp.,
   17 F.3d 691 (4th Cir. 1994) ........................................................... 27, 28

In re Papandreou,
   139 F.3d 247 (D.C. Cir. 1998) ............................................................ 6

In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.,
   928 F.3d 42 (D.C. Cir. 2019) .............................................................. 6

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ............................................................................... 11, 14

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*,
  746 F.2d 855 (D.C. Cir. 1984) ................................................................................. 17

*Jerome Stevens Pharms., Inc. v. FDA*,
  402 F.3d 1249 (D.C. Cir. 2005) ................................................................................. 6

*Khadr v. United States*,
  529 F.3d 1112 (D.C. Cir. 2008) ................................................................................. 6

*Lewis v. Casey*,
  518 U.S. 343 (1996) ................................................................................................. 29

*\*Lincoln v. Vigil*,
  508 U.S. 182 (1993) .......................................................................................... *passim*

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ................................................................................................. 31

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
  No. CV DLB-25-1363, 2025 WL 1585051 (D. Md. June 5, 2025) ......................... 31

*Maryland v. King*,
  567 U.S. 1301 (2012) ........................................................................................... 3, 30

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ................................................................................................. 10

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ................................................................................................... 7

*\*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ................................................................................. 11

*Metadure Corp. v. United States*,
  490 F. Supp 1368 (S.D.N.Y. 1980) ......................................................................... 15

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) ................................................................................. 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................................................................. 21, 22

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
  915 F.3d 197 (4th Cir. 2019) ............................................................................ 27

*Munaf v. Geren*,
  553 U.S. 674 (2008) ............................................................................................ 6

*Nevada v. DOE*,
  400 F.3d 9 (2005) ............................................................................................... 9

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................ 7

*Off. of Pers. Mgmt. v. Richmond*,
  496 U.S. 414 (1990) ............................................................................................ 8

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
  48 F. Supp. 3d 87 (D.D.C. 2014) ..................................................................... 26

*Perry Capital LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) .......................................................................... 15

*Person v. Mayor & City Council of Baltimore*,
  437 F. Supp. 2d 476 (D. Md. 2006) ................................................................. 26

*Plains Com. Bank v. Long Fam. Land & Cattle Co.*,
  554 U.S. 316 (2008) ............................................................................................ 6

*Pub. Citizen v. Stockman*,
  528 F. Supp. 824 (D.D.C. 1981) ...................................................................... 23

*Pursuing Am.'s Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ............................................................................ 7

*Reeside v. Walker*,
  11 How. Pr. 272 (1851) ....................................................................................... 8

*Rochester Pure Waters Dist. v. EPA*,
  960 F.2d 180 (D.C. Cir. 1992) ........................................................................ 8, 9

*Sampson v. Murray*,
  415 U.S. 61 (1974) ............................................................................................ 27

*Sea Containers Ltd. v. Stena AB*,
  890 F.2d 1205 (D.C. Cir. 1989) ....................................................................... 25

*Seila Law LLC v. CFPB,*
   591 U.S. 197 (2020) ................................................................................. 25

*Sierra Club v. EPA,*
   353 F.3d 976 (D.C. Cir. 2004) ................................................................. 21

*\*Spectrum Leasing Corp. v. United States*
   764 F.2d 891 (D.C. Cir. 1985) .......................................................11, 12, 14

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ..................................................................................... 6

*Suburban Mortg. Assocs. v. U.S. Dep't of Hous. & Dev.,*
   480 F.3d 1116 (Fed. Cir. 2007) ................................................................ 16

*\*Sustainability Inst. v. Trump,*
   No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) .................... 10, 13

*Trump v. Sierra Club,*
   140 S. Ct. 1 (2019) ................................................................................... 23

*Twin Metals Minn. LLC v. United States,*
   No. 22-cv-2506, 2023 WL 5748624 (D.D.C. Sept. 6, 2023),
   *appeal filed*, No. 23-5254 (D.C. Cir. Nov. 9, 2023) ................................... 6

*Vera Institute of Justice v. U.S. Department of Justice,*
   No. 25-CV-1643 (APM), 2025 WL 1865160 (D.D.C. July 7, 2025),
   *appeal filed*, No. 25-5248 (D.C. Cir. July 10, 2025) ........................... 14, 15

*Widakuswara v. Lake,*
   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ....................... 13

*Widakuswara v. Lake,*
   No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ..................... 13

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................................ 6, 26

*Wis. Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ....................................................... 25, 27, 30

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ................................................................................. 16

**CONSTITUTION**

U.S. Const., art. I, § 9, cl. 7 .......................................................................... 8

**STATUTES**

2 U.S.C. § 683 ................................................................................................. 23

2 U.S.C. § 684 ............................................................................................ 23, 24

2 U.S.C. § 686 ................................................................................................. 24

2 U.S.C. § 687 ................................................................................................. 24

5 U.S.C. § 701 ................................................................................................. 16

5 U.S.C. § 702 ................................................................................................. 10

5 U.S.C. § 706 ................................................................................................. 21

28 U.S.C. § 1491 ............................................................................................. 10

42 U.S.C. § 7438 ....................................................................................... *passim*

Inflation Reduction Act of 2022,
    Pub. L. No. 117-169, 136 Stat. 1818 ....................................................... 3

**RULES**

Fed. R. Civ. P. 12(b)(1) ..................................................................................... 6

Fed. R. Civ. P. 12(h)(3) ................................................................................... 10

Fed. R. Civ. P. 65(c) ........................................................................................ 32

**LEGISLATIVE HISTORIES**

H.R. 1, 119th Cong., Sec. 60016 (1st Sess. 2025). ..................................... *passim*

**REGULATIONS**

2 C.F.R. § 200.340(a)(4) .................................................................................. 21

Executive Order No. 14,151, 90 Fed. Reg. 8,339 (Jan. 20, 2025) ................. 4, 22

Executive Order No. 14,154, 90 Fed. Reg. 8,353 (Jan. 20, 2025) ................. 4, 22

Executive Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) ................. 4, 5

**OTHER AUTHORITIES**

K. Stith, Congress' Power of the Purse,
  97 Yale L.J. 1343 (1988) .......................................................................................................... 8

The White House, President Trump's One Big Beautiful Bill Is Now the Law (July 4, 2025),
  https://www.whitehouse.gov/articles/2025/07/president-trumps-one-big-beautiful-bill-is-now-
  the-law/ ........................................................................................................................................ 1

## INTRODUCTION

This case arises from an Environmental Protection Agency (EPA) decision months ago to terminate certain Clean Air Act grants. EPA made this decision in accordance with Executive Orders issued by the President directing subordinate officials to ensure that, where legally permissible, federal funds are not being used to support activities that are inconsistent with the President's policy priorities. In belatedly moving for a preliminary injunction, Plaintiffs seek immediate access to the funds awarded under the grants several months after those funds were frozen or the grants were terminated. Plaintiffs' request for a preliminary injunction should be denied for several reasons.

