## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| APPALACHIAN VOICES, ET AL., ) | |
| ) | |
| *Plaintiffs,* ) | |
| *on behalf of themselves and* ) | |
| *all others similarly situated* ) | |
| ) | |
| v. ) | Civil Action No. 1:25-cv-01982-RJL |
| ) | |
| ) | |
| UNITED STATES ENVIRONMENTAL ) | |
| PROTECTION AGENCY, et al., ) | |
| ) | |
| *Defendants.* ) | |
| _____ ) | |

**BRIEF OF AMICI GATHER, AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, CITY OF OAKRIDGE, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, TRANSPORTATION FOR MASSACHUSETTS, AND URBAN SUSTAINABILITY DIRECTORS NETWORK IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**GATHER**
210 West Road, Unit 3
Portsmouth, NH 03801

**AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS**
P.O. Box 66624
Mobile, AL 36660

**CLEAN AIR COALITION OF WESTERN NEW YORK**
371 Delaware Avenue
Buffalo, NY 14202

**CLIMATE AND ENERGY PROJECT**
P.O. Box 1858
Hutchinson, KS 67504

**CONNECTICUT ROUND TABLE ON CLIMATE AND JOBS**
P.O. Box 232
Clinton, CT 06413

**EASTERN RHODE ISLAND CONSERVATION DISTRICT**
2283 Hartford Avenue
Johnston, RI 02919

**EMERALD CITIES COLLABORATIVE**
1660 L ST NW Suite 204
Washington DC 20036

**ENGINEERS WITHOUT BORDERS**
1031 33rd Street
Denver, CO 80205

**ERIE COUNTY RESTORATIVE JUSTICE COALITION**
567 Hertel Avenue
Buffalo, NY 14207

**GREENROOTS**
90 Everett Avenue, 3rd Floor, Suite 10
Chelsea, MA 02150

**HEALTHY BOURBON COUNTY ACTION TEAM**
104 N National Avenue
Fort Scott, KS 66701

**CITY OF OAKRIDGE**
P.O. Box 1410
Oakridge, OR 97463

**RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE**
225 Dyer Street, Second Floor
Providence, RI 02903

**RHODE ISLAND SCHOOL RECYCLING PROJECT**
P.O. Box 25378
1284 Broad Street
Providence, RI 02905

**SANTA FE GREEN CHAMBER OF COMMERCE**
418 Cerrillos Road, Suite 29
Santa Fe, NM 87501

**TRANSPORTATATION FOR MASSACHUSETTS**
50 Milk Street, 16th Floor
Boston, MA 02109

**URBAN SUSTAINABILITY DIRECTORS NETWORK**
500 Westover Drive, #14973
Sanford, NC 27330

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 1

   i.    Thriving Communities Grantmaking Program ................................................. 2

   ii.   Thriving Communities Technical Assistance Centers .................................... 2

   iii.  Government-to-Government Program ............................................................. 3

   iv.  Community Change Grants ............................................................................. 3

INTERESTS OF AMICI CURIAE .............................................................................. 4

ARGUMENT ................................................................................................................ 9

   I.    EPA's Abrupt Termination of the Environmental and Climate Justice Block Grant Program Has Caused Significant Harm and Will Continue to Cause Irreparable Harm to Amici ............................................................................. 9

      A.  Impacts on Program Work ....................................................... 13

      B.  Impacts on Internal Operations ............................................... 14

      C.  Reputational Harms ................................................................. 16

   II.   The Harm Suffered by Amici Will be Substantially Redressed by Plaintiffs' Motion. ..................................................................................... 19

CONCLUSION.......................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**.................................................................................................................**Page(s)**

*Appalachian Voices, et al. v. United States Environmental Protection Agency, et al.*,
   1:25-cv-01982-PLF, (D.D.C. June, 25, 2025)................................................... 3, 9, 19

*Clarke v. Off. of Fed. Hous. Enter. Oversight*,
   355 F. Supp. 2d 56 (D.D.C. 2004) .............................................................. 14

*Dist. of Columbia v. U. S. Dep't of Ag.*,
   444 F. Supp. 3d 1 (D.D.C. 2020) ............................................................... 15

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021)..................................................................... 16

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
   763 F. Supp. 3d 36 (D.D.C. 2025) .............................................................. 14

*Open Cmtys. All. v. Carson*,
   286 F. Supp. 3d 148 (D.D.C. 2017) ............................................................ 15

*Tex. Children's Hosp. v. Burwell*,
   76 F. Supp. 3d 224 (D.D.C. 2014) .......................................................... 13, 15

*Xiaomi Corp. v. Dep't of Def.*,
   No. 21-cv-280, 2021 WL 950144, (D.D.C. Mar. 12, 2021).................................... 16

