**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| APPALACHIAN VOICES, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>*Defendants*. | Civil Action No. 1:25-cv-01982-RJL |

**PLAINTIFFS' SUPPLEMENTAL BRIEFING ON MOOTNESS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

BACKGROUND ..... 2

ARGUMENT ..... 5

I. The OBBBA did not moot Plaintiffs' claims. ..... 5

A. Grant funds were obligated when OBBBA was passed. ..... 6

B. The OBBBA did not apply to grants that became rescinded in the future. ..... 11

II. The September 30 obligation deadline does not make Plaintiffs' claims moot ..... 12

A. Grants were obligated prior to the deadline ..... 12

B. Courts may equitably extend expiration of budget authority ..... 13

C. Defendants' arguments to the contrary are unavailing ..... 14

CONCLUSION ..... 15

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Appalachian Voices v. Trump*,
No. 25-5333 (D.C. Cir. July 21, 2026) ....................4

*Climate United Fund v. Citibank, N.A.*,
184 F.4th 679 (D.C. Cir. 2026) (en banc) ....................1, 5, 8

*Connecticut v. Schweiker*,
684 F.2d 979 (D.C. Cir. 1982) ....................13

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
554 U.S. 33 (2008) ....................11

*Glob. Health Council v. Trump*,
No. 25-00402, 2026 WL 2884272 (D.D.C. Sept. 25, 2026) ....................14

*Goodluck v. Biden*,
104 F.4th 920 (D.C. Cir. 2024) ....................14, 15

*Grupo Mexicano de Desarrollo S.A. v. All Bond Fund, Inc.*
527 U.S. 308 (1999) ....................14

*Harris Cnty., Texas v. Kennedy*,
786 F. Supp. 3d 194 (D.D.C. 2025) ....................6

*Harris County, Texas v. EPA*,
No. 25-cv-3646 (TSC), 2026 WL 2837849 (D.D.C. Sept. 22, 2026) ....................5, 8

*Maine Cmty. Health Options v. United States*,
590 U.S. 296 (2020) ....................12

*Morton v. Mancari*,
417 U.S. 535 (1974) ....................12

*Nat'l Ass'n of Reg'l Councils v. Costle*,
564 F.2d 583 (D.C. Cir. 1977) ....................13, 14

*Nat'l Fair Hous. All. v. U.S. Dep't of Hous. and Urban Dev.*,
No. 25-1965 (SLS), 2025 WL 2105567 (D.D.C. Jul. 28, 2025) ....................13, 14

*Office of Personnel Management v. Richmond*,
496 U.S. 414 (1990) ....................14

*Rhode Island AFL-CIO v. U.S. Env't Prot. Agency*,
No. 25-cv-510-MSM, 2026 WL 2797310 (D.R.I. Sept. 18, 2026) ....................6

*Sustainability Institute v. Trump*, No. 25-cv-2152-RMG (D.S.C. June 11, 2026) ......................2, 5

*Sustainability Institute v. Trump*, No. 25-cv-2152-RMG (D.S.C. July 22, 2026) ..........................5

*Sustainability Institute v. Trump*, No. 26-2040 (4th Cir. Aug. 20, 2026) ......................................5

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
665 F.3d 1339 (D.C. Cir. 2012) ...............................................................................................8

*United States v. Oakland Cannabis Buyers' Co-op*,
532 U.S. 483 (2001) ...............................................................................................................14

*West Virginia Ass'n of Cmty. Health Ctrs., Inc. v. Heckler*,
734 F.2d 1570 (D.C. Cir. 1984) .............................................................................................13

**Federal Statutes**

31 U.S.C. § 1502(b) ...............................................................................................................15

31 U.S.C. §§ 1552-1553 ..........................................................................................................12

42 U.S.C. § 7438(a) ...........................................................................................................12, 13

42 U.S.C § 7438(a)(2) ...............................................................................................................2

42 U.S.C. § 7438(b)(1) ..............................................................................................................2

Continuing Appropriations and Extensions Act, 2027 Pub. L. No. 119-103 § 157,
140 Stat 987, 999 (2026) .........................................................................................................11

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025) ...............................3

**Regulations**

2 C.F.R. 1500, subpt. E ..............................................................................................................2

2 C.F.R. § 200.342 .....................................................................................................................7

2 C.F.R. § 200.344(f) ..................................................................................................................8

2 C.F.R. § 1500.14(c) ...........................................................................................................7, 10

2 C.F.R. § 1500.15 .....................................................................................................................3

2 C.F.R § 1500.17(a)–(d) ......................................................................................................7, 10

48 C.F.R. 52.249-2 ...................................................................................................................10

48 C.F.R. 52.249-2(5) ...............................................................................................................11