First, this case is moot and should be dismissed. On July 3, Congress passed a final reconciliation bill that included rescission of all unobligated funds supporting the Environmental and Climate Justice Block Grants provided for in section 138 of the Clean Air Act, which includes the terminated grants at issue in this case. *See* H.R. 1, 119th Cong., Sec. 60016, (1st Sess. 2025). Rescission of funding for environmental and climate justice block grants. The bill was signed into law on July 4.[1] This Court is not empowered to make available funding that has been rescinded by Congress. Accordingly, there is no live case or controversy for which this Court can grant a remedy. The Court must dismiss.[2]

Second, even to the extent this case is not moot, this Court lacks subject matter jurisdiction over Plaintiffs' claims, which, at a fundamental level, seek to enforce contractual grant agreements.

---

[1] *See* The White House, President Trump's One Big Beautiful Bill Is Now the Law (July 4, 2025), https://www.whitehouse.gov/articles/2025/07/president-trumps-one-big-beautiful-bill-is-now-the-law/.

[2] Defendants are seeking dismissal of Plaintiffs' claims because they are moot since Congress's recent rescission of unobligated funding for the terminated grants, because the Tucker Act deprives this Court of jurisdiction to hear the claims, and because Plaintiffs' constitutional and Inflation Reduction Act claims fail on the merits.

Compl. at ¶¶ 179, 185, 196, 205, 216. As the Supreme Court has explained, this argument sounds in contract and can be heard only in the Court of Federal Claims. Further, these programs are lump-sum appropriations, and, as such, Congress left it up to agencies to determine how to allocate funds and to whom. Accordingly, the Court lacks jurisdiction because those decisions are committed to agency discretion by law.

Third, even if this court did have jurisdiction, Plaintiffs are not likely to succeed on the merits. Plaintiffs' claims fail on the merits under the deferential Administrative Procedures Act standard. The statutory grant program affords Defendants discretion to decide which recipients are entitled to funding. That discretion is what allows Defendants to pause funding pending further internal review. This same discretion, consistent with grant regulations and grant terms and conditions, allows for terminating grant awards when they no longer effectuate the program goals or agency priorities.

Fourth, should this court reach the merits, Plaintiffs cannot demonstrate irreparable harm. At the outset, any allegation of irreparable harm is belied by the delay in Plaintiffs' filing of the Preliminary Injunction motion—nearly six months after some funds were initially frozen. But regardless, their allegation of irreparable harm fails on its merits. Many of Plaintiffs' claimed harms are speculative and easily remedied by money damages that could be provided if their suit was not moot and were properly brought in the Court of Federal Claims. Their alleged injuries all flow from claimed financial harm, and the consequences of this harm are neither imminent nor grave enough to warrant preliminary relief—nor are they irreparable. If their grants were terminated improperly, they may seek relief in an as-applied challenge.

Finally, Plaintiffs' requested relief is neither in the public interest nor equitable. While Plaintiffs' purported future harms are speculative, the government will indisputably suffer an

irreparable harm if it "is enjoined by a court from effectuating [the law]." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). Plaintiffs' requested relief risks intruding into the Executive's lawful prerogatives and turning this Court into an overseer of grant administration at EPA.

## BACKGROUND

### A.    Statutory Background

Plaintiffs seek access to federal funding from grant programs appropriated through the Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 ("IRA") -- specifically grant programs supporting the Environmental and Climate Justice Program block grants established in Clean Air Act section 138. The statute governing such grants appropriates $2.8 billion and provides that the EPA Administrator "shall use" the funds to provide grants to eligible entities "to carry out" specified activities "that benefit disadvantaged communities, as defined by the Administrator." 42 U.S.C. § 7438(a)-(b). Allowable activities include, for example, "community-led air and other pollution monitoring, prevention, and remediation;" "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events;" "reducing indoor toxics and indoor air pollution;" and "facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes." *Id*. § 7438(b)(2).

Congress terminated EPA's access to unobligated balances that would be used to fund this program via statute signed into law on July 4, 2025. The statute, H.R. 1, entitled "An Act to Provide for Reconciliation," is an appropriations bill that includes rescissions of funding for various environmental programs in title VI of the bill. The Environmental and Climate Justice block grant program funding is rescinded in section 60016, stating "[t]he unobligated balances of amounts

made available to carry out section 138 of the Clean Air Act (42 U.S.C. 7438) are rescinded."

### B.    Relevant Executive Orders

In the days after his inauguration, the President issued several Executive Orders setting forth his Administration's priorities and instructing agencies to pause funding to the extent permitted by law to allow time to review whether the funding aligns with those priorities. Executive Order No. 14,154, 90 Fed. Reg. 8,353 (Jan. 20, 2025), titled *Unleashing American Energy*, declares the policy of the United States to encourage certain "energy exploration and production," guarantee the accessibility of "an abundant supply of reliable energy," and ensure that no federal funding is "employed in a manner contrary to the principles outlined in this section, unless required by law," *id*. § 2(a), (c), (i). The Executive Order further instructs agencies to "immediately pause the disbursement of funds" under the IRA to assess "consistency with the law and the policy outlined in" the Executive Order. *Id*. § 7(a).

In the *Ending Radical and Wasteful Government DEI Programs and Preferencing* Executive Order No. 14,151, 90 Fed. Reg. 8,339 (Jan. 20, 2025), the President declared that "Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great." *Id*. Relevant here, the President then directed agencies to "terminate, to the maximum extent allowed by law ... 'equity-related' grants or contracts." *Id*. § 2(i).

In the *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative* Executive Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025), the President directed a review of "all existing covered contracts and grants and, where appropriate and consistent with applicable law, [directed agencies to] terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate

4

spending to promote efficiency and advance the policies of my Administration." *Id*. § 3(b). "'Covered contracts and grants' means discretionary spending through Federal contracts, grants, loans, and related instruments, but excludes direct assistance to individuals . . .; and other critical, acute, or emergency spending, as determined by the relevant Agency Head." *Id*. § 2(d).

Shortly after the President's Executive Orders, the obligation and disbursement of funds under the grants at issue here were temporarily paused pending a review of the funding for consistency with the Administration's policy priorities. Over the ensuing months, however, the EPA began issuing termination notices. As of May 2, 2025, all grants in support of the Environmental and Climate Justice block grant program had been terminated.