**Statutes**

42 U.S.C. § 7438.................................................................................... 19

42 U.S.C. § 7438(b)(1) .............................................................................. 9

## INTRODUCTION

Gather, American Society of Adaptation Professionals, Clean Air Coalition of Western New York, Climate and Energy Project, Connecticut Roundtable on Climate and Jobs, Eastern Rhode Island Conservation District, Emerald Cities Collaborative, Engineers Without Borders, Erie County Restorative Justice Coalition, GreenRoots, Healthy Bourbon County Action Team, City of Oakridge, Racial & Environmental Justice Committee, Rhode Island School Recycling Project, Santa Fe Green Chamber of Commerce, Transportation for Massachusetts, and Urban Sustainability Directors Network (Amici) submit this Amicus Brief pursuant to Local Civil Rule 7(o)(1) in support of Plaintiffs' Motion for a Preliminary Injunction. Amici are community-based organizations and local governments that have been awarded federal grant funds through the Environmental Protection Agency's (EPA) Environmental and Climate Justice Block Grant Program (Block Grant Program) as subgrant awardees of its Thriving Communities Grantmaking Program (TCGM), Thriving Communities Technical Assistance Centers (TCTACs), Government-to-Government Program (G2G), and Community Change Grants (CCGs).[1] As a result of EPA's unlawful and unprecedented wholesale termination of every grant in the Block

---

[1] Decl. of Anne Hayes, Gather, attached as Ex. A; Decl. of Debra Butler, American Society of Adaptation Professionals, attached as Ex. B; Decl. of Chris Murawski, Clean Air Coalition of Western New York, attached as Ex. C; Decl. of Lindsay Hamilton, Climate and Energy Project, attached as Ex. D; Decl. of Allison Pilcher, Connecticut Roundtable on Climate and Jobs, attached as Ex. E; Decl. of Sara Churgin, Eastern Rhode Island Conservation District, attached as Ex. F; Decl. of Meishka L. Mitchell, Emerald Cities Collaborative, attached as Ex. G; Decl. of Clare Haas Claveau, Engineers Without Borders, attached as Ex. H; Decl. of Dina Thompson, Erie County Restorative Justice Coalition, attached as Ex. I; Decl. of Roseann Bongiovanni, GreenRoots, attached as Ex. J; Decl. of Jody Love, Healthy Bourbon County Action Team, attached as Ex. K; Decl. of Bryan Cutchen, City of Oakridge, attached as Ex. L; Decl. of April Brown, Racial & Environmental Justice Committee, attached as Ex. M; Decl. of Warren Heyman, Rhode Island School Recycling Project, attached as Ex. N; Decl. of Glenn Schiffbauer, Santa Fe Green Chamber of Commerce, attached as Ex. O; Decl. of Reggie Ramos, Transportation for Massachusetts, attached as Ex. P; Decl. of Jamal Brown, Urban Sustainability Directors Network, attached as Ex. Q.

Grant Program, Amici have suffered significant harm. Because Amici will continue to suffer harm until the grants are reinstated, Amici strongly support Plaintiffs' motion for a preliminary injunction and urge the Court to enjoin EPA from terminating the Block Grant Program, including the following grants awarded to Amici:

### i.    <u>Thriving Communities Grantmaking Program</u>

The TCGM program provided $600 million in pass-through funding for regional and national grantmakers to issue thousands of subgrants to community-based organizations, local governments, educational institutions, and Native American organizations "to address environmental issues with assessment, planning, or project development activities."[2] EPA created the TCGM program specifically to "alleviate much of the burden that the federal grants process places on small, resource-constrained community-based organizations by streamlining and simplifying the application process."[3]

### ii.    <u>Thriving Communities Technical Assistance Centers</u>

EPA created TCTACs in partnership with the Department of Energy to support the TCGM program. TCTACs assist under-resourced communities with identifying grant funding sources, writing grant proposals, and managing federal grants, as well as providing guidance and

---

[2] EPA, *The Thriving Communities Grantmaking Program*, https://www.epa.gov/inflation-reduction-act/thriving-communities-grantmaking-program (last updated Mar. 21, 2025); Environmental Protection Network, *The Environmental Justice Thriving Communities Grantmaking Program RFPs* (Sept. 21, 2024), https://www.environmentalprotectionnetwork.org/grantmakers-rfps/.

[3] EPA, *The Thriving Communities Grantmaking Program*, https://www.epa.gov/inflation-reduction-act/thriving-communities-grantmaking-program (last updated Mar. 21, 2025).

resources around community engagement, meeting facilitation, and accessibility.[4] EPA awarded $177 million to fund 17 TCTACs across the country.[5]

### iii.     Government-to-Government Program

The G2G program provided $58 million in funding to support government activities that lead to measurable environmental or public health impacts in communities.[6] EPA awarded these grants to partnerships between community organizations and either Tribes or local governments.[7]

### iv.     Community Change Grants

CCGs provided roughly $2 billion to fund "activities to benefit communities through projects that reduce pollution, increase community climate resilience, and build community capacity to address challenges."[8] "These place-based investments focused on community-driven initiatives to be responsive to community and stakeholder input."[9]

---

[4] Plaintiffs' Compl. ¶ 95, *Appalachian Voices, et al. v. United States Environmental Protection Agency, et al.*, 1:25-cv-01982-PLF, (D.D.C. June 25, 2025); EPA, *Biden-Harris Administration Announces $177 Million for 17 New Technical Assistance Centers Across the Nation to Help Communities Access Historic Investments to Advance Environmental Justice* (Apr. 13, 2023), https://perma.cc/KT4B-YZ7E.