70 Fed. Reg. 3629 (January 26, 2005) .......... 7

91 Fed. Reg. 32198 (May 29, 2026) .......... 11

**Other Authorities**

B-198074, 60 Comp. Gen. 591 (1981) .......... 8

Merriam-Webster's Collegiate Dictionary (11th ed. 2014) .......... 11

OMB Circular No. A-11 § 20.5(a) .......... 7

## INTRODUCTION

To evade their mandatory duty to restore the Environmental and Climate Justice Block Grant ("ECJ") program, Defendants argue that there is no money available to do so. But Defendants' arguments are unavailing. As the D.C. Circuit recently recognized, the One Big Beautiful Bill Act ("OBBBA") only rescinded funds that were unobligated at the time the bill was enacted. *Climate United Fund v. Citibank, N.A.*, 184 F.4th 679, 680-81 (D.C. Cir. 2026) (mem) (en banc).[1] The ECJ program grants remained obligated at that time, and indeed many still are—EPA recently averred that over $445 million remains available in its accounts, Ex. 1, Decl. of Travis Voyles at ¶ 9, *Sustainability Institute v. Trump*, No. 25-cv-2152-RMG (D.S.C. July 31, 2026), ECF No. 232-1 ("July 2026 Voyles Decl."), with additional sums available to be recalled from the Office of Management and Budget. *Id*.

Defendants are also wrong that the September 30, 2026, deadline to obligate funds for the ECJ program means relief is no longer available in this case. First, many ECJ program grants were obligated prior to that deadline and remain obligated today. Second, this Court has both equitable and statutory authority to extend the deadline to preserve the status quo and allow the Court to decide the case that is properly before it.

And this Court has minimal work left to do. When Plaintiffs first brought this suit they asked this Court to both vacate Defendants' unlawful action that terminated the ECJ program and to order EPA to "effectuate the grant programs mandated by Section 138 of the Clean Air Act." Compl. Prayer For Relief (Items C, F). That action is now vacated. Order and Opinion at 11,

[1] While only six judges joined this section of the opinion, Judge Srinivason noted that he would also have joined were it not for the fact that the OBBBA repealed the language mandating the Greenhouse Gas Reduction Fund at issue. Because the OBBBA did not repeal the language mandating the ECJ program it is clear that a majority of the en banc court would conclude the statute did not reach grants that were obligated at the time the OBBBA was enacted.

*Sustainability Institute*, No. 25-cv-2152-RMG (D.S.C. June 11, 2026), Dkt. No. 217. Accordingly, all that remains for this Court is to order the requested injunctive relief, i.e. to restore the ECJ program.

**BACKGROUND**

In 2022, Congress created the ECJ Program as part of the Inflation Reduction Act, and ordered the Environmental Protection Agency ("EPA"), to award $2.8 billion in grants for environmental, public health, and resiliency projects that will "benefit disadvantaged communities," 42 U.S.C. §7438(b)(1), and provided an additional $200 million to administer the program, *id*. § 7438(a)(2). Congress mandated that EPA "shall use" the appropriated funds "to award grants" by September 30, 2026. *Id.* § 7438(b)(1). EPA used these funds to develop five grant programs and awarded over 350 grants to Plaintiffs and other local governments and community groups across the country. Compl., Dkt. 1 at ¶¶ 64-65.

Shortly after President Trump came into office on January 20, 2025, EPA first froze—and then terminated—the entire ECJ Program in February of 2025 "for policy reasons." Compl. Ex. 1-A, Decl. of Travis Voyles, Dkt. 1-4 at ¶¶ 3–4. Following this decision—and continuing through, at least, May 2025,[2] EPA sent form letters to grantees, purporting to formally terminate the grants in the ECJ Program. Compl. at ¶ 114. These form letters informed grantees about their rights, provided by EPA's regulations, to dispute EPA's termination decision and explained the process for filing such a dispute, as established by 2 C.F.R. 1500, Subpart E. Compl. Ex. 1-J,

[2] ECJ grantees in *Sustainability Institute v. Trump* did not receive termination letters until late-July 2025. *See, e.g.*, Ex. 2, Suppl. Decl. of Sustainability Inst. at 2, *Sustainability Institute v. Trump*, No. 25-cv-2152-RMG (D.S.C. Mar. 5, 2026), ECF No. 174-2 (supplemental declaration attaching termination letter dated July 28, 2026).

Sample Termination Letter, Dkt. 1-4 at 57 (citing 2 C.F.R. § 1500.15). Many grantees disputed their terminations under this process. *See, e.g.,* Ex. 2, Suppl. Decl. of Sustainability Inst. at 6.