### C.    Plaintiffs' Claims

Plaintiffs are nonprofit organizations and local and Tribal governments who allege that they were awarded the grants at issue in this case. They claim that the freezing and termination of their grants were unlawful in a variety of ways. In particular, and as relevant here, Plaintiffs bring claims under the Administrative Procedures Act challenging the agencies' funding decisions as arbitrary and capricious, contrary to the relevant statutes and grant agreements, and in violation of the Constitution. On June 25, 2025, Plaintiffs filed their Complaint challenging EPA's termination of the grants, *see* ECF No. 1, and on June 27, 2025, Plaintiffs filed the instant Preliminary Injunction motion. *See* ECF No. 29. Among other things, Plaintiffs request that the Court enjoin the Defendants from terminating the Environmental and Climate Justice Block Grant program, and further order that Defendants immediately reinstate the program, immediately resume processing, disbursing, and paying on Plaintiffs' grants, and release funds previously withheld. *See* [Proposed] Prelim. Inj. Order at 1-2, ECF No. 29-2.

**LEGAL STANDARDS**

The "first and fundamental" question for any Article III court is that of subject-matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citation omitted); *see Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 324 (2008). Thus, "resolving a merits issue while jurisdiction is in doubt 'carries the courts beyond the bounds of authorized judicial action.'" *In re Papandreou*, 139 F.3d 247, 254-55 (D.C. Cir. 1998) (citation omitted). The plaintiff bears the burden of establishing the court's subject-matter jurisdiction. *See, e.g., Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). If the plaintiff is unable to do so, the Court must dismiss the action. *See Steel Co.*, 523 U.S. at 94; *see also Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Under Rule 12(b)(1), a court may consider material beyond the allegations in the complaint. *See Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see Twin Metals Minn. LLC v. United States*, No. 22-cv-2506, 2023 WL 5748624, at *3 (D.D.C. Sept. 6, 2023), *appeal filed*, No. 23-5254 (D.C. Cir. Nov. 9, 2023). Allegations of unlawful conduct are not facially plausible given an "'obvious alternative explanation'" that is "necessarily incompatible with the plaintiffs' versions of events." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 57 (D.C. Cir. 2019) (per curiam); *Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 567.

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). An injunction is "never awarded as of right," *Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). The movant must satisfy a four-prong test, establishing "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The third and fourth factors merge in cases where the government is the defendant, because "the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *accord Nken v. Holder*, 556 U.S. 418, 435 (2009).

The D.C. Circuit has "emphasized that 'the first and most important' of these four factors is whether the movant 'ha[s] established a likelihood of success on the merits.'" Mem. Op. at 9, *Vera Inst. of Just. v. Dep't of Just.*, No. 25-cv-1643 (D.C. Cir. July 7, 2025) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)). "If a plaintiff cannot show a likelihood of success on the merits, 'there is no need to consider the remaining factors.' [T]he 'merits' on which [a] plaintiff must show a likelihood of success encompass not only substantive theories but also *establishment of jurisdiction*." *Id.* at 9-10 (emphasis added) (citations omitted).

## ARGUMENT

**I.    THE COURT LACKS JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS AND MUST DISMISS THIS CASE.**

Since bringing their lawsuit, Plaintiffs' grants have effectively been abolished by Congress through the rescission of unobligated funds for the Environmental and Climate Justice Block Grant program in H.R. 1, signed into law on July 4, 2025. Their claims are now moot. Even if the claims

were live, however, this Court would lack jurisdiction because Plaintiffs are seeking to enforce

their contracts, and such claims can be brought only in the Court of Federal Claims.

A. **Because Funding For the Grant Program Has Been Rescinded, Plaintiffs' Claims for Relief are Moot.**

Plaintiffs filed their Complaint and Motion for injunctive relief in late June. Since then,

Congress has rescinded all funding for the program that Plaintiffs are asking this Court to reinstate

and order Defendants to disburse funds from—funds which no longer exist as of July 4, 2025. *See*

An Act to Provide for Reconciliation, H.R. 1, tit. VI, section 60016 ("The unobligated balances of

amounts made available to carry out section 138 of the Clean Air Act (42 U.S.C. 7438) are

rescinded."). The only legal obligation remaining on the grants is for any allowed costs incurred

before termination and other allowable termination and close-out costs. EPA has left funds

available for those costs as applicable if or when it receives claims from grantees regarding specific

costs incurred as a result of the grant terminations. Apart from ensuring that funds remain available

for those close-out costs, the grant funds were effectively deobligated at the time of termination.

"It is beyond dispute that a federal court cannot order the obligation of funds for which

there is no appropriation." *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 184 (D.C. Cir. 1992)

(citing *Reeside v. Walker*, 11 How. Pr. 272, 291 (1851); *Off. of Pers. Mgmt. v. Richmond*, 496 U.S.

414, 423-25 (1990). "Nor can it be contended that a court may appropriate funds from which an

obligation may be made." *Id.* (citing U.S. Const., art. I, § 9, cl. 7; *Cincinnati Soap Co. v. United

States*, 301 U.S. 308, 321 (1937); K. Stith, Congress' Power of the Purse, 97 Yale L.J. 1343 (1988)

(examining Congress's exclusive power to appropriate)).

A similar situation was before the D.C. Circuit in *Rochester Pure Waters Dist*. There, the

D.C. Circuit was considering an appeal of a district court order requiring EPA to set aside funds to

cover the plaintiffs' separate and ongoing litigation because Congress was expected to rescind

those funds imminently. *Id*. at 182. Although the plaintiffs had received a temporary restraining order directing EPA to preserve the funds at risk of rescission, Congress nevertheless passed the bill fully rescinding the funds. *Id*. at 182-83. The plaintiffs then moved for a permanent injunction, which the court granted to "'ensure that plaintiffs will have an adequate remedy should they prevail on their administrative appeals.'" *Id*. at 183 (quoting the district court). The D.C. Circuit found that while it is permissible for a court to award an injunction to preserve funds beyond their statutory lapse date, the case of a statutory rescission is "critically different from [] lapses of budget authority," because Congress had made its intent clear by rescinding the appropriation that would have covered the plaintiffs' claims. *Id*. at 184-85. Once Congress did so, "the funds reverted to the Treasury . . . notwithstanding the district court's temporary restraining order as *that order was not, nor could it have been, binding on Congress*." *Id*. at 185 (emphasis added).

By granting relief in this moot case, this Court would be making the same error as the district court in *Rochester*. Congress was fully aware when it passed H.R. 1 that these Environmental and Climate Justice block grants had been awarded, terminated, and the funds deobligated. But Congress determined it no longer wished to fund that program and therefore rescinded all unobligated funds. "The Appropriations Clause of the U.S. Constitution vests Congress with exclusive power over the federal purse." *Nevada v. DOE*, 400 F.3d 9, 13 (2005) (citation omitted). For Plaintiffs to prevail, they must identify an appropriation that EPA may use to fulfill the grant agreements. *See Id.* Outside of an appropriation obligating funds for the block grant program, there is no way for Plaintiffs to recover. Therefore, there is no longer a live controversy for which this Court can grant effective relief. Plaintiffs' Complaint and Motion for Preliminary Injunction should be dismissed.