[5] Plaintiffs' Compl. ¶ 96, *Appalachian Voices, et al. v. United States Environmental Protection Agency, et al.*, 1:25-cv-01982-PLF, (D.D.C. June 25, 2025); EPA, *Biden-Harris Administration Announces $177 Million for 17 New Technical Assistance Centers Across the Nation to Help Communities Access Historic Investments to Advance Environmental Justice* (Apr. 13, 2023), https://perma.cc/KT4B-YZ7E.

[6] Plaintiffs' Compl. ¶ 91, *Appalachian Voices, et al. v. United States Environmental Protection Agency, et al.*, 1:25-cv-01982-PLF, (D.D.C. June 25, 2025); EPA, *The Government-to-Government Program*, https://www.epa.gov/inflation-reduction-act/government-government-program (last updated Mar. 21, 2025).

[7] *Id.*

[8] EPA, *Inflation Reduction Act Community Change Grants Program*, https://www.epa.gov/inflation-reduction-act/inflation-reduction-act-community-change-grants-program (last updated Mar. 21, 2025).

[9] *Id.*

## INTERESTS OF AMICI CURIAE

Amici, as Block Grant Program subgrantees, received critical pass-through funds from primary grant recipients to address urgent environmental and public health issues in their communities. Amici are varied nonprofit organizations and government entities from across the country, ranging in size, scope of work, and geographic impact. Yet Amici share certain traits. As subgrantees, these organizations were chosen for their expertise, local and systemic knowledge, and meaningful community relationships. Amici were tasked with connecting grant funding directly to the people and projects with the greatest needs. In this role, Amici represent the communities in the community grant programs. Congress specifically appropriated the grant funds to address the urgent public health, environmental, and disparity issues Amici work to address every day across the nation. After receiving the grant awards, Amici immediately got to work to address these issues in their communities, relying on EPA's promise of funding and support. EPA's sudden and unlawful termination of the grant funds has caused irreparable harm to Amici and will continue to cause harm unless the grant program is restored.

Gather has fought food insecurity in New Hampshire since 1816. *See* Ex. A at ¶ 2. Its mission is to offer innovative programs that build food security in welcoming and dignified ways. *Id.* It is the largest food access organization in southern New Hampshire, serving residents across 119 New Hampshire and southern Maine towns. *Id.* at ¶ 3. Gather is a subgrantee of the TCGM program. *Id.* at ¶ 1.

American Society of Adaptation Professionals (ASAP) is a nationwide organization that supports and connects climate adaptation professionals with private organizations, universities, independent consultants, federal employees, and municipalities and works as an intermediary or resource for their climate adaptation projects. *See* Ex. B at ¶ 4. ASAP was formed as a

professional society bridging geographies, disciplines and methodologies throughout diverse and dynamic fields of climate work, with the goal of making applications and processes of adaptation and resilience more efficient. *Id.* ASAP is a subgrantee of a TCTAC Grant. *Id.* at ¶ 5.

Clean Air Coalition of Western New York (CAC) was founded in 2007 in Buffalo, New York, by residents concerned about the environmental health in their neighborhoods, who demanded an active role in the decisions that impacted their communities. *See* Ex. C at ¶ 2. CAC builds power by developing grassroots leaders who organize their communities to run and win environmental justice and public health campaigns in Western New York. *Id.* at ¶ 3. CAC is a subgrantee of a CCG. *Id.* at ¶ 1.

The Climate and Energy Project's (CEP) mission is to build resilience in Kansas through equitable clean energy solutions and climate action. *See* Ex. D at ¶ 2. Its priority issues are climate resilience, clean energy, civic participation, and civic and clean energy policy. *Id.* CEP is a subgrantee of a TCTAC Grant. *Id.* at ¶ 5.

Connecticut Roundtable on Climate and Jobs' (CRCJ) mission is to build alliances among diverse constituencies to combat climate change, create jobs and promote racial, economic, and environmental justice. *See* Ex. E at ¶ 2. Most of its work is in issue advocacy, policy advocacy at the state and local level, coalition-building, community organizing, public education, developing public resources, and stakeholder engagement around issues such as air quality, clean energy, workforce development, and green jobs. *Id.* at ¶ 3. CRCJ is an Anchor Organization and a subgrantee of the TCGM program. *Id.* at ¶ 5.

Eastern Rhode Island Conservation District's (ERICD) vision is to promote and improve long-lasting and environmentally-friendly practices that protect natural resources such as soil, water, and air. *See* Ex. F at ¶ 2. Its mission is to meet that vision through outreach, education,

help with environmental questions, and financial assistance. *Id.* It works with a variety of people and groups including farmers, landowners, cities, towns, schools, and others in the community. *Id.* ERICD is a subgrantee of a CCG. *Id.* at ¶ 1.

Emerald Cities Collaborative (ECC) is a national nonprofit organization that advances racial, economic, and climate justice to build communities that are more equitable, economically just, and sustainable. *See* Ex. G at ¶ 2. Headquartered in Washington, D.C., ECC implements replicable place-based strategies in community and worker powerbuilding, economic inclusion, and equitable implementation throughout the United States. *Id.* at ¶ 3. ECC is a subgrantee of the TCGM program. *Id.* at ¶ 1.