On July 4, 2025, Congress enacted and the President signed into a law a budget reconciliation bill called the One Big Beautiful Bill Act ("OBBBA"), Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025).[3] Among other things, the OBBBA repealed certain provisions of the Inflation Reduction Act and rescinded portions of certain funding appropriated under that act.

However, for the ECJ Program, Congress did not repeal the statutory mandate and rescinded only a subset of the $3 billion originally appropriated. The relevant provision of the One Big Beautiful Bill Act states in full:

> SEC. 60016. RESCISSION OF FUNDING FOR ENVIRONMENTAL AND CLIMATE JUSTICE BLOCK GRANTS.
>
> The *unobligated balances of amounts* made available to carry out Section 138 of the Clean Air Act (42 U.S.C. § 7438) are rescinded.

OBBBA § 60016, 139 Stat. at 156 (emphasis added).

This rescission did not touch funds for grants that were already awarded. As the chair of the House subcommittee with jurisdiction over the ECJ Program explained, rescinding "unobligated balances" "can't rescind expenditures that have already been obligated." Ex. 3, *Markup of Budget Reconciliation Text: Hearing on H.R. 1 Before the H. Comm. on Energy and Commerce* at 8-9 (247:6055-248:6057), 119th Congress 247-48 (May 13, 2025) ("Excerpts of Budget Markup Hearing Transcript") (statements of Rep. Morgan Griffith, then-Chairman, Subcommittee on the Environment). Mr. Griffith recognized that if those funds later became unobligated, they could potentially be subject to a "future recission," but "for purposes of this

[3] Defendants refer to this same piece of legislation as the "Working Families Tax Cuts Act." It is also referred to as H.R. 1.

reconciliation, [Congress] can't look at the crystal ball" and guess at what legislation it might enact "in the future." *Id.* at 8-9.

EPA and the non-partisan Congressional Budget Office operated under the same understanding. According to a recent EPA disclosure, approximately $479 million in ECJ Program funding "was recorded as unobligated in EPA's financial systems on July 4, 2025," when the OBBBA became law. Ex. 1, July 2026 Voyles Decl. at ¶ 7. That is roughly consistent with the CBO's contemporaneous calculations, which reflected that the OBBBA rescinded $516 million from the ECJ program.[4] *See* Ex. 4, Congressional Budget Office, *Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative to CBO's January 2025 Baseline* (June 29, 2025).

By that time, Plaintiffs had already filed this case. They sued in June 2025, challenging the elimination of the ECJ Program and claiming violations of both the Administrative Procedure Act and the Constitution, and moved for a Preliminary Injunction. *See generally* Compl., Dkt. 1; Motion for a Preliminary Injunction, Dkt. 29. Defendants then, on July 14, 2025, moved to dismiss—arguing, in part, that Plaintiffs' claims were moot. Defs. Mot. to Dismiss and Memo. in Opp'n. to Plaintiffs Motion for a Prelim. Inj., Dkt. 66. This Court granted Defendants' motion to dismiss but did not consider the mootness issue. Mem. Op., Dkt. 98.

On appeal, the D.C. Circuit vacated this Court's dismissal order, finding that the Court "erred by reaching the merits of the grantees' constitutional claims before resolving mootness, a jurisdictional issue." Judgment at 2, *Appalachian Voices v. Trump*, No. 25-5333 (D.C. Cir. July 21, 2026), Doc. 2184115. The D.C. Circuit then remanded the case for further proceedings.

---

[4] This slight discrepancy is likely due to the Congressional Budget Office calculations being based on estimates, whereas EPA's was based on actual finalized figures. Regardless, both calculations point to the fact that only a small fraction of funds was rescinded by OBBBA.

In a separate case, in June 2026, the United States District Court for the District of South Carolina vacated EPA's action terminating the ECJ program. That Court considered—and rejected—the Government's argument that the OBBBA mooted the case. Order and Opinion at 3, n. 1, *Sustainability Institute*, No. 25-cv-2152-RMG (D.S.C. June 11, 2026), ECF No. 217. In a later order, that Court directed EPA to take actions to effectuate the ECJ program; and that order was appealed and stayed pending appeal. Order at 2, *Sustainability Institute*, No. 25-cv-2152-RMG (D.S.C. July 22, 2026), ECF No. 227; Order, *Sustainability Institute*, No. 26-2040 (4th Cir. Aug. 20, 2026), ECF No. 32 (granting stay pending appeal). The court's vacatur of EPA's action was not stayed, however, and remains in place. In conjunction with those proceedings, EPA explained that "as of July 28, 2026, EPA's financial systems reflect[ed] $445,664,391.57 in recently deobligated ECJ funding . . . . [which] ha[d] not yet been rescinded[.]"). Ex. 1, July 2026 Voyles Decl. at ¶ 9. In addition, in July there were currently approximately 73 grants "still financially 'open' in EPA's financial system, meaning closeout has not concluded. *Id.* at ¶ 25.