**B.      Plaintiffs' Termination-Related Claims are in Essence Contract Claims That Must Be Brought in the Court of Federal Claims.**

Even if the Court is unpersuaded by the mootness of this case, it still cannot hear Plaintiffs' claims because the Court lacks subject matter jurisdiction over disputes challenging grant terminations. "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Indeed, the Fourth Circuit, considering a nearly identical challenge to the same grant program, recently granted a stay of the district court's injunctions after concluding that the district court likely lacked jurisdiction over what it concluded was essentially a contractual challenge. *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *1 (4th Cir. June 5, 2025).

"[A]bsent a clear and unequivocal waiver of sovereign immunity," the "United States and its agencies are generally immune from suit in federal court." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Although the APA provides a limited waiver of the Government's sovereign immunity for suits challenging final agency action and "seeking relief other than money damages," it does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

One example of such an implicit limitation on APA relief involves suits against the United States that sound in contract, such that a party seeking to access funding that it believes the government is obligated to pay under a contract or a grant. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Hence, "the Tucker Act 'impliedly forbids'" bringing "contract actions"

against "the government in a federal district court" under the APA. *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004). This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). That jurisdictional barrier is mandatory and for good reason. It ensures that contract claims against the Government are channeled into a court that has "unique expertise," *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

Courts consider two factors in assessing whether an action raises a contract claim governed by the Tucker Act: "the source of the rights upon which [Plaintiffs] base[ their] claims" and "the type of relief sought."' *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). In assessing "the source of the rights" upon which the plaintiffs bases their claims, courts consider whether the "plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights 'exist prior to and apart from rights created under the contract,' and whether the plaintiff 'seeks to enforce any duty imposed upon' the government 'by the relevant contracts to which' the government 'is a party.'" *Crowley Gov't Servs.*, 38 F.4th at 1107 (citation modified). When a claim is premised on an agreement with the Government, depends upon the Government's having breached that agreement, and seeks to compel the Government to pay sums due under the agreement—it is a Tucker Act claim, not an APA claim. *See Megapulse*, 672 F.2d at 967-71.

Applying those principles, Plaintiffs' claims, despite their insistence to the contrary, are essentially contract claims that must be brought in the United States Court of Federal Claims ("CFC"). The grant instruments are plainly "the source of the rights upon which" Plaintiffs base their claims. *Megapulse*, 672 F.2d at 968. The asserted right to billions of dollars in taxpayer funds arises solely from the grants and "in no sense…exist[s] independently of those grants. *Spectrum*,

*Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). Plaintiffs would have no claim absent the Government's alleged breach of the grant agreements. No appropriations statute, no provision of the Inflation Reduction Act, and no agency regulation confers any right to payment on Plaintiffs. If Plaintiffs did not have grants, they would not have claims.

Moreover, the only means by which Plaintiffs can achieve their requested relief is through the restoration of their grants. Plaintiffs explicitly seek an order "to immediately reinstate the Environmental and Climate Justice Block Grant program…[and]…immediately resume the processing, disbursement, and payment of…grants," [Proposed] Prelim. Inj. Order at 1, ECF 29-2. Thus, what they want is "the classic contractual remedy of specific performance." *Spectrum*, 764 F.2d at 894.

Because the Tucker Act precludes a contract action against the Government in District Court under the APA, *Albrecht*, 357 F.3d at 67-68, this Court lacks subject-matter jurisdiction over the breach of contract claims--including an injunction barring Defendants from effectuating grant terminations or an order to resume disbursement of funds under such grants. Plaintiffs must bring those claims in the Court of Federal Claims, where they may seek money damages for any breach.

The Supreme Court recently stayed another district court order to make payments based on certain grant agreements, concluding that the government was likely to succeed in showing that the Tucker Act provides the Court of Federal Claims jurisdiction over contract suits like this one. *Dep't of Educ. v. California*, 604 U.S.---, 145 S. Ct. 966, 968 (2025) (per curiam). There, a number of states challenged the Department of Education's termination of various education-related grants, the district court temporarily enjoined the terminations, and the First Circuit denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court granted the government's request for emergency relief, reaffirming that "the APA's

limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (citation omitted).

Indeed, applying *California*, the Fourth Circuit recently stayed an injunction involving a very similar challenge to the same grants at issue here. The Fourt Circuit reasoned that "like the grants in *California*, the grants here were awarded by federal executive agencies to specific grantees from a generalized fund." Stay Op., *Sustainability Institute v. Trump*, No. 25-1575, 2025 WL 1587100, at *2, (4th Cir. June 5, 2025). Thus, the panel explained, "it is the operative grant agreements"—not the underlying statutes—that "entitle any particular Plaintiff to receive federal funds." *Id*.

The fact that Plaintiffs' asserted right to payment arises only from contractual agreements distinguishes the Tucker Act analysis from *Widakuswara v. Lake*, upon which Plaintiffs predicate much of their argument against applying the Tucker Act here. In *Widakuswara*, the D.C. Circuit understood the relevant statutes to "require[] allocation of funds to th[e] specific, named" plaintiffs. *See* Panel Stay Order, *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *11 (D.C. Cir. May 3, 2025) (Pillard. J., dissenting); *see also* En Banc Order, *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc). Even assuming that is dispositive, that feature is not present here, where Congress simply passed a provision in the Inflation Reduction Act appropriating a lump sum of nearly $3 billion and then left it to the Agency to determine how to allocate that sum in support of the programs indicated. The IRA did not establish an entitlement to funding for any of the Plaintiff organizations here, nor did it allocate set amounts to specific Plaintiffs.

The relief that Plaintiffs seek is likewise contractual in nature. Plaintiffs seek an order barring the agencies from effectuating terminations of Plaintiffs' awards and requiring continuation of payments under those contracts. In other words, Plaintiffs seek to order Defendants to specifically perform contractual obligations, a "classic contractual remedy," and one that is generally unavailable against the Government. *Spectrum*, 764 F.2d at 894; *see also Ingersoll-Rand*, 780 F.2d at 79-80 (order "reinstating the original award of [a] contract . . . amount[ed] to a request for specific performance"). The appropriate vehicle for a claim seeking relief for an asserted breach of contract is a "Tucker Act [suit] in" the CFC, not an APA action. *Bowen v. Massachusetts*, 487 U.S. 879, 890 n.13 (1988).