Engineers Without Borders (EWB-USA) works to bring together underserved communities and volunteer engineers to advance local infrastructure solutions in the United States and its territories. *See* Ex. H at ¶ 6. The program brings more than 200,000 technical professionals and students together to serve communities that do not have resources to access engineering services which include agricultural, civil works, energy, information systems, mechanical, structural, waste management, and water supply and sanitation engineering projects. *Id.* EWB-USA is a subgrantee of the TCGM program. *Id.* at ¶ 1.

Erie County Restorative Justice Coalition (ECRJC) is a coming together of people from across Erie County, New York who believe that conflicts are often best resolved by the people involved. *See* Ex. I at ¶ 2. By creating a safe space where all individuals involved in a conflict can come together and discuss what happened, who was harmed, and who bears responsibility for repairing the harm, ECRJC facilitators are helping to change the way their communities address conflict and crime. *Id.* They provide training, consulting, and other support in restorative justice practices, and establish partnerships with communities, schools, courts, and other groups

to help create positive change through dialogue. *Id.* at ¶ 3. They connect communities to resources and, when conflict and crime occur, they have processes to help people navigate through it. *Id.* ECRJC is a subgrantee of a CCG. *Id.* at 1.

GreenRoots is a resident-led, grassroots, community-based organization with 30 years of experience in achieving significant environmental justice accomplishments and public health victories in Chelsea, East Boston, and the Greater Boston region. *See* Ex. J at ¶ 2. GreenRoots' mission is to achieve environmental justice and greater quality of life through collective action, unity, education, and youth leadership across neighborhoods and communities. *Id.* GreenRoots is a subgrantee of the TCGM program. *Id.* at ¶ 1.

Healthy Bourbon County Action Team (HBCAT) is a Kansas-based community-based nonprofit organization that partners with local communities to promote health equity, empower communities, advance workforce development, and encourage economic stability. *See* Ex. K at ¶ 2. HBCAT is a subgrantee of a G2G grant. *Id.* at ¶ 1.

The City of Oakridge is a rural mountain community of approximately 3,300 residents, situated at the edge of the Willamette National Forest in Oregon. *See* Ex. L at ¶ 2. The town has firsthand experience with climate-fueled disasters—wildfire smoke has become an annual burden, and in recent years, Oakridge has twice come under direct wildfire threat. *Id.* During the 2022 Cedar Creek Fire, the city was under evacuation notice for weeks. *Id.* Oakridge is a subgrantee of a CCG. *Id.* at ¶ 1.

Racial & Environmental Justice Committee (REJC) transforms the collective priorities of BIPOC, low-wealth, and frontline communities in Providence and throughout Rhode Island into policy solutions to cultivate a world where everyone lives well without living better at the expense of others. *See* Ex. M at ¶ 2. REJC facilitates co-governance so that decision-making is

shared between communities at the frontlines of environmental and racial injustices and the institutions that formally hold decision-making power. *Id.* REJC is an Anchor Organization and a subgrantee of the TCGM program and the G2G grant program. *Id.* at ¶¶ 1, 14.

Rhode Island School Recycling Project runs a student-led recycling program in Rhode Island public schools. *See* Ex. N at ¶ 3. It teaches students how to sort lunchroom trash to divert healthy, edible food out of the waste stream to food insecure students and families, recycle what can be recycled, and compost food waste. *Id.* In the last three years, the Rhode Island School Recycling Project has diverted 30 tons of edible, healthy food to food insecure students and their families and diverted over 300 tons of waste from the landfill, either to be recycled or composted. *Id.* at ¶ 4. Rhode Island School Recycling Project is a subgrantee of a CCG. *Id.* at ¶ 1.

Santa Fe Green Chamber of Commerce (SFGCC) works to build a sustainable community of local businesses that are environmentally sound, economically viable, and socially responsible through action, advocacy and education. *See* Ex. O at ¶ 4. It advocates for green public policy and issues that support sustainable businesses. *Id.* SFGCC is involved at the city, county, and state levels promoting legislation that benefits its community and membership. *Id.* It actively lobbies for community solar power, clean energy and energy efficiency, as well as issues that promote green jobs and a better business climate in Santa Fe. *Id.* SFGCC is a subgrantee of a TCTAC Grant. *Id.* at ¶ 1.

Transportation for Massachusetts (T4MA) is a statewide coalition focused on improving Massachusetts' transportation systems. *See* Ex. P at ¶ 2. T4MA is committed to addressing the decades of inequitable transportation policies adversely impacting low-income, working class, Black, Indigenous, and communities of color. *Id.* T4MA works towards a Massachusetts with

transportation systems that connect people with their choice of housing, economic opportunities, healthcare, and accessible and reliable public transportation that benefits residents in all of Massachusetts. *Id.* They advocate at the federal, state, and local levels for transportation policies that are just, safe, reliable, accessible, equitable, and affordable. *Id.* at ¶ 3. T4MA is an Anchor Organization and a subgrantee of the TCGM program. *Id.* at ¶¶ 1, 6.