The D.C. Circuit's mandate to vacate this Court's dismissal order was entered on this Court's docket on September 11, 2026. On October 23, 2026, this Court directed the parties to brief the issue of whether this case is moot.

## ARGUMENT

### I. The OBBBA did not moot Plaintiffs' claims.

As the D.C. Circuit recently made clear, recissions in the OBBBA did not affect grants that were "obligated" to grantees at the time of the OBBBA's enactment. *Climate United Fund*, 184 F.4th at 680-81. As courts have concluded in analogous cases, by rescinding "only 'unobligated balances' available to carry out" the ECJ program, "Congress impliedly declined to rescind obligated ones, meaning the provision left funds already obligated to grant recipients undisturbed." *Harris County, Texas v. EPA*, No. 25-cv-3646 (TSC), 2026 WL 2837849, at *7

(D.D.C. Sept. 22, 2026) (analyzing recission of funds for § 134 of the Clean Air Act); *see also Rhode Island AFL-CIO v. U.S. Env't Prot. Agency*, No. 25-cv-510-MSM, 2026 WL 2797310, at *5 (D.R.I. Sept. 18, 2026) (noting that the "more obvious reading" of Congress's intent was that "following the OBBBA, already existing grant awards were to remain in place");[5] *see also Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194, 202 (D.D.C. 2025) (in an analogous setting, finding that where "the Act rescinded only unobligated appropriations, any grants that had already been issued were left undisturbed.").

Indeed, the text of the OBBBA was clear: Congress expressly retained the ECJ program and eliminated only those balances that were "unobligated" at the time the OBBBA was enacted. This discrete action did not—and could not—affect funds associated with grants that had already been awarded, such as the vast majority of ECJ grants, including Plaintiffs'. Thus, the OBBBA did not moot Plaintiffs' claims.

The ordinary meaning and plain text of the statute, longstanding principles of fiscal law and practice, and the context in which the bill was passed make clear the OBBBA only affected a small fraction of the ECJ program.

**A. Grant funds were obligated when OBBBA was passed.**

While EPA claims there is "no dispute" that Plaintiffs' agreements were "formally terminated" by June 2025—this misreads both the Complaint and the law. While it is true that EPA sent "form letters to grantees purporting to formally terminate the grants," Compl. at ¶ 114, that action alone did not—and could not—immediately terminate the grants, nor could it

[5] While EPA had not begun the termination of grants in question in these cases, that is a distinction without a difference. As discussed below, the fact that EPA sent letters to ECJ grantees beginning a termination process did not finalize that process or immediately deobligate funds. As such, the ECJ funds were obligated on July 4, 2025, just as the Greenhouse Gas Reduction and Solar for All funds were in the cited cases.

automatically deobligate the grant funds. Instead, the letters were merely the start of a process that may or may not have ultimately led to termination of any particular grant. If the Court were to accept EPA's position—that a letter purporting to terminate a grant can immediately moot claims about that grant termination—no termination could *ever* be reviewed, and EPA's own appeal regulations would be a nullity.

A brief overview of federal fiscal law makes this clear. The parties agree that when EPA issues a grant agreement, those funds become "obligated" as there is now a "legally binding agreement." *See* OMB Circular No. A-11 § 20.5(a); EPA Opening Br. at 4, Dkt. 119. If EPA wishes to terminate a grant and legally end that agreement, however, it is required to follow a set of binding regulations. These regulations require EPA to provide a grantee "with an opportunity to object and provide information challenging" any termination decision. 2 C.F.R. § 200.342. Accordingly, "[EPA] . . . must comply with any requirements for hearings, appeals, or other administrative proceedings to which the recipient . . . is entitled under any . . . regulation applicable to the action involved." *Id.* Complying with these rules is not optional. EPA has long emphasized that "fair and consistent dispute resolution" is "a central principle of administering EPA's assistance programs." Assistance Agreement Competition-Related Disputes Resolution Procedures, 70 Fed. Reg. 3629, 3630 (January 26, 2005).

The decision to terminate the grant then does not become "final" until after a Dispute Decision Official makes a determination on the merits of any dispute, and the grant agreement remains legally binding until that time. 2 C.F.R. § 1500.14(c) (defining "agency decision"); *id.* § 1500.17(a)–(d) (setting out the process for determination of disputes). As the Comptroller General found in an analogous situation, when a party files a notice of appeal with EPA following a termination decision, funds should "certainly not" be deobligated "prior to the time

that a decision on the propriety" of the termination "has been rendered." B-198074, 60 Comp. Gen. 591 (1981); *see also U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1349–50 (D.C. Cir. 2012) (finding Comptroller General's "expert opinion" persuasive).