Plaintiffs have brought claims to enforce an obligation to make funds available and the only source of plaintiffs' asserted rights to the funds are the grant agreements in question. Thus, their claims are essentially contractual and belong in the Court of Federal Claims. Accordingly, Plaintiffs' APA claim runs headlong into the jurisdictional problem implicated in *California*. Plaintiffs' Complaint demonstrates that all the allegations that are claimed to result in APA or constitutional violations are closely connected with Plaintiffs' status as grantees and arise directly out of the grant terminations. *See* Compl. at ¶¶ 166-213.

Two recent cases in this Court arrived at similar conclusions as the *California* court in dismissing the plaintiffs' APA claims. In *Vera Institute of Justice v. U.S. Department of Justice,* the court was asked to reinstate grants terminated by the Department of Justice's Office of Justice Programs. No. 25-CV-1643 (APM), 2025 WL 1865160, at *1 (D.D.C. July 7, 2025), *appeal filed*, No. 25-5248 (D.C. Cir. July 10, 2025). In examining its authority to deny or grant the plaintiffs' request, it held that it lacked jurisdiction over the plaintiffs' APA claims under a *California* analysis. *Id*. at *8. The court found that the plaintiffs' arbitrary-and-capricious claim "appear[ed]

in all material respects identical to that of *California*," and the grant agreements at issue were not distinguishable from the grants in front of the *California* court, which were "treated as contracts implicating Tucker Act jurisdiction." *Id.* at *10.

Similarly, in *Amica Center for Immigrant Rights v. Department of Justice*, the plaintiffs brought APA claims against the Department of Justice's Executive Office of Immigration Review (EOIR) for its termination of five programs services. No. CV 25-298 (RDM), 2025 WL 1852762, at *1 (D.D.C. July 6, 2025). The court held that two of the programs that had been terminated and subsequently sourced in-house were subject to the Tucker Act, depriving the court of jurisdiction to hear the claim. *Id.* at *11. The remaining three programs were also unreviewable because the "[d]efendants' decision to discontinue these programs and reallocate their resources [were] unreviewable." *Id.* at *14.

It is no answer for Plaintiffs that *California* did not involve constitutional claims. Regardless of how a claim is styled, a district court lacks jurisdiction if the claim "is in its essence contractual." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (internal quotation marks omitted); *see also Albrecht*, 357 F.3d at 68. Plaintiffs may not escape the procedural limitations of the Tucker Act by "masquerading its claims as suits for injunctive or declaratory relief" or by "lumping [their] contract claims together and denominating them a constitutional violation." *Metadure Corp. v. United States*, 490 F. Supp 1368, 1371, 1373 (S.D.N.Y. 1980). Plaintiffs advance no bona fide, freestanding constitutional claims.

As the Supreme Court explained in *Dalton v. Specter*, not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." 511 U.S. 462*,* 472 (1994). Rather, the Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory

authority." *Id.* (collecting cases). The Constitution is implicated, for example, if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473.

Here, plaintiffs' asserted constitutional claims are really "statutory one[s]," *id.* at 474, as they assert that the agencies have exceeded their statutory authority. Any statutory claim could be recharacterized as a violation of the constitutional separation of powers, or as amending the relevant statutes in violation of the Presentment Clause, but that is precisely the sleight of hand rejected in *Dalton*.

Plaintiffs' APA and separation of powers arguments fail for lack of subject matter jurisdiction. The only permissible reading of Plaintiffs' Complaint is that it seeks "to obtain [a] financial benefit" or "monetary relief" from the Government. *Suburban Mortg. Assocs. v. U.S. Dep't of Hous. & Dev.*, 480 F.3d 1116, 1126 (Fed. Cir. 2007). That is a contractual claim the court lacks jurisdiction to hear. As such, Plaintiffs cannot demonstrate likelihood of success on the merits of their claims. *See California*, 145 S. Ct. at 966.

### C. The Court Lacks Jurisdiction to Review the Agencies' Discretionary Decisions Regarding How to Allocate Funds.

Even if Plaintiffs' claims were not contractual in nature, which they are, the APA itself would likely preclude review, as many funding decisions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see, e.g., Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion.").

In *Lincoln*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was not reviewable under the APA's reasoned-decision-making standards. 508 U.S. at 185-88. There, the Court explained that Congress may have "circumscribe[d] agency discretion to allocate resources by putting restrictions in the operative statutes," but in the absence of such directives agencies may "allocate[] funds ... to meet permissible statutory objectives." *Id*. at 193. "Of course," the Court went on, this discretion is not unbounded because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id*. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), courts may not "intrude." *Id*.

Although *Lincoln* addressed lump-sum appropriations, the D.C. Circuit has made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations— "clearly requir[e] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted).

Consistent with *Lincoln*, courts have held that funding decisions are "committed to agency discretion." *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282 at 290 (4th Cir. 2022) ("[D]ecisions that involve resource allocation and the need for flexibility to adapt to changing circumstances" are especially likely to fall beyond the APA's reach.) (citation omitted); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at

least) to distribute the funds among some or all of the permissible objects as it sees fit."). An agency has discretion over how to spend the funds obligated to a statutory program, including whether to fund specific projects within that program. *See Amica Ctr.*, 2025 WL 1852762 at *14.

In the Clean Air Act, Congress authorized EPA to determine where to send federal funding based on the agency-determined priorities, payment schedules, and terms: "The Administrator shall use amounts made available under subsection (a)(1) to award grants for periods of up to 3 years to eligible entities to carry out activities described in paragraph (2) that benefit disadvantaged communities, *as defined by the Administrator*." 42 U.S.C. § 7438(b)(1) (emphasis added).

Plaintiffs retort that the operative word in this section is "*shall*," arguing it compels the EPA to obligate funds in support of the Environmental and Climate Justice Block Grant program. However, Plaintiffs fail to wrestle with the words "*as defined by the Administrator*," which grant the Administrator exclusive authority to determine which communities are disadvantaged and which activities would benefit such communities. Nothing in the statute requires that the Administrator continue to fund plaintiffs' grants specifically or provides any meaningful standard by which to judge the Administrator's determination to curtail funding to projects that do not, in the Administrator's view, properly advance the Administration's priorities. That language thus does not constrain the Administrator's discretion in the relevant sense or support the district court's decision to exercise jurisdiction over plaintiffs' claims seeking judicial review of the Administrator's specific decisions related to plaintiffs' specific grants.

At this opening stage of litigation, Plaintiffs have not carried their burden to establish jurisdiction.

## II.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM.

Even if this Court determines that EPA's discretionary authority does not deprive it of

jurisdiction, it should reject Plaintiffs' claims on the merits. The Agency's decision to terminate the grants was within its discretionary authority and did not violate any statutory or constitutional provisions.