Urban Sustainability Directors Network (USDN) brings local government sustainability practitioners together to learn, collaborate, and accelerate the work of local sustainability. *See* Ex. Q at ¶ 2. By equipping them with the knowledge, resources, and partnerships they need to succeed, USDN helps advance change locally in member communities as well as across the field of practice. *Id.* Its mission is to create equitable, resilient, and sustainable communities by advancing the field of local government sustainability and equipping practitioners to be catalysts of transformative change. *Id.* USDN is a subgrantee of the TCGM program. *Id.* at ¶ 1.

## ARGUMENT

I.  **EPA's Abrupt Termination of the Environmental and Climate Justice Block Grant Program Has Caused Significant Harm and Will Continue to Cause Irreparable Harm to Amici**

Congress created the Block Grant Program to ensure that the benefits of its investments would flow to the "disadvantaged communities" that face the greatest impacts from pollution and environmental degradation and have historically had little voice in the decision-making processes that affect them.[10] In doing so, Congress recognized that community-based organizations are best positioned to address environmental and public health issues in their communities but often lack the resources to do so. It further recognized that the traditional grantmaking process is often too difficult and time-consuming for these groups to access. For

---

[10] 42 U.S.C. § 7438(b)(1); Plaintiff's Compl. ¶ 6, *Appalachian Voices, et al. v. United States Environmental Protection Agency, et al.,* 1:25-cv-01982-PLF, (D.D.C. June 25,2025).

example, the TCGM program was specifically created to "alleviate much of the burden that the federal grants process places on small, resource-constrained community-based organizations."[11]

Amici have used or intended to use the Block Grant Program funds they received for numerous projects and programs that would address issues relating to climate change, climate resilience, environmental injustice, and public health in their communities, as well as to reduce pollution. For example, the City of Oakridge, Oregon was awarded $3.7 million to establish a community resilience hub that would serve Oakridge residents during emergencies such as wildfires, smoke events, and extreme heat. Ex. L at ¶¶ 3-5. The grant would have supported the transformation of a former school building now owned by the city into a critical lifeline during future climate disasters. *Id.*

ECRJC, based in Erie County, New York, was awarded $639,533.39 to support primary recipient PUSH Buffalo in implementing a community emergency disaster preparedness project. Ex. I at ¶¶ 5-6. ECRJC intended to convene and facilitate community neighborhood leaders in emergency preparedness communication and restorative justice practices. *Id.*

GreenRoots, based in Chelsea, Massachusetts, was awarded $175,000 to expand its work on climate justice, urban heat island impact, air quality, and lead poisoning prevention. Ex. J at ¶¶ 6-7. It intended to use the funds, in part, to implement a robust tree planting initiative by planting 150 trees in Chelsea, installing 100 air quality monitors throughout Chelsea, and eliminating lead-pipe service lines from drinking water sources in the city. *Id.* These are crucial initiatives for Chelsea and East Boston, the communities GreenRoots serve, and which bear a disproportionate burden from New England's industrial activities and climate vulnerabilities. *Id.*

---

[11] EPA, *The Thriving Communities Grantmaking Program*, https://www.epa.gov/inflation-reduction-act/thriving-communities-grantmaking-program.

at ¶ 10. Both communities face intensified risks from climate change, with poor air quality, urban heat, coastal flooding, and minimal green spaces exacerbating health and environmental burdens. *Id.*

The Kansas-based CEP was awarded $487,225 to utilize its climate and energy expertise to provide technical assistance on climate resilience and clean energy solutions to communities experiencing environmental justice concerns. Ex. D at ¶¶ 5-6. The grant would have allowed them to serve as a community connector, bringing communities across Kansas who have been redlined and continue to suffer historic harm together and into the technical assistance center. *Id.* at ¶ 6.

Several Amici were awarded funds to address food waste and food insecurity in their communities. Gather, based in Portsmouth, New Hampshire, was awarded $347,155.09 to expand its food recovery initiative called Seacoast Waste Not, which helps divert surplus food from ending up in landfills. Ex. A at ¶¶ 7-9. The surplus food from regional restaurants, caterers, clubs, and industry professionals would have doubled the number of well-balanced meals (90,000 to 180,000+) that it could have created using the recovered food to distribute to hungry residents. *Id.* at ¶ 9. Rhode Island School Recycling Project was awarded $136,000 to expand its student-led recycling program in public schools. Ex. N at ¶ 12. This program teaches students how to sort lunchroom trash to divert healthy, edible food out of the waste stream to food insecure students and families, recycle what can be recycled, and compost food waste. *Id.* at ¶ 3. In the last three years, Rhode Island School Recycling Project has diverted 30 tons of edible, healthy food to food insecure students and their families and diverted over 300 tons of waste from the landfill, either to be recycled or composted. *Id.* at ¶ 4.

Several Amici, including ASAP, CEP, CRCJ, ECC, HBCAT, REJC, SFGCC, and T4MA, provided outreach, technical assistance, and funding for grassroot organizations to apply for grants and implement projects. For example, HBCAT received $296,094 over three years to provide technical assistance to local organizations, including facilitating mini-grants and hosting educational workshops. Ex. K at ¶¶ 8, 12. ECC was awarded $2,767,118 over 33 months to provide technical assistance and mentorship to sub-awardees and regional grantmakers, and to provide sub-awardees and regional grantmakers access to ECC's resources, toolkits, and networks. Ex. G at ¶¶ 8-9. CRCJ was awarded $226,333.03 over three years to connect small, resource-constrained organizations working on environmental justice issues to the subgrant program and related technical assistance opportunities. Ex. E at ¶ 5.