Only if the termination decision is upheld may EPA then move on to a lengthy closeout process. In this closeout process, grantees submit a final financial report and make "necessary adjustments to the Federal share of costs." 2 C.F.R. § 200.344(f). Grantees "typically have 120 days" to submit that report. Ex. 5, EPA email at 1, Dkt. 87-1. Only then, once this closeout process is finalized, do any remaining funds become deobligated. As EPA's director of the Office of the Controller put it: "we don't process a deobligation until we get the final financial report." *Id.*; *see also* Ex. 6, *Climate United* Argument Transcript at 2 (Feb. 24, 2026) (Counsel for EPA representing that funds don't "technically get deobligated until closeout is done.").

Thus, just as the D.C. Circuit concluded in *Climate United*, and this court concluded in *Harris County*, EPA's clear and longstanding process to deobligate funds only after an opportunity for appeal and finalization of the closeout process makes clear that the OBBBA did not rescind the majority of grants at issue in the ECJ program. *Climate United Fund*, 184 F.4th at 680-81; *Harris County*, 2026 WL 2837849 at *7. This makes sense because it would not be possible to know whether there remains a legal obligation to pay out the funds in question until after a final decision on termination and closeout costs.

That lengthy process had only just begun when the OBBA was enacted. By that time, many—but not all—ECJ Program grant recipients had received a notice letter beginning a termination process. Many of those recipients administratively contested their terminations to EPA, in addition to filing this case. Few grantees, if any, had closed out their grants by submitting final financial reports. In fact, EPA has acknowledged that even today some grants

"are still financially 'open' in EPA's financial system, meaning closeout has not concluded and deobligation . . . has not been completed." Ex. 1, July 2026 Voyles Decl. at ¶ 25. As a result, the majority of ECJ funds were not rescinded by the OBBBA, which rescinded only "unobligated" balances.

And this reflects what Congress understood at the time. For example, before the vote on the OBBBA, the Congressional Budget Office estimated that the OBBBA would affect just $516 million of the ECJ program, a fraction of its $3 billion appropriation. And this amount roughly tallies with the $479,450,776.11 EPA recently admitted was "recorded as unobligated in EPA's financial systems on July 4, 2025." *Id.* at ¶ 7.

Likewise, during a markup hearing before the House Committee on Energy and Commerce, Representative Morgan Griffith—proponent of the OBBBA and then-Chair of the Subcommittee on the Environment—was asked about the effect of EPA's efforts to terminate grants on the recission proposal. He explained that the OBBBA would not rescind funds tied to grants that had been awarded because Congress "can't rescind expenditures that have already been obligated." Ex. 3, Excerpts of Budget Markup Hearing Transcript at 8-9. If those funds later became unobligated, they could potentially be subject to a "future recission," but "for purposes of this reconciliation, [Congress] can't look at the crystal ball and decide what might happen in the future." *Id.* In other words, additional legislation would be needed for future recissions.

In short, Congress chose the term "unobligated balances," with all its attendant limits, on purpose and the limited recission did not touch Plaintiffs' grant funds nor those obligated to other ECJ grantees at the time the OBBBA was enacted.

For these same reasons, Defendants are also wrong where they suggest that following a termination letter the only funds that remain obligated are funds needed for closeout. EPA

Opening Br. at 6-7. Defendants appear to suggest that deobligation happens in two stages: First, as to the bulk of a grant, the moment a termination letter is sent; and second, as to whatever costs the government might still owe, once the closeout process runs its course. This makes no sense because funds become deobligated not based on speculation but rather only once it is certain that there is no longer a legal obligation to pay the funds and the precise amount of any obligations are known. Defendants cite nothing to support this two-step process and with good reason. As noted above, it incorrectly assumes that every grant that has received a termination letter will in fact be terminated notwithstanding the administrative dispute process. And it requires Congress to guess at the precise outcomes of the closeout process.

Such a scheme would essentially eliminate grantees' established right to appeal grant terminations. It is also unworkable. Until all parties have engaged in a thorough closeout process there is no way to determine how much funding remains owed to a grantee. That is precisely why agencies are required to keep the full set of funds obligated and available until closeout is final. *See* 2 C.F.R. § 1500.14(c) (defining "agency decision"); *id.* § 1500.17(a)–(d) (setting out the process for determination of disputes).