### A.  The Challenged Actions are Committed to Agency Discretion by Law.

Plaintiffs argue that EPA's decision to pause or terminate funding in light of a change in policies was contrary to law because it violates federal statutes and the Constitution. Pls.' Mem. in Supp. of Mot. for Prelim. Inj., at 11 ("Pls.' Mem."), ECF No. 29-1. For the reasons explained below, these arguments fail.

### i.    *Defendants have authority to select recipients for funding under applicable law.*

Plaintiffs' statutory claims are premised on the idea that pausing or terminating grants contravenes the IRA and Clean Air Act. *See* Pls.' Mem. at 17-18. But despite Plaintiffs' assertions, EPA's actions were not contrary to law. Plaintiffs' statutory analysis ignores the wide-ranging discretion that Congress gave EPA to administer these programs. To start, in the absence of specific Congressional direction, the Executive has discretion to determine how best to allocate grant funding.

*Lincoln* establishes the general rule that complicated agency funding determinations are committed to agency discretion, subject to displacement only by specific statutory restrictions. *See* 508 U.S. at 193. There, the Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. In deciding how to allocate resources, an agency must engage in "a complicated balancing of a number of factors" that are uniquely within the agency's

"expertise," including "whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Lincoln*, 508 U.S. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

Here, the funding framework demonstrates that Defendants have ample discretion to decide whether to fund particular grant recipients. The IRA-funded grant program at issue is governed by a statute that appropriates billions of dollars and provides that the EPA Administrator "shall use" the funds to "carry out" any of a large number of permissible activities "that benefit disadvantaged communities, as defined by the Administrator." 42 U.S.C. § 7438(a)-(b). Plaintiffs contend that the statute's use of "shall" requires the Administrator to expend the full measure of appropriated funds on the specified programs. *See, e.g.*, Pls.' Mem. at 15, 26.

But even under Plaintiffs' own reading of that language, nothing in that statute constrains the Administrator's discretion to determine how best to allocate the billions of dollars appropriated among many different potential grant recipients or activities. To the contrary, the statute makes clear that the Administrator may determine which activities "benefit disadvantaged communities" and may exercise his discretion to allocate funds among many possible activities to best achieve that goal as he understands it. And nothing in the statute prohibits the Administrator from terminating or pausing plaintiffs' grants under that provision if he determines that plaintiffs' projects do not comport with Administration priorities.

There is no need for a statute specifically authorizing Defendants to pause funding and redirect it. That authority is implicit in the grant program and appropriations law themselves, because they direct the agencies to administer the grant program in a manner that accomplishes certain broad objectives but otherwise leaves the agency with discretion over how to allocate the

funding. In such circumstances, the agency has statutory authority to pause funding and evaluate whether that funding is being put to the best use.

Grant regulations do not alter this analysis; instead, they generally allow agencies to terminate grants "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4); *see also* ECF Nos. 29-3, 29-4, 29-5, 29-6 (EPA citing C.F.R. § 200.340 in terminating grants that conflict with agency priorities). The pauses and terminations here are not based on grantee compliance; they are based on the agency's review of whether federal funds are being spent in a manner that best promotes the Executive's agenda. Nothing in the regulations forecloses such a pause or termination.

Plaintiffs have not demonstrated that any statute meaningfully constrains EPA's discretion regarding how to allocate appropriated funds among potential grant recipients. On the contrary, the relevant statute generally provides an undifferentiated sum, which EPA must determine how best to allocate among different statutory goals and potential recipients. Because Congress did not circumscribe exactly how EPA must allocate the funds and to whom, its decisions to fund or terminate grants are committed to agency discretion by law.

### ii. *Plaintiffs' allegations do not show arbitrary and capricious decision-making*

EPA's decision to pause or terminate funding is not arbitrary and capricious. Given the finite amount of tax dollars allocated to these programs, it is certainly rational to pause funding on projects pending further determination whether to continue that funding in the same manner. The scope of review under the "arbitrary [and] capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v.*

*EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004).

First, Plaintiffs claim EPA "failed to provide a 'reasoned analysis' for the terminations." *See* Pls.' Mem. at 24. Yet EPA's decisions are plainly attributable to the EOs and a review of those EOs makes plain that the President explained exactly why his administration's approach to grant funding would be different. *Cf. State Farm*, 463 U.S. at 59 (Rehnquist, J., concurring in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations.").

Plaintiffs also challenge Defendants' decision-making for failing to account for grantees' reliance interests in their continued receipt of funding. *See, e.g.*, Pls.' Mem. at 25. But again, those reliance interests are contrary to the objectives articulated by the President--*i.e.*, ensuring that grant funds achieve value for American taxpayers, consistent with the President's broader energy and diversity policies. *Unleashing American Energy*, EO 14,154, §§ 1, 2; *Ending Radical and Wasteful Government DEI Programs and Preferencing*, EO 14,151 § 2; *DOGE*, EO 14,222 § 1. To the extent Plaintiffs contend that agency guidance is subject to arbitrary and capricious review, these documents are reasonable because they are clearly efforts to give notice of and comply with policy goals outlined in Presidential orders.

Ultimately, Plaintiffs' arbitrary and capricious arguments fail. The question is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Plaintiffs cannot disregard the rationality of pausing spending, pending a determination about whether such funding could be redirected to a purpose more consistent with the President's policies.

### iii.    Impoundment Control Act

Plaintiffs also contend that Defendants' actions violate the APA because they violate the Impoundment Control Act ("ICA"). However, a claim under the ICA is not enforceable through an APA suit. *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734-35 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (Mem.). The ICA provides a framework for guiding inter-Branch engagement on certain decisions regarding the obligation of appropriated funds; it does not confer any judicially enforceable rights on third parties. The current version of the ICA provides that the President is required to "transmit to both Houses of Congress a special message" whenever he "determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or that such budget authority should be rescinded for fiscal policy or other reasons" 2 U.S.C. § 683(a). That special message is required to contain various information about the proposed rescission, such as "the amount of budget authority" involved and "the reasons why the budget authority should be rescinded." *Id*.

Once Congress receives a special message, it may proceed to consider a rescission bill to rescind some or all of the funds covered by the special message. But if Congress has not "completed action on a rescission bill rescinding all or part of the amount proposed to be rescinded" within 45 days, then the statute states that the amount proposed to be rescinded "shall be made available for obligation." *Id*. § 683(b).

In addition, the statute provides that the President should transmit a special message to Congress whenever the Executive Branch "proposes to defer any budget authority provided for a specific purpose or project." 2 U.S.C. § 684(a). The statute states that such deferrals are "permissible only" for certain specified reasons. *Id*. § 684(b).