After being awarded Block Grant Program grants, Amici immediately got to work implementing them. They created curricula around the grants, provided educational outreach and community engagement, established partnerships with organizations and vendors, created coalitions, attended numerous meetings, built workshops, and developed intake processes to help organizations apply for grants, hired staff, and engaged consultants.

All this work came to an abrupt halt in the Spring of 2025, when EPA, under direction from President Trump and with no action from Congress, eliminated the Block Grant Program, including the TCGM, TCTAC, G2G, and CCG programs. The sudden and unlawful termination of the Block Grant Program, without warning or cause, has harmed and continues to harm Amici. Amici have lost a combined total of over $14 million from the termination of these grant programs. They have suffered impediments to their internal operations, reputational harms with partner organizations and contractors, and an inability to continue sorely needed programmatic work in their communities.

A.    <u>**Impacts on Program Work**</u>

The sudden termination of these grants, if allowed to continue for the duration of this litigation, will irreparably harm Amici by threatening their ability to continue programmatic work in their communities. *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 244 n.7 (D.D.C. 2014) (finding irreparable harm where nonprofit organizations "may not be driven out of business, but programs they provide may be"). For many Amici, the termination of their grant means the loss of critical infrastructure and potentially lifesaving projects they planned to provide. For example, after the City of Oakridge lost its grant, "the entire project [to build a resilience hub] has unraveled." Ex. L at ¶ 8. Oakridge had to "pause most construction plans, delay contracting efforts, and stall vital community preparedness initiatives." *Id.* This is devastating for a city that is no stranger to climate-fueled disasters as it goes into wildfire season—wildfire smoke has become an annual burden, and in recent years, Oakridge has twice come under direct wildfire threat. *Id.* at ¶ 2. "During the 2022 Cedar Creek Fire, the city was under evacuation notice for weeks, and the limitations of [its] emergency infrastructure were laid bare." *Id.* Climate-fueled disasters like this will continue to become far too common for Oakridge and communities throughout the country as heat waves and extreme weather events become more frequent.

Similarly, EPA's sudden and arbitrary withdrawal of grant funds put other communities at risk. Gather is no longer able to expand its food recovery program, which means more excess food will be thrown into landfills instead of being distributed to food-insecure community members. Ex. A at ¶ 11-12. The grant termination has made it impossible for T4MA to work with other grassroot organizations that provide critical environmental justice work in the communities they serve. Ex. P at ¶ 13. These are the groups that the grant program was specifically meant to

reach and help. *Id.* at ¶ 9. EWB-USA has had to scale back its pre-development engineering services dramatically, "leaving underserved communities hanging in the balance." Ex. H at ¶ 14. "Communities all over the United States, especially in rural areas without the tax bases to fund essential projects," no longer have access to essential technical skills. *Id.* ECC is unable to provide grant funding and support to 100-200 under-resourced community organizations in EPA Regions 1-3. Ex. G at ¶ 18. Because of this, the important work of each of these grassroot organizations will suffer. *Id.*

### B.    Impacts on Internal Operations

The sudden termination of these grants, if left unaddressed by the court, will irreparably harm Amici by impeding their internal operations. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 57 (D.D.C. 2025) (Plaintiffs have suffered irreparable harm by being "forced to dismiss employees, cut essential programs, and pay workers out of their own pockets."); *Clarke v. Off. of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 65 (D.D.C. 2004) ("unrecoverable" economic harms constitute irreparable harm). Amici have had to reduce or eliminate programs, Ex. F at ¶¶ 10-13; Ex. H at ¶¶ 14-15 ("EWB-USA has had to reduce staff capacity to our pre-award levels…When we reduce staff like we have had to do, we lose valuable employees with significant institutional knowledge of the community's needs"); Ex. J at ¶¶ 10-11; Ex. K at ¶ 16; Ex. L at ¶ 8; Ex. M at ¶ 10; Ex. Q at ¶ 10, cut or will have to cut staff, Ex. B at ¶ 15; Ex. C at ¶ 17; Ex. D at ¶ 11; Ex. K at ¶ 19; Ex. M at ¶ 11;  Ex. Q at ¶ 12, and terminate partnerships. Ex. P at ¶ 15. Many have spent money upfront on program development and have not been reimbursed for these costs. Ex. B at ¶ 14; Ex. D at ¶¶ 9-10; Ex. E at ¶ 8 ("We spent $95,543.81 under the grant but have not yet received reimbursement"); Ex. I at ¶ 10; Ex. K at ¶ 14; Ex. M at ¶ 9; Ex. P at ¶ 12. Some Amici have been unable to pay their staff. Ex. E at ¶ 11

("CRCJ staff went seven weeks without pay in early 2025 awaiting our other funding sources to land").