Notably, the termination architecture for these grants is distinct from that of a federal procurement contract, where the Government's broad right to terminate for convenience is included as a mandatory clause in those contracts. 48 C.F.R. 52.249-2, Termination for Convenience of the Government (Fixed Price). When the Government terminates for convenience, the contractor does not have appeal rights—however that regulation provides the contractor a termination settlement remedy that generally compensates the contractor for costs

incurred. *Id.* at 52.249-2(5). EPA's attempt to graft a Termination for Convenience right onto these grant agreements should be rejected.[6]

**B. The OBBBA did not apply to grants that became rescinded in the future.**

To the extent Defendants argue the OBBBA somehow rescinded grant funds that became deobligated *after* the bill was enacted, that is also wrong. As explained above, the plain language of the OBBBA made clear that rescission was limited to funds that were not obligated at the time the bill passed. "Unobligated" is a past participle, that is "'[a] verb form indicating past or completed action.'" *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39 (2008) (quoting American Heritage Dictionary 1287 (4th ed. 2000)). A past participle has "the characteristics of both verb and adjective" and "typically expresses completed action." Merriam-Webster's Collegiate Dictionary at 903, 907 (11th ed. 2014). For example, in interpreting the Bankruptcy Code, the Supreme Court explained that the use of the past participle "confirmed" to modify the noun "plan" is most naturally read to refer to a plan "that has been confirmed in the past," placing a temporal limitation on the statute. *Fla. Dep't of Revenue*, 554 U.S. at 39–41. This is particularly so because it would be simple for Congress to include language making clear that it was intended to have future effect if that was its intent.

The same reasoning here means OBBBA rescinded balances that were unobligated at the time of enactment—not future balances that might later become unobligated. To read the intent of Congress otherwise would amount to a repeal-by-implication—eliminating all funding for all ECJ grants at some point in the future is the same thing as repealing the entire ECJ program. Yet

---

[6] Underscoring that agencies do not currently have this authority, on May 29, 2026, the Office of Management and Budget ("OMB") proposed revisions to the grant termination regulations to provide agencies with the authority to terminate for convenience. *See* Regulation for Federal Financial Assistance, 91 Fed. Reg. 32198 (May 29, 2026). Congress has prohibited OMB from implementing these proposed revisions. *See* Continuing Appropriations and Extensions Act, 2027 Pub. L. No. 119-103 § 157, 140 Stat 987, 999 (2026).

Congress carefully did *not* repeal the statutory text mandating the ECJ program. And "repeals by implication are not favored," *Morton v. Mancari*, 417 U.S. 535, 549 (1974), especially "in the appropriations context." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) (cleaned up).

Plaintiffs do not ask the Court to order EPA to obligate "funds that Congress has rescinded." *See* EPA Opening Br. at 5. Instead, Plaintiffs ask the Court to recognize that Congress only rescinded a small portion of the funds apportioned for the ECJ program—and request the Court to order EPA to restore the Congressionally mandated ECJ program.

## II. The September 30 obligation deadline does not make Plaintiffs' claims moot

Defendants' second argument—that the statutory deadline to obligate funding has now passed, making relief today impossible—also fails. First, there is a significant amount of ECJ funding that was already obligated to grantees before September 30th. Second, this Court may equitably extend the expiration of budgetary authority when, as here, justice so requires.

### A. Grants were obligated prior to the deadline

Defendants argue that because the IRA required ECJ grants to be obligated by September 30, 2026, a date which has now passed, relief is no longer available and this case is moot. EPA Opening Br. at 5-6. This misunderstands the nature of the September 30, 2026 deadline, which requires only that funds be *obligated* by that date—not that all funds be *spent* by that date. 42 U.S.C. § 7438(a) (stating that appropriated funds are "to remain available until September 30, 2026" to award grants). Funds are available for an additional five years after obligation. *See* 31 U.S.C. §§ 1552-1553. As discussed above, the majority of the ECJ funding was obligated by September, 30 2026. And Defendants themselves admit that many of these grants have not yet been closed out. Ex. 1, July 2026 Voyles Decl. at ¶ 25 (noting that "approximately 73 . . . grants are still financially "open" in EPA's financial system, meaning closeout has not concluded").

Because Defendants' action terminating the ECJ program has been held unlawful and vacated, EPA may not rely on its decision to eliminate the ECJ program to close out these grants. Accordingly, these grants remain obligated and may be restored as part of the resurrection of the ECJ program.

**B. Courts may equitably extend expiration of budget authority**

This Court has authority to—and should—equitably extend the expiration of the ECJ Program to preserve the status quo and protect its ability to decide this case because Plaintiffs filed this case well before the expiration of the statutory deadline.