23

Finally, the statute provides for various enforcement mechanisms by the Comptroller General, an official within the Legislative Branch. Thus, if the Comptroller General concludes that the "President has failed to transmit a special message with respect to" a particular deferral or decision to establish a reserve, the Comptroller General is directed to "make a report on such reserve or deferral and any available information concerning it to both Houses of Congress," which report "shall be considered a special message." 2 U.S.C. § 686(a). And if "budget authority is required to be made available for obligation and such budget authority is not made available for obligation," the statute provides that the Comptroller General may "bring a civil action" in district court. *Id*. § 687.

Thus, even if the ICA permitted a private right of action, which it does not, Plaintiffs still could not obtain the relief they seek. At most, Plaintiffs would have established that the Executive Orders constituted a deferral of budget authority for which the requisite "special message" was not communicated to Congress. *See* 2 U.S.C. § 684. In that scenario, the remedy would be a directive to communicate the special message—not a broad injunction against the Executive. And of course, transmission of the special message to Congress pursuant to section 684(a) would not redress Plaintiffs' injuries in any way. Plaintiffs' Impoundment Control Act theory fails.

### B. Defendants' Actions Did Not Violate the Constitution.

Plaintiffs' motion contends that Defendants have violated constitutional separation of powers principles by "usurp[ing] the legislative and appropriations powers of Congress." Pls' Mem. at 20. Plaintiffs argue that by terminating the grants, Defendants are somehow interfering with Congress's "power of the purse" granted to it via the Appropriations Clause and the Spending Clause of the Constitution. Pls' Mem. at 18. But Defendants have not violated any particular provision of the congressional appropriation at issue here because the Inflation Reduction Act does

not obligate EPA to fund any specific Plaintiff—only that it direct funds generally toward the activities listed. The block grant funding was available until September 2026, meaning Defendants still had a substantial amount of time left to fund new activities at the time they took the challenged action.

The Constitution vests the "entire" executive power in the President. *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). The Government here has not tacked on new conditions that must be met to obtain funds. The Government may choose to focus on different ways to achieve the conditions outlined by Congress. That does not constitute applying new conditions, seizure of the power of the purse, an improper attempt to legislate, or failure to take care that the laws are faithfully executed. *See also Lincoln*, 508 U.S. at 192-93 (agency's discretionary decision to discontinue funding program was as unreviewable as original decision to begin program).

The Executive's actions have not disregarded congressional statutory directives, co-opted the power of the purse, or otherwise violated the separation of powers doctrine, and in any event, Plaintiffs have not put forward any independent constitutional claims as required by *Dalton*. Plaintiffs cannot demonstrate likelihood of success on the merits.

## III.    PLAINTIFFS DO NOT FACE IRREPARABLE HARM.

In this Circuit, there is a "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Any alleged irreparable harm "must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). It also must be of such "*imminence* that there is a clear and present need for equitable relief." *Id.* (quoting *Wis. Gas Co.*, 758 F.2d at 674). Plaintiffs' motion should be denied on the basis that they have failed to demonstrate irreparable injury in the absence of injunctive relief. *See id.* ("A movant's failure to show any irreparable harm is therefore grounds for refusing

to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210–11 (D.C. Cir. 1989))).

As an initial matter, Plaintiffs' own delay in seeking preliminary relief weighs against finding irreparable harm. The EOs were issued on January 20 and January 21 and funding for Plaintiffs' grants began turning off as early as late January, but Plaintiffs waited until June 27—six months after the relevant EOs—to file their Motion. *See Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (holding that delay of thirty-six days before filing for preliminary injunctive relief was "dilatory action" that failed to clear the high bar needed to show entitlement to relief); *see also Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding that a delay of forty-four days before bringing action for injunctive relief was "inexcusable," and "bolstered" the "conclusion that an injunction should not issue," particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm). The latest plausible date on which Plaintiffs can claim an alleged harm is May 2, 2025, when the last of the termination notices were issued—nearly two months before Plaintiffs' PI Motion was filed. *See* ECF No. 29-3, Ex. 3; ECF No. 29-4, Ex. 4; ECF No. 29-5, Ex. 4.

Second, Plaintiffs' allegations of irreparable harm are ultimately speculative. A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis added). Issuing a preliminary injunction "based only on a possibility of irreparable harm" would be "inconsistent" with treating a preliminary injunction as an "extraordinary remedy[.]" *Id*. This irreparable harm must be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). "[H]arm is not 'irreparable' if it can be compensated by money damages." *Person v. Mayor & City Council of Baltimore*, 437 F. Supp. 2d 476, 479 (D. Md. 2006)

(citing *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994)).

Plaintiffs' affidavits belie their contention that irreparable harm is "actual and imminent." *Direx Israel*, 952 F.2d at 812. For example, Treasure Island Mobility Management Agency claims that without funding from one of the Environmental and Climate Justice grants, "transportation service improvements . . . *may* be significantly delayed . . . ." Decl. of Tilly Chang ¶ 14, ECF No. 29-8 (emphasis added). PUSH Buffalo notes that it is "*concerned* that [it] will be unable to enact the programs as [it] had originally planned" and that "some or all of the contractors *may* need to take on different work" while waiting for funds to become available. Decl. of Dawn Wells-Clyburn ¶ 18, ECF No. 29-4 (emphasis added). Similarly, 2°C Mississippi is "*worried* the financial constraints caused by the grant terminations will force 2CM to enter into a period of institutional hibernation." Decl. of Dominika Parry ¶ 31, ECF No. 29-5 (emphasis added). This is the language of possibility, not imminence, and potential future harm-however severe-is insufficient for Plaintiffs to meet their burden. *See, e.g., Corbel Commc'ns Indus. LLC v. Lat Long Infrastructure LLC*, No. LA CV 21-8097 JAK, 2021 WL 6104231, at *12 (N.D. Cal. Oct. 29, 2021) (noting that "[m]ere assertions that a plaintiff 'may' go out of business are insufficient").

Third, Plaintiffs have failed to establish that the harm they may suffer is irreparable, *i.e.*, "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (citation omitted). The gravamen of plaintiffs' injury is monetary—the classic example of reparable harm. *Wisconsin Gas Co.*, 758 F.2d at 674 (It is "well settled that economic loss does not, in and of itself, constitute irreparable harm."); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). "Mere injuries, however

27

substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Id.* "A plaintiff must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Hughes Network Sys.*, 17 F.3d at 693).

Here, economic losses, if any, may be recoverable because Plaintiffs can dispute the termination, and, if successful, they will receive funds to the extent required by law. That fact fatally undermines Plaintiffs' assertions of irreparable harm.