Amici are now spending additional staff time fundraising and submitting grant applications to try to make up for the financial gaps left by the termination of the grant program. *Dist. of Columbia v. U. S. Dep't of Ag.*, 444 F. Supp. 3d 1, 42 (D.D.C. 2020) ("[H]arms from the forced diversion of resources" are irreparable harms); *Open Cmtys. All. et al. v. Carson*, *et al.*, 286 F. Supp. 3d 148, 178 (D.D.C. 2017) (finding irreparable harm where plaintiff has "changed its activities" and "diverted scarce resources away from previously planned projects" due to agency inaction); Ex. A at ¶¶ 13-16; Ex. D at ¶¶ 11-12; Ex. G at ¶ 21; Ex. H at ¶ 17, Ex. I at ¶¶10-14; Ex. P at ¶ 14; Ex. Q at ¶ 10 ("We will be . . . shifting budget items away from programming and into fundraising and development."). This is time that would otherwise be spent advancing Amici's missions and programmatic work. Ex. M at ¶ 22 ("The sense of urgency and stress following the grant termination was so profound that REJC had to pause most of the work we were doing to focus on contingency planning and getting new grants"); Ex. P at ¶ 14 ("When we were selected as Anchor Organization, we had forgone hours that could have been dedicated for other work and opportunities to further the TCGP program because we believed in its transformative potential."); Ex. E at ¶ 9 ("[W]ork on one project limits our ability to work on and seek funding for other projects. [This grant] accounted for 46% of CRCJ's 2025 budget. If not for our work on this program and its significant use of organizational resources, we would have been able to fundraise more for our other programs and campaigns"); Ex. K at ¶ 18 ("I have been devoting almost all of my time towards trying to secure funding, instead of doing the actual important work of HBCAT to improve health and the local economy"); Ex. C at ¶ 20 ("[W]e are spending a significant amount of time trying to raise funds from other sources, instead of doing

the Project work"). Moreover, for many Amici, the Block Grant Program funds were by far the largest grants they had received, and the loss of this funding is difficult, if not impossible, for many organizations to make up. Ex. C at ¶ 12; Ex. J at ¶ 9.

These operational harms have had a significant and negative impact on Amici staff. Ex. C at ¶ 17; Ex. F at ¶ 11 ("The constant fear of being let go has had a profound effect on staff morale at ERICD…I know many of our employees are looking for jobs elsewhere, at organizations that are not reliant on federal funding"); Ex. I at ¶ 13 ("The uncertainty and increased workload caused by this lack of funding has created stress, a sense of insecurity, and other mental health challenges for our staff. It is challenging to retain staff when the work is this hard"); Ex. K at ¶ 19; Ex. Q at ¶ 12 ("The threat of layoffs has created a morale issue at USDN and there is great concern amongst staff that they may lose their jobs, particularly since many partner organizations have already had to let people go").

### C. Reputational Harms

The sudden termination of these grants has irreparably harmed Amici by damaging their reputation and relationships with community partners relying on these funds to fight environmental injustices in their communities. *Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *9-10 (D.D.C. Mar. 12, 2021) ("[B]ecause 'injury to reputation or goodwill is not easily measurable in monetary terms' it is typically 'viewed as irreparable.'" (quoting Wright & Miller's Federal Practice & Procedure Section 2948.1 (3d ed. 1998))); *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (finding a "significant and irreparable" injury where, even if an organization's affiliates survived, "the community connections they have developed are likely to erode"). Ex. B at ¶ 16; Ex. C at ¶ 22; Ex. K at ¶¶ 21-22; Ex. L at ¶¶ 9-10; Ex. M at ¶ 20; Ex. P at ¶¶ 15-16; Ex, O at ¶ 12; Ex. Q at ¶ 11.

Amici have spent years building these relationships through mutual trust and respect. That trust depends on continued follow-through on the promises and commitments that they make. As one Amici has explained, "when resources are promised and then revoked, it is not merely a setback, it deepens the skepticism of our most underserved residents and erodes faith in public investment." Ex. L at ¶ 9. Amici have had to go back on their word, cancel contracts, and communicate to partners, vendors, and the public that they can no longer do the projects they promised. This harm goes far beyond these specific projects. Because Amici rely on community relationships to fulfill their missions, this loss of trust threatens all future work. Ex. K at ¶ 22 ("Many partners feel disillusioned and blindsided, especially those who have already mobilized staff or launched complementary efforts based on the federal commitment. This unexpected reversal has not only damaged morale but also created hesitation around future collaboration — particularly with federally funded initiatives — making it harder to rebuild momentum and restore confidence moving forward").

Additionally, some Amici were seen as "ambassadors" of the grant program because they "encouraged groups to spend time and resources applying for grant money" and "leveraged the trust organizations had in [them] over the years to champion this program." Ex. P at ¶ 15. "The sudden termination of the grant program [] eroded [the groups'] trust in [them]" and "greatly harmed [their] relationship with these groups." *Id.;* Ex. E at ¶ 12 ("CRCJ has suffered reputational and relational harm stemming from the broken trust with communities we pushed towards federal funding opportunities…and who invested their limited resources in developing applications only to have the program vanish unexpectedly"). Amici's relationships with their communities "is [their] most important capital for advancing [their] mission," Ex. P at ¶ 15, and

17

the damage caused by the sudden termination of the grant program and resulting fractured relationships simply cannot be overstated.