A long line of binding D.C. Circuit precedent recognizes this Court's inherent equitable authority to prevent the expiration of budget authority by suspending the operation of a lapse provision and extending the term of already existing budget authority. *See Nat'l Ass'n of Reg'l Councils v. Costle*, 564 F.2d 583, 588 (D.C. Cir. 1977); *West Virginia Ass'n of Cmty. Health Ctrs., Inc. v. Heckler*, 734 F.2d 1570, 1576-7 (D.C. Cir. 1984); *Nat'l Fair Hous. All. v. U.S. Dep't of Hous. and Urban Dev.*, No. 25-1965 (SLS), 2025 WL 2105567, at *12 n. 4 (D.D.C. Jul. 28, 2025). This authority is based on courts' inherent equitable powers to preserve the status quo of a dispute and to protect their ability to decide a case properly before them. *Connecticut v. Schweiker*, 684 F.2d 979, 997 (D.C. Cir. 1982).

In determining whether it is appropriate to invoke this equitable authority, the critical question is whether the budget authority in question had lapsed before the suit was filed. *Schweiker*, 684 F.2d at 997. Here, Plaintiffs filed their case on June 25, 2025—over 15 months before the budget authority under Section 138 lapsed on September 30, 2026. 42 U.S.C. § 7438(a).

### C. Defendants' arguments to the contrary are unavailing

In arguing against the possibility of equitable extension, EPA ignores this clear precedent. Instead, it cites to a string of distinguishable and inapposite cases to argue that "[t]his Court's equitable authority does not extend to countermanding Congress's statutory command that ECJ program funds must expire at the end of the fiscal year[.]" EPA Opening Br. at 5-6. This argument is simply incorrect.

EPA's primary authority, *Goodluck v. Biden*, has no bearing in the appropriations context. EPA contends that *Goodluck* bars courts sitting in equity from "overrid[ing] clear statutory limits" without identifying "some other statutory authority" permitting such action. EPA Br. at 6, quoting *Goodluck v. Biden*, 104 F.4th 920, 928 (D.C. Cir. 2024). Yet EPA ignores the fact that *Goodluck* was unrelated to appropriations law, and that in *Goodluck*, the D.C. Circuit specifically recognized that in the appropriations context "courts may 'suspend the operation of a lapse provision.'" *Goodluck*, 104 F.4th at 927, *citing Costle*, 564 F.2d at 588. Counsel for EPA recently acknowledged as much in oral argument before the D.C Circuit in *National Fair Housing Alliance*—responding when the Court asked, "Do you think that the *Goodluck* case overruled the *Costle* line of cases?," with "No, I don't think it overruled it. It just criticized it." *Nat'l Fair Hous. All.*, 2025 WL 2105567 at *12, n. 4; *see also Glob. Health Council v. Trump*, No. 25-00402, 2026 WL 2884272 at *6, n. 3 (D.D.C. Sept. 25, 2026) (finding that the court is "bound to follow" *Costle* as it is "circuit precedent").

EPA's remaining cases are easily distinguishable. Neither *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483 (2001) nor *Grupo Mexicano de Desarrollo S.A. v. All Bond Fund, Inc.* 527 U.S. 308 (1999) address this Court's ability to equitably extend a statutory deadline. And while *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990), does

address the interplay between courts of equity and Congressional appropriations, it, too, is silent on the question of equitable extension of statutory deadlines.

EPA also ignores that Congress expressly grants courts the authority to extend the availability of appropriations in exactly the type of case before this court. 31 U.S.C. § 1502(b) provides that a provision of law requiring that the balance of an appropriation be returned to the general fund at the end of a definite period "does not affect the status of lawsuits or rights of action involving the right to an amount payable from the balance." *Id.* Here, too, in a similar case, counsel for EPA recently conceded that under both § 1502(b) and *Goodluck*, "the Court has the authority to extend the availability of appropriations." *See* Ex. 7, Mem. in Opp'n to Mot. for TRO at 11, *Brighton Park Neighborhood Council v. McMahon*, No. 1:25-cv-04523 (SLS) (D.D.C. Dec. 30, 2025).

Thus, under either its broad equitable authority, or under § 1502(b), this Court can, and should, extend the September 30, 2026, statutory deadline for appropriation of funds to preserve the status quo and allow the Court to decide the case properly before it.

## CONCLUSION

For the foregoing reasons, this Court should find this case is not moot and proceed to address Plaintiffs' motion for a preliminary injunction to restore the ECJ grant program.