Plaintiffs' affidavits contain the specific amounts of money they allege they are entitled to receive, making any eventual monetary award readily calculable. *See* ECF Nos. 29-3 through 29-42. And while different Plaintiffs are in different circumstances, Plaintiffs fail to articulate why monetary awards at the conclusion of litigation in the proper forum would be an insufficient remedy so as to justify the extreme measure of a preliminary injunction. For example, the Institute for Sustainable Communities acknowledges that "[t]he injury to ISC and its interests would be redressed by reinstating [its] TCTAC and TCGM grants;" in other words, restoring the funding included in those grants. Decl. of Rebecca Kaduru ¶ 35, ECF No. 29-17. And while ISC's President describes the financial difficulties ISC will face without federal funding, the affidavit does not explain why a monetary remedy at the conclusion of the litigation would be inadequate to compensate ISC for financial harm.

Finally, Plaintiffs argue that "Defendants may take action to de-obligate some of the funds at issue in this litigation and release them to the Treasury, which could deprive Plaintiffs of the possibility of effective relief." Pls.' Mem. at 42. However, these funds were deobligated when the grants were terminated and Congress has now rescinded those funds. Ultimately, even if Plaintiffs

can show present harm or some threat of harm, there is no reason why they cannot vindicate that harm through individualized, as-applied challenges to any future government action. Their declarations do not establish the need for broad relief in a single lawsuit, rather than proceeding in the ordinary course of APA review over discrete, specific funding decisions.

Plaintiffs have failed to make a clear showing that irreparable injury is likely in the absence of an injunction. Plaintiffs' claims of irreparable injury are speculative and fail to demonstrate why a monetary award would be inadequate to compensate Plaintiffs for any economic harm they have allegedly already suffered or may suffer in the future. For this additional reason, Plaintiffs' motion should be denied.

## IV.    THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION.

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Lewis v. Casey*, 518 U.S. 343, 360 (1996) (explaining that an injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties). An injunction in this case risks irreparable harm to the government and to the public interest by requiring the payment of money that the government may never recover. As in *California*, the government "is unlikely to recover the grant funds once they are disbursed." 145 S. Ct. at 969. Plaintiffs have not "promised to return withdrawn funds should [their] grant termination[s] be reinstated" in the future, *see id.* (citation omitted).

Moreover, an injunction would interfere with the President's ability to execute core Executive Branch policies. As explained, the grants at issue here were terminated based on the potential that the grants might conflict with the Administration's policy priorities. Interfering with the President's ability to control subordinate officials by directing them to ensure that funding is

consistent with his priorities—and thus requiring the government to expend money in support of causes that may be inconsistent with the Administration's policy objects—inflicts a severe separation-of-powers harm on the Executive Branch. *Cf. Maryland*, 567 U.S. at 1303. That concern is merely exacerbated when, as here, Congress has terminated the program overall.

By contrast, Plaintiffs have not established that an injunction is necessary to avert irreparable harm. Plaintiffs have no cognizable interest in receiving federal funds to which they are not legally entitled. Plaintiffs' asserted harms are monetary--the classic example of reparable harm. *Wis. Gas Co.*, 758 F.2d at 674 (It is "well settled that economic loss does not, in and of itself, constitute irreparable harm."); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." (alteration in original) (citation omitted)). Plaintiffs can receive any funds to which they are entitled through suit in an appropriate forum. That fact fatally undermines plaintiffs' assertions of irreparable harm.

By statute, Congress has vested control of these grant programs in the Defendant agencies who, in turn, answer to the President and, thus, the public at large. Requiring the Executive to financially support specific projects that may be within the statutory parameters of a program but nevertheless at odds with the Executive's priorities negatively impacts the public interest.

Further, Plaintiffs seek to recover millions in taxpayer dollars. For instance, Plaintiff Health Resources in Action claims entitlement to a federal grant totaling $52,000,000. *See* Decl. of Steven Ridini ¶ 11, ECF No. 29-13. And like the grant recipients in *California*, Plaintiffs have not "promised to return withdrawn funds" if a court ultimately determines the agencies had no obligation to fund them. *California*, 145 S. Ct. at 969 (noting the United States is "unlikely to

recover the grant funds once they are disbursed."). In the event a court finds the agencies' actions were contrary to law, Plaintiffs can be made whole with a monetary award. Conversely, if the United States must fund millions of dollars during the pendency of this litigation, and a court determines the agencies were authorized to freeze or terminate the grants, the money will be spent. Plaintiffs would likely resist recoupment efforts in that scenario. The equities and the public interest, therefore, weigh in the United States' favor.

Additionally, where the government is legally entitled to make decisions about the disbursement or allocation of federal funds and contracts but is nonetheless enjoined from doing so, such funds may not be retrievable afterwards. By contrast, if Plaintiffs' contracts are terminated in accordance with their terms, they may recover any funds to which they are legally entitled. Relatedly, a broad preliminary injunction would have a significant chilling effect on the President's and his advisors' ability to lawfully direct and guide government spending decisions and enforcement priorities. Agencies may feel obligated to forgo pursuing legally permissible actions in furtherance of the President's policy priorities—independent of the EOs—for fear of risking contempt. Thus, the balance of equities favors the government and relief should be denied.

## V.   ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED AND ACCOMPANY A BOND.

To the extent the Court issues any injunctive relief, such relief should be narrowly tailored to that necessary to afford relief only to the named Plaintiffs, and not the putative class or other parties not before the Court. Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc*., 512 U.S. 753, 765 (1994) (citation omitted). Courts thus must narrowly tailor any injunctive relief to the plaintiffs themselves. *See, e.g., Maryland v. Corp. for Nat'l & Cmty. Serv*., No. CV DLB-25-1363, 2025 WL 1585051, at *38 (D. Md. June 5, 2025) ("The scope of the injunction is

narrowly tailored to restore the AmeriCorps-funded programs in the plaintiff states."); *Barton v. U.S. Dep't of Lab.*, 757 F. Supp. 3d 766, 793 (E.D. Ky. 2024) ("Although this Court recognizes the incongruity in affording relief only to the parties to the suit, issuing preliminary relief any broader than to the parties currently before it (or who may be joined subsequently) is unnecessary and runs afoul of our federal system."). Moreover, to the extent that Plaintiffs' claims turn on the proposition that any statute *requires* EPA to make funding available to any particular plaintiff, the Court's injunction must track that obligation rather than require Defendants to reinstate specific grants.

Defendants also respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

Moreover, in accordance with Federal Rule of Civil Procedure 65(c) Defendants respectfully request that any injunctive relief accompany a bond of commensurate size to compensate the government if an injunction is ultimately overturned. Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). A bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed.

**CONCLUSION**

For the foregoing reasons, this Court should deny Plaintiffs' motion for a preliminary injunction and grant Defendants' motion to dismiss the case.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Jessica A. Lundberg*
JESSICA LUNDBERG (WA Bar No. 60100)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: jessica.a.lundberg@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2025, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/ Jessica A. Lundberg*

JESSICA LUNDBERG (WA Bar No. 60100)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: jessica.a.lundberg@usdoj.gov