Importantly, many community partners came to the Block Grant Program with a pre-existing and legitimate distrust of the federal government that Amici had to work hard to overcome to establish trust and build relationships. "The termination of the grant has eroded the trust of [their] community partners, including tribal communities and community-based organizations. The termination of the grant has reinforced a distrust of government long held by some of these groups, already regularly left out of programs and wary of government promises. The termination of the grant, on the cusp of delivering on promises to many communities, will have long term impacts on these communities, sowing distrust and making it even more difficult to reengage people and repair damaged relationships." Ex. G at ¶ 19. For example, EWB-USA helped an Indigenous community in Chiloquin, Oregon, apply for and win a $16 million grant that was then cancelled. Ex. H at ¶ 16. "These communities have been promised and unpromised so many projects, and while they continue to wait, they will have to suffer the long-term effects of the lack of infrastructure investment, resulting in lost economic opportunities and climate risks." *Id.* Going forward, it will be extremely difficult, if not impossible, for Amici to regain this lost trust.

As a direct result of EPA's abrupt, unlawful, and unprecedented termination of Amici's grant awards, Amici have experienced substantial and overwhelming injuries. In addition to the harms outlined above, Amici's declarations, attached, describe in detail the extent of the injuries and the distinct ways the across-the-board termination has impacted each organization specifically.[12]

---

[12] *See* Amici Decls., attached at Exhibits A – Q.

## II.    The Harm Suffered by Amici Will be Substantially Redressed by Plaintiffs' Motion

Plaintiffs have moved the Court for: ". . . a preliminary injunction that would require EPA to reinstate all grant programs and awards authorized by 42 U.S.C. § 7438, enjoin EPA from any future termination of these programs and awards, and require EPA to provide adequate staffing and administrative resources to operate the affected grant programs."[13] If an injunction is granted and the grant programs and awards are reinstated, the injuries suffered by Amici will be substantially alleviated.[14] In particular, the devastating impacts to program work and overwhelming impacts to internal organizational operations would be largely redressed with a reinstatement of the grant programs and awards. Amici will be able to rehire or retain staff, fill budget gaps, fulfill community promises, rebuild relationships with community partners, and reinstate critical programs in their communities. Amici strongly support Plaintiffs' motion for a preliminary injunction.

## CONCLUSION

The sudden and unlawful termination of the Block Grant Program has irreparably harmed Amici by impairing their internal operations, harming their relationships with partner organizations and contractors, and threatening their ability to continue critical programmatic work in their communities. The injuries to Amici will be redressed in large part by the relief requested in Plaintiffs' motion for a preliminary injunction. For these reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.

---

[13] Plaintiffs' Mem. In Supp. of Mot. for Prelim. Inj. at 41, *Appalachian Voices, et al. v. United States Environmental Protection Agency, et al.*, 1:25-cv-01982-PLF, (D.D.C. June 27, 2025).
[14] *See* Ex. A at ¶ 17; Ex. B at ¶ 19; Ex. C at ¶ 23; Ex. D at ¶ 13; Ex. E at ¶ 14; Ex. F at ¶ 14; Ex. G at ¶ 22; Ex. H at ¶ 20; Ex. I at ¶ 15; Ex. J at ¶ 12; Ex. K at ¶ 24; Ex. L at ¶ 11; Ex. M at ¶ 23; Ex. N at ¶ 15; Ex. O at ¶ 15; Ex. P at ¶ 17; Ex. Q at ¶ 14.

DATED: July 17, 2025                    Respectfully submitted,

*/s/ Chloe C. Fross*
Chloe Fross (D.C. Bar No. MA0048)
Alexandra Enríquez St. Pierre (MA Bar No. 706739)
(*Pro Hac Vice* pending)
Erica Kyzmir-McKeon (N.Y. Bar No. 4987376)
(*Pro Hac Vice* pending)
Rachel Genna Briggs (AK Bar No. 2103012)
(*Pro Hac Vice* pending)
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
Tel: 617-850-1790
Email:    cfross@clf.org
           aestpierre@clf.org
           ekyzmir-mckeon@clf.org
           rbriggs@clf.org

*Counsel for Amici Gather, American Society of Adaptation Professionals, Clean Air Coalition of Western New York, Climate and Energy Project, Connecticut Roundtable on Climate and Jobs, Eastern Rhode Island Conservation District, Emerald Cities Collaborative, Engineers Without Borders, Erie County Restorative Justice Coalition, GreenRoots, Healthy Bourbon County Action Team, City of Oakridge, Racial & Environmental Justice Committee, Rhode Island School Recycling Project, Santa Fe Green Chamber of Commerce, Transportation for Massachusetts, Urban Sustainability Directors Network*

Heidi H. Trimarco (NH Bar No. 266813)
(*Pro Hac Vice* pending)
Conservation Law Foundation
27 North Main Street
Concord, NH 03301-4930
Tel: 603-573-9140
Email:    htrimarco@clf.org

*Counsel for Amicus Transportation for Massachusetts*