Dated: November 18, 2026

Respectfully submitted,

*<u>/s/ Ben Grillot</u>*
Ben Grillot (D.C. Bar No. 982114)
Kimberley Hunter (N.C. Bar No. 41333)
(*Pro Hac Vice*)
Irena Como (N.C. Bar No. 51812)
(*Pro Hac Vice*)
James Whitlock (N.C. Bar No. 34304)
(*Pro Hac Vice*)
SOUTHERN ENVIRONMENTAL LAW CENTER

500 New Jersey Ave, Suite 6000
Washington, DC 20001
Telephone: (202) 828-8382
Facsimile: (202) 347-6041
bgrillot@selc.org
kmeyer@selc.org
icomo@selc.org
jwhitlock@selc.org

*Counsel for Appalachian Voices, 2°C Mississippi, Lowcountry Alliance for Model Communities, Parks Alliance of Louisville, Pittsburgh Conservation Corps (d/b/a Landforce) and Southwest Renewal Foundation and Proposed Class Counsel.*

*<u>/s/ Hana V. Vizcarra</u>*
Hana V. Vizcarra (D.C. Bar No. 1011750)
Deena Tumeh (D.C. Bar No. 1741543)
Linnet Davis-Stermitz (WA Bar No. 63190)
(*Pro Hac Vice*)
Andrew Saavedra (N.Y. Bar No. 6062814)
(*Pro Hac Vice*)
EARTHJUSTICE
1250 I Street NW, 4th Floor
Washington, D.C. 20001
(202) 667-4500
hvizcarra@earthjustice.org
dtumeh@earthjustice.org
ldavisstermitz@earthjustice.org
asaavedra@earthjustice.org

*Counsel for Air Alliance Houston, Bessemer Historical Society (d/b/a Steelworks Center of the West), Deep South Center for Environmental Justice, Downwinders at Risk, Health Resources in Action, Institute for Sustainable Communities, Inter-Tribal Council of Michigan, PUSH Buffalo, and WE ACT for Environmental Justice and Proposed Class Counsel.*

*<u>/s/ Toby Merrill</u>*
Toby Merrill† (D.D.C. Bar ID MA0006)
Graham Provost‡ (D.C. Bar No. 1780222)
Elaine Poon‡‡ (VA Bar No. 91963)
(*Pro Hac Vice*)
Cassandra Crawford†† (N.C. Bar No. 45369)

(*Pro Hac Vice*)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
toby@publicrightsproject.org
graham@publicrightsproject.org
elaine@publicrightsproject.org
cassandra@publicrightsproject.org

*Counsel for Allegheny County, Kalamazoo County, King County, Native Village of Kipnuk, City of Sacramento, City and County of San Francisco, City of Springfield and Treasure Island Mobility Management Agency, and Proposed Class Counsel.*

*/s/ Gary DiBianco*
Gary DiBianco (D.C. Bar No. 458669)
Jillian Blanchard (CA Bar No. 203593)
(*Pro Hac Vice*)
Larissa Koehler (CA Bar No. 289581)
(*Pro Hac Vice*)
LAWYERS FOR GOOD GOVERNMENT
6218 Georgia Avenue NW, # 5001
Washington, D.C. 20011
(202) 258-6826
Gary@lawyersforgoodgovernment.org
Jillian@lawyersforgoodgovernment.org
Larissa@lawyersforgoodgovernment.org

*Co-Counsel for Institute for Sustainable Communities, Native Village of Kipnuk, Inter-Tribal Council of Michigan, and Kalamazoo County.*

*/s/ Sara J. Eisenberg*
David Chiu (CA Bar No. 189542)
*San Francisco City Attorney*
Yvonne R. Meré (CA Bar No. 175394)
(*Pro Hac Vice*)
*Chief Deputy City Attorney*
Mollie M. Lee (CA Bar No. 251404)
(*Pro Hac Vice* forthcoming)
*Chief of Strategic Advocacy*
Sara J. Eisenberg (CA Bar No. 269303)
(*Pro Hac Vice*)

*Chief of Complex and Affirmative Litigation*
1390 Market Street, 7th Floor
San Francisco, CA 94102
Telephone: (415) 554-4274
yvonne.mere@sfcityatty.org
mollie.lee@sfcityatty.org
sara.eisenberg@sfcityatty.org

*Counsel for Plaintiffs City and County of San Francisco and Treasure Island Mobility Management Agency.*

*/s/ Christopher M. Sanders*
Christopher M. Sanders
(*Pro Hac Vice*)
General Counsel to the King County Executive
Cristy J. Craig
(*Pro Hac Vice*)
Senior Deputy Prosecuting Attorney
Mika Rothman
(*Pro Hac Vice*)
Deputy General Counsel
OFFICE OF KING COUNTY PROSECUTING ATTORNEY
LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
*chrsanders@kingcounty.gov*
*cristy.craig@kingcounty.gov*
*mrothman@kingcounty.gov*

*Attorneys for Plaintiff Martin Luther King, Jr. County.*

† Admitted in Massachusetts. Not admitted in California.
†† Admitted in North Carolina. Not admitted in California.
‡ Admitted in D.C. Not admitted in California.
‡‡ Admitted in Virginia. Not admitted in California